**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MASSACHUSETTS**

PRESIDENT AND FELLOWS OF
HARVARD COLLEGE; and
MASSACHUSETTS INSTITUTE OF
TECHNOLOGY,

        Plaintiffs,

  v.

UNITED STATES DEPARTMENT OF
HOMELAND SECURITY; U.S.
IMMIGRATION AND CUSTOMS
ENFORCEMENT; CHAD F. WOLF, in his
official capacity as Acting Secretary of the
United States Department of Homeland
Security; and MATTHEW ALBENCE, in his
official capacity as Acting Director of U.S.
Immigration and Customs Enforcement,

        Defendants.

Civil Action No. 1:20-cv-11283

**COMPLAINT FOR DECLARATORY
AND INJUNCTIVE RELIEF**

## INTRODUCTION

1.      On March 13, 2020, President Donald J. Trump declared a national emergency.[1]

By that time, Governor Charles Baker had already announced a state of emergency in the

Commonwealth of Massachusetts, on March 10, 2020.[2]  These orders were issued in recognition

of the fact that the United States, along with the rest of the world, was facing a pandemic without

parallel in recent history.  SARS-CoV-2, the lethal coronavirus that is sweeping the globe, has

forced governments, businesses, and organizations at all levels of society to implement

---

[1] https://www.whitehouse.gov/presidential-actions/proclamation-declaring-national-emergency-concerning-novel-coronavirus-disease-covid-19-outbreak.

[2] https://www.mass.gov/executive-orders/no-591-declaration-of-a-state-of-emergency-to-respond-to-covid-19.

unprecedented protocols to slow the transmission of the virus and mitigate the still-rising death toll from COVID-19, the disease caused by the virus.

2.      The federal government recognized the fact that protection of public safety, together with permitting universities to continue their mission of educating all of their students, depended on those universities' ability to educate students remotely.  On March 13, 2020, this recognition took the form of an "exemption" issued by United States Immigration and Customs Enforcement ("ICE"), a division of the Department of Homeland Security, to a preexisting rule that students in the country on certain nonimmigrant student visas ("F-1" visas) must attend most classes in person.  Recognizing the depth of the emergency and the needs of both students and educational institutions, ICE provided that students holding those nonimmigrant visas could attend remote classes while retaining their visa status.  The government made clear that this arrangement was "in effect for the duration of the emergency."[3]

3.      Since then, numerous universities in the United States, including Harvard University and the Massachusetts Institute of Technology, have offered education to their students remotely.  Given that the pandemic continues to rage, with record numbers of infections in the United States every day, Harvard and MIT concluded, after careful planning processes, that, to protect the health and lives of their students, faculty, staff, and communities, they should offer most of their fall 2020 semester curricula online.  Several other universities across the country have done the same.

4.      The ability to provide remote education during the pandemic is of paramount importance to universities across the country.  COVID-19 is a highly contagious disease that

---

[3] https://www.ice.gov/sites/default/files/documents/Document/2020/Coronavirus%20Guidance_3.13.20.pdf.

spreads from human to human in close contact situations.  Medical evidence and official governmental guidance indicate that indoor gatherings of any size are of particular concern. Densely populated classrooms that are attendant with on-campus instruction have the potential to turn into "super-spreader" situations that endanger the health of not only the university community, but also those in the surrounding areas and anyone else with whom community members may come into contact.  Indeed, in recognition of the exceptional risk of indoor congregation, Harvard has limited undergraduate on-campus residency to 40% of capacity for the upcoming term.  Similarly, MIT has limited undergraduate on-campus residency for the fall to members of the rising senior class and a limited number of additional students.

5.     Immediately after the Fourth of July weekend, ICE threw Harvard and MIT— indeed, virtually all of higher education in the United States—into chaos.  On July 6, 2020, ICE announced that it was rescinding its COVID-19 exemption for international students, requiring all students on F-1 visas whose university curricula are entirely online to depart the country, and barring any such students currently outside the United States from entering or reentering the United States.  ICE also purported to require schools whose classes would be entirely online to submit an "operational change plan" no later than Wednesday, July 15, 2020—nine days after the change was announced.  It also announced that universities that have adopted a hybrid model—a mixture of online and in-person classes—will have to certify for each student on an F-1 visa that the "program is not entirely online, that the student is not taking an entirely online course load for the fall 2020 semester, and that the student is taking the minimum number of online classes required to make normal progress in their degree program."  To do so, universities on a hybrid model will be required to issue a new Form I-20 for each of these students—in some cases, numbering in the thousands per university—by August 4, 2020.

