**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MASSACHUSETTS**

| | |
|---|---|
| PRESIDENT AND FELLOWS OF HARVARD COLLEGE; and MASSACHUSETTS INSTITUTE OF TECHNOLOGY, <br><br> Plaintiffs, <br><br> v. <br><br> UNITED STATES DEPARTMENT OF HOMELAND SECURITY; U.S. IMMIGRATION AND CUSTOMS ENFORCEMENT; CHAD F. WOLF, in his official capacity as Acting Secretary of the United States Department of Homeland Security; and MATTHEW ALBENCE, in his official capacity as Acting Director of U.S. Immigration and Customs Enforcement, <br><br> Defendants. | Civil Action No. 1:20-cv-11283 |

**MEMORANDUM OF LAW IN SUPPORT OF PLAINTIFFS'**
**<u>MOTION FOR TEMPORARY RESTRAINING ORDER</u>**

# TABLE OF CONTENTS

Page

TABLE OF AUTHORITIES ................................................................................ ii

INTRODUCTION ..............................................................................................1

STATEMENT ...................................................................................................3

    A.    The COVID-19 Pandemic ...................................................... 3

    B.    ICE's Response To The Pandemic ........................................... 3

    C.    Harvard's And MIT's Response To The Pandemic ..................... 4

    D.    Effects On Harvard And MIT Students .................................... 6

    E.    ICE's Surprise About-Face ................................................... 7

LEGAL STANDARD ..........................................................................................8

ARGUMENT ....................................................................................................9

I.    PLAINTIFFS ARE LIKELY TO SUCCEED ON THE MERITS .....................................9

    A.    The Directive Is Arbitrary And Capricious Because It Fails To Consider Either The Harms That The Change Would Impose Or Plaintiffs' Reliance On ICE's Prior Policy .......................................... 9

    B.    The Directive Is Arbitrary And Capricious Because ICE Has Failed To Articulate Any Plausible Rationale That Could Justify It ................... 13

    C.    The Directive Violates The APA's Notice-And-Comment Requirement ........... 16

II.    PLAINTIFFS WILL BE IRREPARABLY INJURED ABSENT EMERGENCY RELIEF .....................17

III.    THE REMAINING EQUITABLE FACTORS ALSO FAVOR GRANTING A TEMPORARY RESTRAINING ORDER ................................................. 19

CONCLUSION .................................................................................................20

# TABLE OF AUTHORITIES

**Page(s)**

## CASES

*Amerijet Int'l, Inc. v. Pistole*,
   753 F.3d 1343 (D.C. Cir. 2014) ................................................................... 13

*Bruns v. Mayhew*,
   750 F.3d 61 (1st Cir. 2014) ............................................................................ 8

*Chrysler Corp. v. Brown*,
   441 U.S. 281 (1979) ...................................................................................... 16

*Commerce Bank & Trade Co. v. Prop. Administrators, Inc.*,
   252 F. Supp. 3d 14 (D. Mass. 2017) ............................................................... 8

*Dep't of Commerce v. New York*,
   139 S. Ct. 2551 (2019) ..................................................................... 13, 14, 15

*Dep't of Homeland Sec. v. Regents of the Univ. of California*,
   No. 18-587, 2020 WL 3271746 (U.S. June 18, 2020) .................... 9, 10, 12, 13

*Devitri v. Cronen*,
   289 F. Supp. 3d 287 (D. Mass. 2018) ........................................................... 19

*Encino Motorcars, LLC v. Navarro*,
   136 S. Ct. 2117 (2016) ............................................................................ 12, 13

*Levesque v. Block*,
   732 F.2d 175 (1st Cir. 1983) ........................................................................ 17

*Michigan v. EPA*,
   135 S. Ct. 2699 (2015) ............................................................................ 10, 15

*Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*,
   463 U.S. 29 (1983) .......................................................................................... 9

*New Hampshire Hospital Ass'n v. Azar*,
   887 F.3d 62 (1st Cir. 2018) .................................................................... 16, 17

*Perez v. Mortgage Bankers Ass'n*,
   575 U.S. 92 (2015) ........................................................................................ 17

*Rio Grande Cmty. Health Ctr., Inc. v. Rullan*,
   397 F.3d 56 (1st Cir. 2005) .......................................................................... 17

*United States v. Valverde*,
    628 F.3d 1159 (9th Cir. 2010) ........................................................................ 17

*Winter v. Natural Resources Defenses Council, Inc.*,
    555 U.S. 7 (2008) ............................................................................................ 8

## STATUTES AND REGULATIONS

5 U.S.C.
    § 551 ................................................................................................................ 16
    § 553 ......................................................................................................... 16, 17
    § 706 ........................................................................................................... 9, 16

8 U.S.C. § 1101 ........................................................................................................ 3

8 C.F.R. § 214.2 ...................................................................................................... 3

## OTHER AUTHORITIES

Bowden, *Cuccinelli Says Rule Forcing International Students To Return Home Will
    'Encourage Schools To Reopen,'* The Hill, July 7, 2020,
    https://thehill.com/homenews/administration/506248-cuccinelli-says-rule-forcing-
    international-students-to-return-home ............................................... 15, 16, 20

*Coronavirus in the United States: Latest Map and Case Count*, N.Y. Times,
    https://www.nytimes.com/interactive/2020/us/coronavirus-us-cases.html ..................... 14

**INTRODUCTION**

On July 6, 2020, U.S. Immigration and Customs Enforcement ("ICE") promulgated a policy that is as cruel as it is capricious.  If allowed to stand, ICE's policy would bar hundreds of thousands of international students at American universities from the United States in the midst of their undergraduate or graduate studies.  The policy would also force American universities into an impossible choice: lose these students, who bring enormous benefits to their schools and our country; or act contrary to their considered judgments about how best to protect the health of their students, faculty, staff, and the surrounding public, potentially jeopardizing the health of the entire university community and beyond.  ICE's policy is supported by neither logic nor law, and the Court should enter a temporary restraining order against it.