6.      ICE's action proceeded without any indication of having considered the health of students, faculty, university staff, or communities; the reliance of both students and universities on ICE's statements that the preexisting exemptions would be "in effect for the duration of the emergency" posed by the COVID-19 pandemic, which continues to this day; or the absence of other options for universities to provide their curricula to many of their international students. Certainly, no notice-and-comment period was provided.

7.      ICE's action leaves hundreds of thousands of international students with no educational options within the United States.  Just weeks from the start of the fall semester, these students are largely unable to transfer to universities providing on-campus instruction, notwithstanding ICE's suggestion that they might do so to avoid removal from the country. Moreover, for many students, returning to their home countries to participate in online instruction is impossible, impracticable, prohibitively expensive, and/or dangerous.

8.      ICE's action also leaves universities across the country, including Harvard and MIT, in the untenable situation of either moving forward with their carefully calibrated, thoughtful, and difficult decisions to proceed with their curricula fully or largely online in the fall of 2020—which, under ICE's new directive, would undermine the education, safety, and future prospects of their international students and their campus community—or to attempt, with just weeks before classes resume, to provide in-person education despite the grave risk to public health and safety that such a change would entail.

9.      By all appearances, ICE's decision reflects an effort by the federal government to force universities to reopen in-person classes, which would require housing students in densely packed residential halls, notwithstanding the universities' judgment that it is neither safe nor educationally advisable to do so, and to force such a reopening when neither the students nor the universities have sufficient time to react to or address the additional risks to

the health and safety of their communities.  The effect—and perhaps even the goal—is to create as much chaos for universities and international students as possible.

10.     Universities and students have been planning the 2020-2021 academic year for months in reliance on ICE's recognition that the COVID-19 pandemic compelled allowing international students to remain in the country even if their studies had been moved entirely online.  ICE's rescission of that recognition failed to consider numerous weighty interests, and is itself arbitrary and capricious and an abuse of discretion.  Further, ICE's action is procedurally defective under the Administrative Procedure Act.  It should be set aside, and the government required to abide by the guidance it put forward in March and on which universities and students relied in planning a fall semester during an ongoing pandemic.

## THE PARTIES

11.     Plaintiff President and Fellows of Harvard College is a non-profit corporation that is the senior governing board of the organization known as Harvard University ("Harvard"). Harvard is a private research university and the oldest institution of higher learning in the United States.  Located in Cambridge, Massachusetts, it provides undergraduate and graduate instruction and degree programs to more than 23,000 students annually, including nearly 5,000 students who study in the United States on F-1 visas.  Harvard brings this lawsuit on behalf of itself and its F-1 visa-holding students.

12.     Plaintiff Massachusetts Institute of Technology ("MIT") is a non-profit, private research university located in Cambridge, Massachusetts.  It provides graduate and undergraduate instruction to approximately 11,500 students annually, including close to 4,000 students who study in the United States on F-1 visas.  MIT brings this lawsuit on behalf of itself and its F-1 visa-holding students.

13.     Defendant United States Department of Homeland Security is a federal agency of the United States.

14.     Defendant United States Immigration and Customs Enforcement is a division of the United States Department of Homeland Security.

15.     Defendant Chad F. Wolf is the Acting Secretary of the United States Department of Homeland Security.  He is sued in his official capacity.

16.     Defendant Matthew Albence is the Acting Director of United States Immigration and Customs Enforcement.  He is sued in his official capacity.

## JURISDICTION AND VENUE

17.     This Court has jurisdiction over this case pursuant to 28 U.S.C. § 1331 and 5 U.S.C. § 702.  Plaintiffs are persons aggrieved by a final agency action promulgated by Defendants.  *See* 5 U.S.C. § 702.  Plaintiffs bring this suit for declaratory and injunctive relief to set aside Defendants' action as contrary to law and arbitrary and capricious, *see id.* §§ 705, 706, presenting a federal question, *see* 28 U.S.C. § 1331.

18.     Venue is proper in this Court because Plaintiffs reside in this District and no real property is involved.  28 U.S.C. § 1391(e)(1).

19.     Plaintiffs have standing to bring this case.  Defendants' actions will cause an imminent, concrete, and irreparable risk to Plaintiffs' ability to achieve their educational missions unless halted by this Court.

20.     Plaintiffs also have standing to assert claims on behalf of their F-1 visa-holding students, who face the imminent, concrete, and irreparable risk of harm to themselves, their families, their educations, their short-term and long-term health, and their future education and employment prospects if Defendants' actions are not halted by this Court.

21.     This Court is authorized to grant the requested injunctive relief pursuant to

Federal Rule of Civil Procedure 65 and 5 U.S.C. § 705.


**FACTS**

**The COVID-19 Pandemic**

22.     On March 13, 2020, President Donald J. Trump declared a national emergency in

response to the COVID-19 pandemic.