In March 2020, recognizing that the United States faced a pandemic without parallel in recent history, colleges and universities across the country concluded that they could only protect the health and safety of their student bodies and further their educational missions by making recourse to remote instruction.  In apparent acknowledgment of this reality, ICE promulgated guidance establishing an "exemption" to a preexisting rule that required students in the United States on certain nonimmigrant student visas—known as "F-1" visas—to attend classes in person.  Since March, hundreds of universities, including Harvard and MIT, have taught their students remotely.  While the pandemic continued to rage through June—with record numbers of infections in the United States every day—Harvard and MIT each engaged in a deliberate, months-long planning process, culminating in operational plans that will permit them to prioritize the health and safety of the communities they serve by offering most or all of their fall semester courses online.  Several other universities have done the same.

Immediately after Independence Day, however, ICE pulled the rug out.  On July 6, ICE

1

announced it would rescind its COVID-19 exemption for F-1 students, stating in no uncertain terms that students on F-1 visas whose university curricula are entirely online due to COVID-19 must depart the country, and that those already outside the United States may not reenter.  The July 6 directive also requires students on F-1 visas whose university curricula provide a mixture of in-person and online offerings to be enrolled in at least some in-person courses, effectively requiring those students to be present in the United States (and in crowded classrooms) or lose their visa status.  ICE also required entirely-online schools to submit an "operational change plan" by Wednesday, July 15—nine days after the change was announced—and to require schools offering a hybrid model to provide an updated certification of eligibility as to each student holding an F-1 visa by August 4—just 21 business days after the change was announced.

ICE's directive betrays no indication that the agency gave any consideration to the health of students, faculty, staff, or university communities; the reliance of students and universities on ICE's statements that the exemptions were due to the COVID-19 pandemic that continues to this day; or the absence of other options for universities to provide their curricula to many of their international students.  Rather, ICE's decision reflects a naked effort by the federal government to force universities to reopen all in-person classes notwithstanding their informed judgment that it is neither safe nor advisable to do so.  The effect—perhaps even the goal—is to create chaos for schools and international students alike.  Universities have been planning the 2020-2021 academic year for months in reliance on ICE's conclusion that the unprecedented COVID-19 pandemic requires permitting students on F-1 visas to study online in this country.  ICE's stunning reversal of its own decision failed to consider numerous weighty interests and is itself therefore arbitrary and capricious and an abuse of discretion.

The Court should enter a temporary restraining order preventing the government from

2

implementing its rescission, pending briefing and decision of a preliminary injunction motion.

## STATEMENT

### A.      The COVID-19 Pandemic

The Court is familiar with COVID-19, as well as the difficulties the pandemic has posed

for the normal operations of businesses, educational institutions, and virtually every other aspect

of daily life.  COVID-19 is easily transmitted, and the numbers of confirmed cases and deaths

from it have grown exponentially in the United States since January 2020, and are expected to

continue to do so.  University campuses provide a particularly heightened risk for transmission

of the coronavirus that causes COVID-19, because the crowded classrooms, dining facilities, and

dormitories that are commonplace features of ordinary campus life could cause large-scale

outbreaks of COVID-19 until the pandemic subsides.  Notwithstanding mitigation measures,

cases continue to rise nationwide, and to date there have been more than 3 million confirmed

cases of COVID-19 and more than 130,000 deaths.

### B.      ICE's Response To The Pandemic

International students can obtain F-1 visas to attend American universities.  Eligibility to

maintain F-1 status is governed by 8 U.S.C. § 1101(a)(15)(F)(i), which requires students to enroll

in a "full course of study," and 8 C.F.R. § 214.2(f), which generally limits the number of online

credits that a visa holder may enroll in per term.  *See* 8 C.F.R. § 214.2(f)(6)(i)(G) (limiting the

number of credits for an F-1 visa to "one class or three credits per session").

In the early stages of the pandemic, the federal government recognized that many

universities would be able to protect their students' health and safety—while continuing to carry

out their missions—only by teaching students remotely.  Accordingly, on March 9, 2020, ICE's

Student and Exchange Visitor Program ("SEVP") division issued a guidance document

recognizing the "fluid and rapidly changing" nature of the situation and stating that the agency

"intend[ed] to be flexible with temporary adaptations," including "online instruction."  Ex. 1 at 1, 3 ("March 9 Guidance").[1]  Four days later, the division issued another guidance document expressly exempting F-1 visa holders from the rule that they must attend most classes in person. Ex. 2 at 1 ("March 13 Guidance").  ICE stated that students holding F-1 visas could attend remote classes while retaining their visa status, and made clear that this arrangement was "in effect for the duration of the emergency."  *Id.*

### C.      Harvard's And MIT's Responses To The Pandemic

In light of the rapidly developing pandemic, Harvard and MIT substantially closed their campuses and transitioned to online instruction in March 2020.  Over the spring and summer, Harvard and MIT each individually engaged in careful, deliberative processes that assigned priority to the safety of students, faculty, staff, and the community, as well as their institutional objectives of continuing to deliver educational services and a meaningful experience to their students.  *See* Garber Decl. ¶¶ 6-9; Barnhart Decl. ¶¶ 6-13.  Harvard and MIT undertook this planning in part in reliance on SEVP's statement in the March 13 Guidance that, because of the pandemic, students on F-1 visas would not be required to attend in-person classes, and that the exemption for these students would remain "in effect for the duration of the emergency."  March 13 Guidance at 1.  *See* Elliott Decl. ¶ 5; Barnhart Decl. ¶ 12.