23.     SARS-CoV-2, which causes the COVID-19 illness, is easily transmitted.   The

numbers of confirmed cases and deaths from COVID-19 have grown exponentially in the United

States since January 2020, and are expected to continue to grow exponentially over the coming

months.

24.     All human beings share a risk of contracting and, upon contraction, transmitting

the virus that causes COVID-19.  Any adult who contracts the virus may experience life-

threatening symptoms, lifelong health consequences, and death.

25.     New information regarding this virus is released daily by public health

authorities.  People who experience serious cases of COVID-19 and do not die face the prospect

of prolonged recovery, including the need for extensive rehabilitation for profound

reconditioning, loss of digits, permanent neurologic damage, and the irreversible loss of

respiratory capacity.

26.     People can also carry and spread the novel coronavirus but be asymptomatic or

pre-symptomatic, making testing or seclusion of only those who are symptomatic an ineffective

solution.

27.     There is no vaccine against COVID-19, nor is there any known medication to

prevent infection.  The most effective measures to reduce the risk are to attempt to prevent

vulnerable populations from being infected in the first place, and to limit community spread. Physical distancing, or remaining physically separated from known or potentially infected individuals, and vigilant sanitation and hygiene are the most effective measures for protecting people from contracting the novel coronavirus.

28.     Evidence indicates that the most likely means of transmission of the coronavirus that causes COVID-19 is through close human-to-human contact, especially indoors.  This presents a particular risk for university campuses.  Crowded classrooms, dining facilities, and dormitories are commonplace features of ordinary campus life and could lead to large-scale outbreaks of COVID-19 until the pandemic subsides.

29.     Nationally, projections by the United States Centers for Disease Control and Prevention ("CDC") indicate that more than 200 million people in the United States could be infected with the novel coronavirus over the course of the pandemic, and the most severe projections envision as many as 1.5 million deaths.

30.     Efforts to contain the spread of this highly contagious disease have included broad shutdowns of society.  On March 16, 2020, the CDC and members of the national Coronavirus Task Force issued guidance advising individuals to adopt far-reaching physical distancing measures, such as working from home, avoiding shopping trips and gatherings of more than 10 people, and staying away from bars, restaurants, and food courts.[4]

31.     Following this advice, many states, including Massachusetts, recognized the need to take steps to protect the health and safety of their residents from human-to-human and surface-to-human spread of COVID-19.  They accordingly issued orders suspending or severely curtailing operations of non-essential businesses, schools, and other locations where individuals congregate.

---

[4] https://www.whitehouse.gov/wp-content/uploads/2020/03/03.16.20_coronavirus-guidance_8.5x11_315PM.pdf.

32.     Notwithstanding these mitigation measures, COVID-19 cases continue to rise

nationwide.  New cases in Massachusetts have begun to level off, but the Commonwealth's

current guidance reflects a general policy of continued caution, and a particular concern with

indoor gatherings.[5]  Moreover, states that have relaxed physical distancing measures, including by

allowing indoor gatherings and the opening of locations where individuals congregate—such as

Texas, Arizona, and Florida—are now seeing renewed surges and record-setting numbers of

COVID-19 cases, hospitalizations, and deaths.

33.     To date, there have been more than 3 million confirmed cases of COVID-19 in

the United States, which have caused more than 131,000 deaths.[6]

### ICE's Initial Response to the Pandemic

34.     International students may attend American universities on nonimmigrant F-1

visas.  Eligibility to maintain F-1 status is governed by 8 C.F.R. § 214.2.

35.     Students on F-1 visas must pursue a "full course of study" during their stay in the

United States.  8 C.F.R. § 214.2(f)(5)(i).

36.     The regulation defines the extent to which online courses may count toward the

full course of study requirement.  8 C.F.R. § 214.2(f)(6)(i)(G) provides:  "For F-1 students

enrolled in classes for credit or classroom hours, no more than the equivalent of one class or three

credits per session, term, semester, trimester, or quarter may be counted toward the full course of

study requirement if the class is taken on-line or through distance education and does not require

the student's physical attendance for classes, examination or other purposes integral to completion

---

[5] *See generally* COVID-19 Public Health Guidance and Directives, https://www.mass.gov/info-details/covid-19-public-health-guidance-and-directives (last visited July 7, 2020).

[6] *Coronavirus in the U.S.:  Latest Map and Case Count*, N.Y. Times, https://www.nytimes.com/interactive/2020/us/coronavirus-us-cases.html [https://perma.cc/25D3-UPBH] (last visited July 7, 2020).

of the class.  An on-line or distance education course is a course that is offered principally

through the use of television, audio, or computer transmission including open broadcast, closed

circuit, cable, microwave, or satellite, audio conferencing, or computer conferencing.  If the F-1

student's course of study is in a language study program, no on-line or distance education classes

may be considered to count toward a student's full course of study requirement."