Since March 2020, Harvard and MIT each established working groups to inform their responses to the pandemic.  Harvard has established eight formal committees and groups to inform its response to the pandemic, including groups advising on approaches for limiting viral transmission on campus and a committee to advise on how to ensure adequate and effective

---

[1] "Ex." citations refer to exhibits to the Declaration of Felicia H. Ellsworth in Support of Plaintiffs' Motion for a Temporary Restraining Order.

contact tracing for on-campus community members.  Garber Decl. ¶ 7.  Similarly, MIT has created working groups on all aspects of its response, including a team of senior faculty and administrators charged by MIT's senior leadership with examining options and making recommendations for the 2020-2021 academic year.  Barnhart Decl. ¶ 7.  Both institutions have collaborated with state and local officials as well as other institutions in Massachusetts to analyze their respective responses to the pandemic.  Garber Decl. ¶ 8; Barnhart Decl. ¶ 8.

On June 3, 2020, Harvard announced that the majority of its graduate instruction in the fall 2020 semester would take place online, and on July 6, 2020, the Harvard Faculty of Arts and Sciences announced its decision to offer undergraduate instruction for the 2020-2021 academic year fully online.  Garber Decl. ¶¶ 15-16.  Harvard is offering limited on-campus housing to undergraduate students, prioritizing those students who are unable to engage effectively in remote learning from their homes, based on their limited access to technology, socioeconomic adversity, and other considerations.  *Id.* ¶ 16.  No more than 40% of undergraduate students will be allowed to return to campus in the fall 2020 term.  *Id.*

On July 7, 2020, MIT announced that it would implement a hybrid on-campus and online program for the 2020-2021 academic year.  Barnhart Decl. ¶¶ 13-14.  Specifically, seniors and a limited number of other undergraduate students with particular needs will be allowed on campus in the fall.  *Id.* ¶ 14.  Students on campus will be offered online classes, with some in-person instruction.  *Id.*  Students off campus will be offered instruction entirely online.  *Id.*  Graduate programs will offer varied amounts of in-person and online instruction.  *Id.*

Harvard and MIT reached those decisions after four months of extensive deliberation and consultation with experts, faculty, staff, students, and community members.  They cannot easily reverse course now, only weeks before the fall semester, to create plans that include increased in-

person sessions, nor is it their judgment that they could do so without increased risk. *See* Garber Decl. ¶ 17; Barnhart Decl. ¶¶ 16, 20. Both Harvard and MIT intend for their faculty members to focus on providing robust and meaningful learning experiences through online media. Requiring those faculty to plan for a potential adjustment to on-campus instruction now would substantially detract from that focus. Harvard and MIT made a considered judgment that increasing the numbers of in-person sessions beyond those planned would pose risks not only to students, but also to faculty, staff members, and contractors—including facilities workers, janitorial staff, support staff, and others—of contracting COVID-19 through increased interactions with students and other faculty and staff. *See* Garber Decl. ¶¶ 11-13; Barnhart Decl. ¶ 16.

### D.  Effects On Harvard And MIT Students

Students have also relied on the March 13 Guidance in making arrangements for their education in the fall. *See* Elliott Decl. ¶ 12; Barnhart Decl. ¶¶ 19-20. Many students have already incurred substantial, irrecoverable costs associated with attending college in the 2020-2021 academic year. Students have taken out loans, made travel arrangements to move to or near campuses, and entered leases for housing arrangements.

Moreover, for many students who have remained in the United States during the pandemic in reliance on ICE's March 13 guidance, returning to their home countries may be impractical or extremely burdensome due to travel restrictions, family obligations, or prohibitive cost. Barnhart Decl. ¶ 19. Students who are able to arrange and afford a return home confront the possibility of lengthy flights, where they may be exposed to COVID-infected passengers. Even if students are able to return safely to their home countries, a considerable share of them will face insurmountable hurdles to participating in online instruction, ranging from inadequate, unreliable, or state-managed Internet access, to time zone differences, to personal risks arising from civil unrest or other issues. *See* Elliott Decl. ¶ 12; Barnhart Decl. ¶¶ 19-21, 25-26.

Of the international students who returned abroad during the COVID-19 pandemic, many cannot return to the United States to participate in hybrid or in-person instruction due to travel restrictions imposed by the federal government or an inability to obtain reissue of visa stamps due to the State Department's continued suspension of consular processing of visa applications. Elliott Decl. ¶ 13; Barnhart Decl. ¶ 27.  These restrictive measures were introduced due to the pandemic emergency, and they remain in place presumably because the emergency persists.