37.     On March 13, 2020, the Student and Exchange Visitor Program ("SEVP"), a

division of ICE, in recognition of the extraordinary circumstances posed by the COVID-19

pandemic and in response to "inquiries concerning the proper status" of international students in

the United States on academic visas "who may have [to] face slightly different scenarios related

to emergency procedures implemented by SEVP-certified learning institutions" issued guidance

concerning F-1 students' ability to maintain their visa status (the "March 13 Guidance").[7]

38.     As relevant here, the March 13 Guidance addressed students attending a school

that "temporarily stops in-person classes but implements online or alternate learning procedures."

The Guidance directed students to "participate in online or other alternate learning procedures and

remain in active status" with SEVP.  Accordingly, students could participate in remote learning

implemented as a result of the pandemic—either in the United States or abroad—while retaining

their visa status.

39.     The March 13 Guidance indicated that it was a "temporary provision" that would

remain "***in effect for the duration of the emergency***."  (Emphasis added.)  SEVP also noted that

the situation was "***fluid***" and "***difficult***" and that "SEVP will continue to monitor the COVID-19

situation and will adjust its guidance ***as needed***."  (Emphases added.)

---

[7] https://www.ice.gov/sites/default/files/documents/Document/2020/Coronavirus%20Guidance_
3.13.20.pdf.

40.      The President's national emergency declaration has not been rescinded or

terminated.  An emergency in fact continues to persist, as daily COVID-19 cases in the United

States have never significantly decreased and have recently begun spiking in several regions.

41.      Notwithstanding the March 13 Guidance's statement that it would remain "in

effect for the duration of the emergency," on June 4, 2020 SEVP issued a "Frequently Asked

Questions" document asserting that "SEVP has not issued guidance to international students and

schools for the fall semester."[8]

### Harvard's and MIT's Response to the Pandemic

42.      Both Harvard and MIT substantially closed their campuses and transitioned to

online instruction in March 2020.  Over the spring and summer, Harvard and MIT each

individually engaged in careful, deliberative planning processes that prioritized the health and

safety of students, faculty, and staff, as well as the universities' institutional objectives of

delivering educational services and a meaningful experience to their students.  Harvard and MIT

undertook this planning in part in reliance on SEVP's statement in the March 13 Guidance that,

because of the pandemic, students with F-1 visas would not be required to attend in-person

classes in order to retain their visa status, and that the exemption for F-1 students would remain

"in effect for the duration of the emergency."

43.      Since March 2020, Harvard has engaged eight formal committees and groups to

inform its response to the pandemic, including a University Coronavirus Advisory Group advising

on approaches for limiting viral transmission on campus; a Harvard University Health System

Medical Expert Advisory Group advising on COVID-19 issues relating to health services for the

University; a Face Mask Committee advising on how to provide adequate and effective face

---

[8] https://web.archive.org/web/20200605003435/https://www.ice.gov/doclib/coronavirus/covid19faq
.pdf.

masks for on-campus community members; and a Testing and Tracing Committee convened to consider how best to apply testing and contact tracing practices to protect the community, as and when students, faculty, and staff returned to campus.

44.     Similarly, since March 2020, MIT deployed a series of working groups to analyze its (1) short and medium term, (2) ongoing, and (3) long term responses to the pandemic.  Among these groups was a team of senior faculty and administrators charged by MIT's senior leadership with examining options and making recommendations for the 2020-2021 academic year.  This group drew heavily on public health leaders in all areas of government.  It also engaged the community and resulted in a detailed report published to the MIT community on June 12, 2020 summarizing MIT's options based on input from public health and medical experts, guidance from local and state government officials, and consultations with students, faculty, and staff.

45.     In addition to these formal structures, Harvard and MIT have consulted on an ongoing basis with epidemiologists, medical experts, industry experts, and others on a wide range of topics relevant to returning students to campus and protecting their safety during instruction.

46.     Based on months of study and consultation, the Harvard Graduate School of Design, the Harvard T.H. Chan School of Public Health, Harvard Law School, Harvard Divinity School, and the Harvard Kennedy School of Government announced on June 3, 2020, that all graduate instruction in the fall 2020 semester, beginning September 3, 2020 would take place online.  That same day, the Harvard Graduate School of Education announced that all graduate instruction in the 2020-2021 academic year, beginning September 3, 2020, would take place online.  The Harvard Faculty of Arts and Sciences announced its decision to offer undergraduate instruction for the 2020-2021 academic year fully online on July 6, 2020.  Despite offering coursework entirely online, Harvard is offering on-campus housing to undergraduate students, prioritizing first-year students and those students who are unable to engage effectively in remote

learning from their homes, based on their limited access to technology, socio-economic status, and other considerations.  No more than 40% of undergraduate students will be allowed to return to campus in the fall 2020 term.