As a general matter, students must be present in the United States pursuing a full-time course of study in order to retain their F-1 status.  Losing F-1 status would have considerable downstream effects for international students.  Many plan to begin their careers, or even to pursue employment opportunities during their course of study, using the Optional Practical Training ("OPT") program, which allows eligible students to receive up to 12 months of employment authorization before and/or after completing their academic studies, or STEM OPT, which allows students who have earned a degree in certain science, technology, engineering, and math fields to apply for a 24-month extension of their post-completion OPT employment authorization if certain other criteria are met.  *See* Elliott Decl. ¶ 13; Barnhart Decl. ¶¶ 23-24.  To take advantage of the OPT program, students must be lawfully enrolled on a full-time basis for one full academic year prior to requesting OPT status.  Students who lose their F-1 status are required to start over from scratch; that is, they must reestablish F-1 status and accrue the full academic year in F-1 status from the date it was reinitiated.

### E.    ICE's Surprise About-Face

On July 6, ICE abruptly changed course, throwing higher education institutions like Harvard and MIT into chaos and causing significant anxiety among international students.  ICE announced it was rescinding its COVID-19 exemption for international students, requiring all students on F-1 visas whose curricula are entirely online due to COVID-19 to depart the country

if they are currently present, and barring any such students currently abroad from entering or

reentering the United States.  Ex. 3 at 1 ("July 6 Directive").  ICE also required schools whose

classes would be entirely online to submit an "operational change plan" no later than

Wednesday, July 15, 2020—nine days after the change was announced—and required

universities to file a new form with the agency for each of its thousands of students on F-1 visas

by August 4, 2020.  *Id.* at 3.

ICE announced this sea change without notice or comment and without any explanation

of its consideration of the health of students, faculty, university staff, or the surrounding

communities, the reliance of both students and universities on ICE's statements that the

exemptions would be "in effect for the duration of the emergency" posed by COVID-19, or the

absence of other options for universities to provide their curriculum to many of their

international students.  Even though the COVID-19 pandemic is still ongoing—indeed, it is

increasing throughout the nation—ICE's decision means to force universities to conduct in-

person classes notwithstanding university and public health officials' judgment that it is neither

safe nor educationally advisable to do so.

## LEGAL STANDARD

A court evaluating a motion for a temporary restraining order considers the traditional

four factors for emergency relief: (1) the likelihood the movant will succeed on the merits; (2)

whether the movant is likely to suffer irreparable harm in the absence of preliminary relief; (3)

the balance of equities; and (4) whether an injunction is in the public interest.  *Commerce Bank*

*& Tr. Co. v. Prop. Administrators, Inc.*, 252 F. Supp. 3d 14, 16 (D. Mass. 2017); *see Winter v.*

*Natural Resources Defenses Council, Inc.*, 555 U.S. 7, 20 (2008); *Bruns v. Mayhew*, 750 F.3d

61, 65 (1st Cir. 2014).  All four factors are satisfied here.

## ARGUMENT

### I.     PLAINTIFFS ARE LIKELY TO SUCCEED ON THE MERITS

Plaintiffs are likely to succeed on the merits of their claims.  The Administrative

Procedure Act (APA) directs courts to "set aside" agency action that is "arbitrary, capricious,

[or] an abuse of discretion," or that is taken "without observance of procedure required by law."

5 U.S.C. § 706(2)(A), (D).  The July 6 Directive fails these basic statutory requirements, for at

least three reasons.  First, the Directive "entirely fail[s] to consider … important aspect[s] of the

problem," *Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29,

43 (1983), namely (a) the significant harms imposed on universities and students by ICE's

change in position and (b) the reliance interests engendered by ICE's prior statements taking the

contrary position.  Second, the Directive does not identify *any* reasoned explanation, much less

one that could justify ICE's decision.  Finally, the Directive violates the APA's notice-and-

comment rulemaking requirement.

### A.     The Directive Is Arbitrary And Capricious Because It Fails To Consider Either The Harms That The Change Would Impose Or Plaintiffs' Reliance On ICE's Prior Policy

Plaintiffs are likely to succeed on their claim that the July 6 Directive is arbitrary and

capricious because it "entirely fail[s] to consider … important aspect[s] of the problem."  *State*

*Farm*, 463 U.S. at 43; *see also Dep't of Homeland Sec. v. Regents of the Univ. of California*, No.

18-587, 2020 WL 3271746, at *11 (U.S. June 18, 2020).  The Directive's abrupt about-face

regarding the legal regime governing international students in the United States will have

profound effects on Plaintiffs and their international student populations—forcing Plaintiffs to

abruptly reconsider plans that they drew up over a months-long process to protect the health and

safety of their community members, and imposing devastating consequences on international

students who will be forced to leave the United States or be barred from returning in the fall.  But

the Directive contains no evidence *at all* that ICE considered these significant effects in devising

its new policy—or the fact that Plaintiffs and their students had relied on ICE's own prior policy

in formulating their fall plans.  ICE may not announce such a dramatic policy shift "without any

consideration whatsoever" of these effects.  *Regents*, 2020 WL 3271746, at *13.  "That alone"

renders the Directive arbitrary and capricious, requiring vacatur.  *Id.* at *14.

1.      The policy announced by the Directive will certainly impose significant harms on

Plaintiffs and their students, faculty, and staff.  It is a basic rule of administrative law that an

agency must "pay[] attention to the advantages *and* the disadvantages of [its] decisions."