47.     On July 7, 2020, MIT announced that it would implement a hybrid on-campus and online program for the 2020-2021 academic year.  Specifically, seniors and a limited number of other students with particular needs will be allowed to return to campus.  Students living on campus will take classes online, with some in-person instruction primarily for seniors.  Students living off campus will be offered instruction entirely online and will not be permitted to access campus.  Graduate programs will vary in the provision of online and in-person instruction.

48.     For both Harvard and MIT, increasing the number of in-person sessions beyond those currently planned would increase the risk to faculty, staff, and students of contracting COVID-19.

49.     While most faculty members are able to provide instruction remotely under the current distance-learning plans, increased in-person sessions would place these instructors in danger of contracting COVID-19.

50.     The median age of the faculty members of Harvard's Faculty of Arts and Sciences is over 60 years old.  According to the CDC, older adults are at highest risk for severe illness from COVID-19, meaning they are more likely to "require hospitalization, intensive care, or a ventilator to help them breathe, or they may even die."[9]

51.     Dozens of faculty members are advisors to local, state, and international efforts to mitigate the COVID-19 pandemic.  Putting these faculty members at increased risk jeopardizes their ability to help society respond to the coronavirus crisis.

---

[9] https://www.cdc.gov/coronavirus/2019-ncov/need-extra-precautions/older-adults.html.

52.     Both Harvard and MIT intend for their faculty members to focus on providing robust and meaningful learning experiences through the online medium.  Requiring those faculty to plan for a potential adjustment to greater on-campus instruction now would substantially detract from that focus.

53.     Were Harvard or MIT compelled to increase the number of in-person sessions beyond those currently planned, it would also increase the risk to staff members—including facilities workers, janitorial staff, support staff, and others—of contracting COVID-19 through increased interactions with students and other faculty and staff.  Most of these staff members reside outside of the immediate vicinity of their workplaces and are at risk of spreading the virus across the greater Boston area.

54.     Students will also be at an increased risk of contracting COVID-19 if Harvard and MIT are compelled to provide more in-person sessions than currently planned.

55.     Students, too, relied on the March 13 Guidance.  Many students have already incurred substantial, irretrievable costs associated with attending college in the 2020-2021 academic year.  Students have taken out loans, made travel arrangements to move to or near campuses, and entered leases for housing arrangements there.

**Without Warning, ICE Announces That It Will End The COVID-19 Exemptions**

56.     On July 6, 2020, without employing notice and comment rulemaking, or even giving students or universities any indication that it was considering revising its policy, SEVP issued a document (the "July 6 Directive"), attached as Exhibit 1,[10] which an accompanying "News Release" described as announcing "modifications … to temporary exemptions for nonimmigrant students taking online classes due to the pandemic for the fall 2020 semester."[11]

---

[10] https://www.ice.gov/doclib/sevis/pdf/bcm2007-01.pdf.

[11] https://www.ice.gov/news/releases/sevp-modifies-temporary-exemptions-nonimmigrant-

57.     The July 6 Directive provided that: "Nonimmigrant F-1 … students attending schools operating entirely online may *not* take a full online course load and remain in the United States.  The U.S. Department of State will not issue visas to students enrolled in schools and/or programs that are fully online for the fall semester nor will U.S. Customs and Border Protection permit these students to enter the United States."  (Emphasis in original.)

58.     Moreover, the July 6 Directive ordered that "[a]ctive students currently in the United States enrolled in such programs must depart the country or take other measures, such as transferring to a school with in-person instruction to remain in lawful status.  If not, they may face immigration consequences including, but not limited to, the initiation of removal proceedings."

59.     The July 6 Directive indicated that the "U.S. Department of Homeland Security plans to publish the procedures and responsibilities … in the near future as a Temporary Final Rule in the Federal Register."  As of the filing of this Complaint, no procedures or responsibilities have been published in the Federal Register.

60.     The July 6 Directive further directed that "[s]chools that offer *entirely online classes or programs* or *will not reopen* for the fall 2020 semester *must* complete an operational change plan and submit it to" SEVP "no later than Wednesday, July 15, 2020."  (Emphasis in original.)