*Michigan v. EPA*, 135 S. Ct. 2699, 2707 (2015).  But the Directive reflects no consideration of

the considerable harms that ICE's new policy imposes on Plaintiffs and their students, faculty,

and staff.

For one, the policy announced by the Directive will require Plaintiffs to reconsider plans

that they have spent months drafting with the input of a broad array of experts and that are

designed to protect the safety and health of all of their community members—and to do so only

weeks before the fall semester begins.  Since March 2020, Harvard and MIT have engaged in

extensive deliberative processes.  *See* Garber Decl. ¶ 6; Barnhart Decl. ¶¶ 6-10.  Harvard, for

instance, convened eight formal committees and groups to inform its response to the pandemic,

including a Coronavirus Advisory Group that advised the University on approaches for limiting

viral transmission on campus and a Medical Expert Advisory Group that advised the University

on COVID issues relating to health services.  Garber Decl. ¶ 7.  MIT has likewise established a

series of working groups to analyze the impact of the pandemic and develop plans for the 2020-

2021 academic year, and engaged in robust consultation with the community and health experts.

Barnhart Decl. ¶¶ 6-7.  Based on these extensive efforts, Harvard concluded that the vast

majority of its degree-granting schools would not be able to safely implement university-wide in-person learning for the fall semester.  Garber Decl. ¶ 15.  MIT concluded that most of its classes could not safely be offered in-person on a university-wide basis.  Barnhart Decl. ¶¶ 13-14.

The policy announced by the Directive wholly upends Plaintiffs' plans, as well as similar plans formulated by other colleges and universities across the country.  As of July 6, ICE's policy requires both Harvard and MIT either to go back to the drawing board and draft new operational plans only weeks before students were scheduled to begin the fall semester or to absorb the considerable academic disruption, community health risk, and additional cost inflicted by ICE's go-home order.  After months of careful planning, Plaintiffs cannot be expected to turn on a dime, overhaul their physical plants, and develop and implement COVID-safe plans based on university-wide in-person instruction.  Garber Decl. ¶ 17; Barnhart Decl. ¶¶ 16, 20.  In effectively requiring both schools to implement such new measures, the Directive imposes a substantial (and, as explained below, irreparable) harm on Plaintiffs themselves.

ICE's new policy also imposes devastating harms on international students.  If Plaintiffs do not alter their operational plans, ICE's new policy will leave thousands of international students enrolled at both Plaintiff institutions without meaningful access to educational resources in the fall semester—a semester that is now only weeks away.  For instance, there are students at both institutions who remained in the United States after Plaintiffs shifted to online education in the spring—whether because those students' home countries were unsafe, travel restrictions would bar them from reentry to the United States if they left, or they simply had no home to which they could return.  *See* Elliott Decl. ¶¶ 12-13; Barnhart Decl. ¶¶ 19-21, 26-27.  Other students simply *cannot* participate in online learning in their home countries.  Some are from countries like Syria or Ethiopia, in which civil war or other crises have made Internet access and

study all but impossible.  Others might be drafted in their home countries, might face threats or abuse based on their sexual orientation, or might not be able to access mental health treatments. These students will be unable to learn if ICE's new policy goes into effect.  They cannot transfer to other educational institutions at this late date, so they will be forced to forfeit their education-based visas and return to their countries of origin—in many cases returning to conditions of social unrest, economic instability, or other threats to their continued safety.

The Directive contains no indication that the agency considered any of these substantial harms that its policy change would impose on Plaintiffs and their students.  Because it "should have considered those matters but did not," its "failure was arbitrary and capricious in light of the APA."  *Regents*, 2020 WL 3271746, at *15.

2.      As importantly, the Directive does not reflect any consideration of the "serious reliance interests" that ICE engendered by previously—and repeatedly—stating in formal agency guidance that international students could remain in the United States while taking classes online.  *Regents*, 2020 WL 3271746, at *14; *Encino Motorcars, LLC v. Navarro*, 136 S. Ct. 2117, 2126 (2016).  As discussed, *supra* pp. 3-4, on March 9, 2020, SEVP issued a guidance document stating the agency's policy to permit "temporary adaptations"—including shifts to "online instruction"—that universities might take to protect student health and safety.  March 9 Guidance at 1, 3.  On March 13, 2020, ICE issued guidance expressly permitting F-1 students to "participate in online or other alternate learning procedures" and stating that such classes would be counted "toward a full course of study" notwithstanding prior regulations.  March 13 Guidance at 1.  The March 13 Guidance explicitly assured that the policy would be "in effect for the duration of the emergency."  *Id.*; *see also id.* at 1-2 (same policy for international students who return to their home countries but continue to take classes online).

12

Defendants cannot dispute that "the duration of the emergency" has not ended.  Acting in reliance on the agency's guidance that its March policy—permitting F-1 visa holders to study online and retain their visa status—would remain in place as long as "the emergency" continued, Plaintiffs engaged in extensive deliberative processes that took into account a wide range of factors, the health and safety of their community members first and foremost among them.  *See supra* p. 10.   Both schools expressly relied on ICE's guidance regarding international students— that, "[g]iven the extraordinary nature of the COVID-19 emergency," international students would be able to enroll in online-only programs consistent with federal law—in formulating their decisions.  *See* Elliott Decl. ¶ 5; Barnhart Decl. ¶ 12.   International students enrolled at Harvard and MIT likewise made plans on the basis of the agency's announcements—including traveling to or remaining here, leasing property, and forgoing opportunities to attend other institutions.