61.     Moreover, the July 6 Directive stated "[s]tudents attending schools offering a hybrid model—that is, a mixture of online and in person classes—will be allowed to take more than one class or three credit hours online," provided that for each such student, the school "certif[ies] to SEVP, through the Form I-20, 'Certificate of Eligibility for Nonimmigrant Student Status,' that the program is not entirely online, that the student is not taking an entirely online

students-taking-online-courses-during.

course load this semester, and that the student is taking the minimum number of online classes required to make normal progress in their degree program."  Compliance with this requirement would require the university to issue a new Form I-20 for each of its potentially thousands of students on F-1 visas and to do so within 21 business days of the July 6 Directive.  Doing so is not only unduly burdensome, but, in many cases, impossible because students are generally not required to register for particular classes until closer to the start of the semester.

62.     Neither the July 6 Directive nor its accompanying "News Release" or updated "Frequently Asked Questions"[12] document indicates any consideration of the multitude of factors relevant and important to ICE's decision to force students holding F-1 visas to attend classes in person as a condition of maintaining their visa status—including when their school has decided to provide classes online only in order to safeguard the health of students, faculty, staff, and the surrounding community.

63.     ICE's Directive reveals no consideration of its action's impact on the health of students, faculty, staff, or the surrounding communities.

64.     Further, ICE's action of July 6 does not account for the reality that the COVID-19 pandemic continues to this day, and that record daily numbers of infections are being reported in the United States.

65.     ICE's action also did not account for the reliance of both students and universities on ICE's statements in the March 13 Guidance that the exemptions it announced were due to the COVID-19 pandemic and would be "in effect for the duration of the emergency."

66.     In fact, the July 6 Directive describes the exemptions given in the March 13 Guidance as allowances made "during the height of the Coronavirus Disease (COVID-19)

---

[12] https://www.ice.gov/doclib/coronavirus/covid19faq.pdf.

crisis"—entirely disregarding the fact that the present rate of documented cases of infection across the country exceeds those of mid-March by a considerable amount.  And that rate continues to climb.

67.     The agency also did not consider the absence of other options by which universities affected by the COVID-19 pandemic and concerned for their students' health and welfare might provide their curricula to F-1 students.

68.     The July 6 Directive will harm continuing F-1 students immensely.  For many students affected by the July 6 Directive, it is infeasible or impossible to attempt to transfer to a program that offers in-person curriculum and therefore allows them to pursue their education from within the United States on F-1 visa status.  These students will therefore likely be forced to leave the country.  The consequences of this sudden displacement are both financial and personal. In addition to incurring substantial expenses to make international travel arrangements in the midst of a pandemic that has significantly reduced the availability of air travel, as well as losing their homes—in many instances at great cost associated with broken leases—some students will be forced to upend their young children's lives by returning to their home countries, while others' families will be split apart in order to comply with the July 6 Directive.

69.     For continuing F-1 students enrolled in a hybrid program who are currently outside of the United States, if the students cannot return to the United States either because of travel restrictions or an inability to get an F-1 entry visa because of the suspension of consular processing of visa applications—all of which were instituted in response to the COVID-19 emergency and remain in effect to this day—these students will lose their F-1 status by the terms of July 6 Directive.  In turn, these students would lose their ability to pursue pre-completion internship and experiential learning opportunities, as well as their eligibility for work allowances

in summer and fall 2021, because of the requirement that students maintain F-1 status for the full academic year preceding their access to practical training.  *See* 8 C.F.R. § 214.2(f)(10).

70.     For F-1 students enrolled in a fully online program, under the July 6 Directive those students cannot lawfully remain in the United States to continue their studies.  Unless this Court intervenes, these students will be required to make precipitous arrangements to return to their home countries amid a worldwide pandemic that has caused nations to close their borders and has considerably limited international travel options.  They must abandon housing arrangements they have made, breach leases, pay exorbitant air fares, and risk COVID-19 infection on transoceanic flights.  And if their departure is not timely, they risk detention by immigration authorities and formal removal from the country that may bar their return to the United States for ten years.  8 U.S.C. § 1182(a)(9).

71.     While students could participate in that program from outside the United States, they may have their research and learning inhibited by time zone variations, unavailable, unreliable, or state-managed Internet connections, and other barriers to online learning.  Still other students simply cannot participate in online learning in their home countries.  For example, some Harvard and MIT students are from Syria, where civil war and an ongoing humanitarian crisis make Internet access and study all but impossible.  Others come from Ethiopia, where the government has a practice of suspending all Internet access for extended periods, including presently, starting on June 30, 2020.  The value of the education offered by Plaintiffs hinges on the diversity of perspective offered by these international students.  Rendering their participation impossible or insignificant will impair the educational experience for all Harvard and MIT students.  Moreover, Harvard and MIT also depend on some F-1 graduate students for teaching support in their undergraduate programs.  Requiring these students to provide instruction from remote locations in their home countries, potentially with considerable time-zone disparities and

variable Internet connectivity, will make it harder for faculty to coordinate with their student

teaching aides and obtain the full benefit of their pedagogy.