The Directive does not even acknowledge these "serious reliance interests," *Encino Motorcars*, 136 S. Ct. at 2126, much less explain why they were (in the agency's view) less important than whatever factors motivated the agency's decision.  "Making that difficult decision was the agency's job, but the agency failed to do it."  *Regents*, 2020 WL 3271746, at *15.

## B.     The Directive Is Arbitrary And Capricious Because ICE Has Failed To Articulate Any Plausible Rationale That Could Justify It

Plaintiffs are also likely to succeed on their claim that the July 6 Directive is arbitrary and capricious because it does not articulate *any* rationale that would justify ICE's decision.  It is "a fundamental requirement of administrative law … that an agency set forth its reasons for decision; an agency's failure to do so constitutes arbitrary and capricious agency action." *Amerijet Int'l, Inc. v. Pistole*, 753 F.3d 1343, 1350 (D.C. Cir. 2014).  "[C]onclusory statements will not do; an agency's statement must be one of *reasoning*."  *Id.* (internal quotation marks omitted); *see also Dep't of Commerce v. New York*, 139 S. Ct. 2551, 2569 (2019) (an agency

must "articulate[] a satisfactory explanation for [its] decision").  Here, the Directive sets forth no reasoning sufficient to justify the agency's dramatic change of policy.  The sole strand of reasoning articulated in the Directive appears to be that, although some "accommodations" with respect to visas may be required "to provide flexibility to schools and … students," there is now a "concordant need to resume the carefully balanced protections implemented by federal regulations."  July 6 Directive at 1.

Such *ipse dixit* is insufficient to justify a policy change of such magnitude.  For one, to the extent the Directive's reasoning is taken at face value, the justification it offers fails at the threshold.  To the extent the premise of the Directive's reasoning is that the public-health conditions that justified the issuance of the COVID-19 exemption in March 2020 have abated, that premise is mistaken.  The national emergency the President declared on March 13, 2020, is still in effect.  The number of COVID-19 cases in the United States passed three million this week, and the number of daily new cases (currently roughly 50,000) is *double* what it was only one month ago.[2]  To the extent the agency's decision here rested on its public-health judgment, basic principles of administrative law required it to "examine[] 'the relevant data'"—including the fact that the rate of viral spread in the United States is increasing, not decreasing—and to "articulate[] 'a satisfactory explanation' for [its] decision, 'including a rational connection between the facts found and the choice made.'"  *Dep't of Commerce*, 139 S. Ct. at 2569 (quoting *State Farm*, 463 U.S. at 43).  In stark contrast to the planning decisions made by Plaintiffs after months of consultation, deliberation, and recourse to expertise, the Directive's conclusory statement bears no resemblance to such a reasoned decision.

---

[2] *See Coronavirus in the United States: Latest Map and Case Count*, N.Y. Times, https://www.nytimes.com/interactive/2020/us/coronavirus-us-cases.html [https://perma.cc/25D3-UPBH] (last visited July 7, 2020).

Indeed, ICE's abrupt change of policy—unsupported by any apparent "attention to the advantages and the disadvantages of [its] decision[]," *Michigan*, 135 S. Ct. at 2707—appears driven not by a reasoned evaluation of the policy considerations but by political factors untethered to the merits of the policy. "[V]iewing the evidence as a whole," it is hard to understand ICE's decision "in terms of" its stated rationale; rather, the evidence "reveal[s] a significant mismatch between the decision the [agency] made and the rationale [it] provided." *Dep't of Commerce*, 139 S. Ct. at 2575. A high-level agency official has openly acknowledged, in fact, that the real basis for the change was not any conclusion that the public-health emergency had eased, but rather that the Administration has decided to use students' visas as a cudgel to coerce universities into resuming in-person classes—contrary to universities' judgments made to protect the health and safety of their communities. Just last night, Acting Deputy Secretary of Homeland Security Ken Cuccinelli stated that the purpose of the agency's change in policy was to "encourage schools to reopen." Bowden, *Cuccinelli Says Rule Forcing International Students To Return Home Will 'Encourage Schools To Reopen,'* The Hill, July 7, 2020.[3] The Directive, in other words, offers "an explanation for agency action that is incongruent with" public statements regarding ICE's change in policy. *Dep't of Commerce*, 139 S. Ct. at 1575.

"The reasoned explanation requirement … is meant to ensure that agencies offer genuine justifications for important decisions, reasons that can be scrutinized by courts and the interested public." *Id.* at 2575-2576. The agency has failed to satisfy that requirement, and Plaintiffs are therefore likely to succeed on this claim, too.

---

[3] https://thehill.com/homenews/administration/506248-cuccinelli-says-rule-forcing-international-students-to-return-home (last visited July 7, 2020).

### C.        The Directive Violates The APA's Notice-And-Comment Requirement

Finally, Plaintiffs are also likely to succeed on their claim that the Directive violates the

APA's notice-and-comment requirement.  The APA requires this Court to hold lawful and set

aside agency action taken "without observance of procedure required by law."  5 U.S.C.