72.     The July 6 Directive will make continued study at Harvard and MIT

impracticable for a sizable portion of the universities' F-1 visa students.  The loss of the ability to

perform research or fieldwork, or even participate in basic coursework under reasonable

conditions, will force many students to interrupt their studies.  Many students risk losing their

ability to access work allowances because of the requirement that students maintain F-1 status for

the full academic year preceding their access to practical training.  *See* 8 C.F.R. § 214.2(f)(10).

This will significantly disrupt those students' career plans and opportunities, further undermining

the value of the educational experience that Harvard and MIT can provide to F-1 visa students.  It

can be reasonably expected that many students will take leaves of absences or withdraw from

Harvard and MIT as a direct result of the July 6 Directive.

73.     The July 6 Directive will also cause immense harm to Harvard and MIT.   Many

of Harvard's curricular programs depend on the presence and diversity of international students.

The curriculum at Harvard's Kennedy School of Government, for example, depends on the

perspectives of international students, including mid-career public officials from around the world

who bring unique viewpoints about different approaches to governance and policy.

74.     By threatening to force many F-1 students to withdraw from Harvard and MIT,

Defendants have put both schools to an impossible choice:  lose numerous students who bring

immense benefits to the school or take steps to retain those students through in-person classes,

even when those steps contradict each school's judgment about how best to protect the health of

the students, faculty, staff, and the entire university community.

75.     Indeed, the Administration has acknowledged that ICE's decision is designed

to force universities to conduct in-person classes notwithstanding universities' and public

health officials' considered judgments that it is neither safe nor educationally advisable to do so.[13]  As Acting Deputy Secretary of Homeland Security Kenneth T. Cuccinelli stated on July 7, 2020, the ICE Directive "will … encourage schools to reopen."[14]  ICE's decision also reflects the Administration's continued efforts to limit and reduce the presence of F-1 international students in the United States.

## CLAIMS FOR RELIEF

### Count I (Violation of Administrative Procedure Act, 5 U.S.C. § 706)
*The July 6 Directive Is Arbitrary And Capricious Because It Fails To Consider Important Aspects Of The Problem Before The Agency*

76.     Plaintiffs incorporate by reference the allegations of the preceding paragraphs.

77.     The APA requires this Court to hold unlawful and set aside any agency action that is "arbitrary, capricious, an abuse of discretion … or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A).  Agency action that is not the product of reasoned decisionmaking is arbitrary and capricious.  *Motor Vehicle Mfrs. Ass'n of United States, Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983).  An agency that "entirely fail[s] to consider an important aspect of the problem" before it has acted in an arbitrary and capricious manner.  *Id.*; *see also Department of Homeland Sec. v. Regents of the Univ. of Calif.*, No. 18-587, 2020 WL 3271746, at *13 (U.S. June 18, 2020).

78.     The July 6 Directive is arbitrary and capricious because it "entirely fail[s] to consider … important aspect[s] of the problem" before ICE.  *State Farm*, 463 U.S. at 43.  For one, the July 6 Directive entirely fails to consider the significant effects that it will have on universities that have invested considerable time and effort in developing plans for the 2020-2021

---

[13] https://twitter.com/realDonaldTrump/status/1280209946085339136?s=20.

[14] https://thehill.com/homenews/administration/506248-cuccinelli-says-rule-forcing-international-students-to-return-home.

academic year—plans that carefully balance the health and safety of faculty, students, and staff, with their core mission of educating students.  The July 6 Directive likewise fails to consider the devastating effects that it will have on international students who will be forced to leave the United States or will be unable to enter to take classes, or those who will not be able to return to their home—or any—country.

79.     The July 6 Directive is also arbitrary and capricious because it "fail[s] to address" the "serious reliance interests" that ICE's repeated prior guidance on this issue engendered. *Regents*, 2020 WL 3271746, at \*14; *Encino Motorcars, LLC v. Navarro*, 136 S. Ct. 2117, 2126 (2016).  As the Supreme Court recently explained, "[w]hen an agency changes course, as DHS did here, it must be cognizant" of "serious reliance interests" that its prior approach has "engendered."  *Regents*, 2020 WL 3271746, at \*14.  "It would be arbitrary and capricious to ignore such matters."  *Id.*  Yet that is exactly what the July 6 Directive does.  It departs from prior guidance that ICE issued on this subject—including its explicit statement on March 13 that the exemptions for F-1 visa holders due to COVID-19 would be "in effect for the duration of the emergency"—without any reasoned basis for the sudden and dramatic change of position.

80.     For these reasons and others, the July 6 Directive must be vacated and "set aside" as "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law."  5 U.S.C. § 706(2)(A).