§ 706(2)(D).  The Directive was issued in contravention of the APA's procedural requirements

and should be set aside on that basis.  The Directive is a "rule" within the meaning of the APA,

as it is "an agency statement of general or particular applicability and future effect designed to

implement, interpret, or prescribe law or policy."  *Id*. § 551(4).  In general, the "agency process

for formulating, amending, or repealing [such] a rule" (*id.* § 551(5)) must comply with the

APA's requirements of notice-and-comment rulemaking.  *Id.* § 553.  While the APA exempts

certain rules from notice and comment procedures, *see id*. § 553(b), the Directive does not fall

within any of those exemptions.  Rather, it is a "substantive" rule that ICE was required to—and

did not—issue pursuant to § 553's notice and comment provisions.

First, the Directive is plainly a substantive rule subject to notice-and-comment

requirements.  As the Supreme Court has explained, an agency must employ notice-and-

comment procedures before issuing a rule that has the "force and effect of law."  *Chrysler Corp.*

*v. Brown*, 441 U.S. 281, 302-303 (1979); *N.H. Hosp. Ass'n v. Azar*, 887 F.3d 62, 70 (1st Cir.

2018).  The Directive does just that: It obligates F-1 students to take an in-person course load to

study in the United States, on pain of visa revocation, and obligates universities that were

offering online instruction to submit operational change plans to the agency.  It also conditions

"maintain[ing] [noncitizens'] F-1 and M-1 nonimmigrant status" on their compliance with the

policy.  July 6 Directive at 1.  And the Acting Deputy Secretary of Homeland Security yesterday

referred to the July 6 Directive as "setting the rules" for the fall 2020 semester.  Bowden, *supra*.

No exceptions to the notice-and-comment requirement apply.  ICE cannot, for instance, defend the Directive as an interpretive rule not subject to the notice-and-comment requirement.  *See* 5 U.S.C. § 533; *Perez v. Mortgage Bankers Ass'n*, 575 U.S. 92, 96 (2015).  An interpretive rule cannot "create[] rights, assign[] duties, or impose[] obligations, the basic tenor of which [are] not already outlined in the law itself."  *N.H. Hosp. Ass'n*, 887 F.3d at 70.  But the Directive *does* "assign[] duties" to universities and students via a dramatic reversal in agency policy.  *Id.*

Nor can ICE argue that "good cause" would support issuing the Guidance without going through notice-and-comment procedures.  There is no plausible argument here that notice and/or public comment would be "impracticable, unnecessary, or contrary to the public interest."  5 U.S.C. § 553(b)(B).  This standard imposes a "high bar," pursuant to which the exception applies "only in those narrow circumstances in which 'delay would do real harm.'"  *United States v. Valverde*, 628 F.3d 1159, 1164 (9th Cir. 2010); *see also Levesque v. Block*, 723 F.2d 175, 184 (1st Cir. 1983) (the good cause exception "is narrowly construed").  Here, by contrast, it is the sudden imposition of the policy change—without notice and only weeks before the fall semester begins—that will "do real harm."  *Id.*  Plaintiffs are thus likely to succeed on this claim, too.

## II.    PLAINTIFFS WILL BE IRREPARABLY INJURED ABSENT EMERGENCY RELIEF

Plaintiffs readily satisfy the other requirements for emergency relief.  Harvard and MIT will be irreparably injured if ICE's policy change takes effect.  An injury is irreparable when it "cannot adequately be compensated for either by a later-issued permanent injunction, after a full adjudication on the merits, or by a later-issued damages remedy." *Rio Grande Cmty. Health Ctr., Inc. v. Rullan*, 397 F.3d 56, 76 (1st Cir. 2005).  Plaintiffs' injury satisfies that standard.

ICE has thrown both Harvard and MIT—and much of higher education throughout the country—into chaos.  Only weeks before the start of the fall semester, ICE is now demanding that Plaintiffs scrap the plans that Plaintiffs developed over months designed to protect the health

and safety of their students, faculty, and staff, as well as their broader communities in Cambridge
and the Greater Boston area.  Elliott Decl. ¶ 9; Barnhart Decl. ¶¶ 16, 20.  Conversely, if Plaintiffs
abide by their plans to operate as safely as possible, the Directive will cause many international
students to withdraw or not enroll, thus irreparably damaging Plaintiffs' ability to maintain their
vibrant and diverse educational communities.  Elliott Decl. ¶¶ 10-11.

Plaintiffs' students will also face irreparable harm if the Directive takes effect.  First,
although the Directive suggests that students may transfer to universities with an in-person
model this fall semester, that is essentially impossible; it is far too late for students to transfer to
most other universities in the United States for the upcoming academic year, even if they would
want to.  Second, some students currently in the United States will face prohibitive difficulties
and costs in traveling back to their home countries, placing them at legal peril if they remain in
the United States out of immigration status and at potential physical peril if they can depart
successfully.  Elliott Decl. ¶¶ 12-13; Barnhart Decl. ¶¶ 19-21.  Third, students who do return to
or stay in their home countries will face enormous challenges continuing their educations,
whether due to inadequate or nonexistent Internet access, time zone differences making it
impossible for them to participate in class discussions, and fundamental safety concerns.  *Id.*

Even if Plaintiffs were somehow able to implement increased in-person or hybrid
instruction, many international students would be unable to return to campus because of closures
of consular services limiting their ability to obtain visas and travel restrictions that prevent them
from leaving their home countries or entering the United States.  Elliott Decl. ¶ 13; Barnhart
Decl. ¶ 27.  Additionally, students participating in hybrid programs from outside the United
States would lose their ability to access critical benefits of their nonimmigrant student visa

programs, such as Curricular Practical Training employment and Optional Practical Training employment.  Elliott Decl. ¶ 13; Barnhart Decl. ¶¶ 23-24.