### Count II (Violation of Administrative Procedure Act, 5 U.S.C. § 706)
*The July 6 Directive Is Arbitrary And Capricious Because It Fails To*
*Offer Any Reasoned Basis That Could Justify The Policy*

81.     Plaintiffs incorporate by reference the allegations of the preceding paragraphs.

82.     As noted above, the APA requires this Court to hold unlawful and set aside agency action that is "arbitrary, capricious, … or otherwise not in accordance with law," 5 U.S.C. § 706(2)(A), including agency action that is not the product of reasoned decisionmaking.  *State*

*Farm*, 463 U.S. at 43.  To satisfy that core requirement of reasoned decisionmaking, an agency must "cogently explain why it has exercised its discretion in a given manner."  *Id.* at 48.

83.     The July 6 Directive fails this statutory requirement.  The July 6 Directive reflects virtually no reasoned decisionmaking.  It identifies a purported "need to resume the carefully balanced protections implemented by federal regulations," but it does not provide any reasoning why the agency perceives such a need to exist, nor why any resumption of the regime set out in federal regulations must begin in less than two months, while the COVID-19 pandemic continues to rage and the national state of emergency remains in effect.

84.     Indeed, the lack of any real justification for the July 6 Directive on its face "reveal[s] a significant mismatch between the [July 6 Directive] and the rationale … provided," *Department of Commerce v. New York*, 139 S. Ct. 2551, 2775 (2019), raising the prospect that the July 6 Directive is being used as a cudgel to compel universities to alter their plans for the fall.

85.     For these reasons and others, the July 6 Directive must be vacated and "set aside" as "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law."  5 U.S.C. § 706(2)(A).

### Count III (Violation of Administrative Procedure Act, 5 U.S.C. §§ 553, 706)
#### *The July 6 Directive Violates The APA's Requirement Of Notice-And-Comment Rulemaking*

86.     Plaintiffs incorporate by reference the allegations of the preceding paragraphs.

87.     The APA requires this Court to hold unlawful and set aside any agency action taken "without observance of procedure required by law."  5 U.S.C. § 706(2)(D).

88.     The APA, 5 U.S.C. § 553, requires (with certain exceptions not applicable here) that agencies publish notice of any proposed substantive rule in advance in the Federal Register, and that the public is given an opportunity to comment on proposed rules before they take effect.

89.     The July 6 Directive issued by ICE is a "rule" within the meaning of the APA because it is an "agency statement of general or particular applicability and future effect designed to implement, interpret, or prescribe law or policy."  5 U.S.C. § 551(4).

90.     The July 6 Directive is not an "interpretative rule[], general statement[] of policy, or rule[] of agency organization, procedure, or practice."  5 U.S.C. § 553(b).  To the contrary, it is a substantive rule that alters students' and universities' rights and obligations under the law.

91.     Absent "good cause" for not doing so, ICE was required to provide notice of its proposal, an opportunity for public comment, and an explanation of the rule ultimately adopted, *see* 5 U.S.C. § 553(b), (c)—none of which it has done.

92.     ICE has made no reasoned "good cause" finding for failing to follow the APA's procedural requirements here, nor could it.

93.     Because ICE promulgated the July 6 Directive without notice and comment, in violation of 5 U.S.C. § 553, it and the modifications it announced are unlawful and must be vacated.

## PRAYER FOR RELIEF

Wherefore, Plaintiffs respectfully seek the following relief:

1.     A temporary restraining order and preliminary and permanent injunctive relief preventing Defendants from enforcing the policy announced in ICE's July 6 Directive, or promulgating it as a Final Rule;

2.     An order vacating and setting aside the policy announced in the July 6 Directive and reinstating the March 13 Guidance;

3.     A declaration that the policy announced in the July 6 Directive is unlawful;

4.     An order awarding Plaintiffs their costs and attorney's fees; and

5.     Any and all other such relief as the Court may deem appropriate.

Dated:          July 8, 2020

By: /s/ Felicia H. Ellsworth

William F. Lee (BBO #291960)
Mark C. Fleming (BBO #639358)
Felicia H. Ellsworth (BBO #665358)
WILMER CUTLER PICKERING
    HALE AND DORR LLP
60 State Street
Boston, MA 02109
Tel.: (617) 526-6000

Seth P. Waxman (*pro hac vice forthcoming*)
Paul R.Q. Wolfson (*pro hac vice forthcoming*)
Ari Holtzblatt (*pro hac vice forthcoming*)
WILMER CUTLER PICKERING
    HALE AND DORR LLP
1875 Pennsylvania Avenue, N.W.
Washington, D.C. 20006
Tel.: (202) 663-6000