In sum, ICE has casually disregarded the extensive planning universities have undertaken over the past few months and thrown the lives of tens of thousands of students into sudden disarray.  Students in online-only programs must now consider how they may make the needed arrangements to leave the country and resume their study in remote conditions, often not conducive to their education.  Students in hybrid programs must consider how they may enter the country for forced in-person instruction so as to avoid losing their F-1 status.  The confusion the Directive has sown thus not only threatens to disrupt this nation's institutions of higher learning; it also will cause severe personal hardship to these international students.

## III.    THE REMAINING EQUITABLE FACTORS ALSO FAVOR GRANTING A TEMPORARY RESTRAINING ORDER

The remaining equitable factors also favor granting the relief sought.  Courts "must weigh the irreparable harm to [Plaintiffs] against the harm to the Government and must determine whether a preliminary injunction would be in the public interest."  *Devitri v. Cronen*, 289 F. Supp. 3d 287, 297 (D. Mass. 2018).  "These two inquiries merge in a case like this one, where the Government is the party opposing the preliminary injunction."  *Id.*

While Plaintiffs and their students will suffer irreparable injury as demonstrated above, the government is not harmed by having to adhere to procedures that it announced in March 2020 and that it stated would remain "in effect for the duration of the emergency"—an emergency that is still ongoing.  The public and government have an interest in ensuring that higher education institutions are able to provide the best possible educational experience to students *while* also taking necessary precautions to mitigate the COVID-19 public health crisis. When considering the implications of COVID-19 for international students in March, ICE wrote

that "SEVP is focused on ensuring that nonimmigrant students are able to continue to make normal progress in a full course of study," and that "nonimmigrant students should participate in online or other alternate learning procedures" that universities implement in light of "the extraordinary nature of the COVID-19 emergency." March 9 Guidance at 1.

In contrast, the Directive has the hallmarks of a politically motivated maneuver to—in the words of the Acting Deputy Secretary of Homeland Security—"encourage schools to reopen," without regard to the public health judgment of the schools and experts about whether that is safe for students, faculty, and staff. Bowden, *supra*. Plaintiffs' goal is to welcome all students back to campus for in-person learning as soon as it is safe. However, after four months of close consultation with experts and internal deliberation—and in reliance on ICE's own prior guidance—Plaintiffs determined that it is not yet prudent to do so. The harm to Plaintiffs and their students from denying a temporary restraining order pending consideration of the issues far outweighs the government's interest in going back on its word due to its single-minded desire to deny the pandemic conditions and reopen everything, no matter the health risk.

Moreover, the Directive is also contrary to the public interest because it arbitrarily and capriciously hinders universities' efforts to reduce the chance of community spread of COVID-19. Because higher education institutions do not exist in a vacuum, an outbreak at one poses a threat to the health and safety of everyone in the surrounding community, and ultimately across the Commonwealth. As between a reckless reopening and a carefully planned and orderly system that puts the health of the entire community first, the public interest favors the latter.

## CONCLUSION

The Court should enter a temporary restraining order preventing Defendants from implementing the July 6 Directive.

Dated:  July 8, 2020                              Respectfully submitted,

                                                  /s/ Felicia H. Ellsworth
                                                  William F. Lee (BBO #291960)
                                                  Mark C. Fleming (BBO #639358)
                                                  Felicia H. Ellsworth (BBO #665358)
                                                  WILMER CUTLER PICKERING
                                                     HALE AND DORR LLP
                                                  60 State Street
                                                  Boston, MA 02109
                                                  Telephone: (617) 526-6000
                                                  E-mail:  felicia.ellsworth@wilmerhale.com

                                                  Seth P. Waxman (*pro hac vice* forthcoming)
                                                  Paul R.Q. Wolfson (*pro hac vice* forthcoming)
                                                  Ari Holtzblatt (*pro hac vice* forthcoming)
                                                  WILMER CUTLER PICKERING
                                                     HALE AND DORR LLP
                                                  1875 Pennsylvania Avenue, N.W.
                                                  Washington, D.C. 20006
                                                  Telephone: (202) 663-6000

## <u>CERTIFICATE OF SERVICE</u>

I, Felicia H. Ellsworth, counsel for Plaintiffs, hereby certify that this document has been filed through the Court's ECF system and will be sent electronically to the registered participants as identified on the Notice of Electronic Filing (NEF).  This document is being sent by express courier to the Defendants at the addresses below and by email.

United States Department of Homeland Security
2707 Martin Luther King Jr. Ave., S.E.
Washington, D.C.  20528

United States Immigration and Customs Enforcement
500 12th St., S.W.
Washington, D.C.  20536

The Hon. Chad F. Wolf
Acting Secretary of Homeland Security
United States Department of Homeland Security
2707 Martin Luther King Jr. Ave., S.E.
Washington, D.C.  20528

Matthew Albence
Acting Director of United States Immigration and Customs Enforcement
United States Immigration and Customs Enforcement
500 12th St., S.W.
Washington, D.C.  20536

/s/ Felicia H. Ellsworth
FELICIA H. ELLSWORTH