## UNITED STATES DISTRICT COURT FOR
## THE DISTRICT OF MASSACHUSETTS

PRESIDENT AND FELLOWS OF HARVARD
COLLEGE and MASSACHUSETTS
INSTITUTE OF TECHNOLOGY,

        Plaintiff,

        v.

UNITED STATES DEPARTMENT OF
HOMELAND SECURITY; UNITED STATES
IMMIGRATION AND CUSTOMS
ENFORCEMENT; CHAD F. WOLF, in his
official capacity as Acting Secretary of the
United States Department of Homeland
Security; and MATTHEW ALBENCE, in his
official capacity as Acting Director United
States Immigration and Customs Enforcement,

        Defendants.

Civil Action No. 20-cv-11283

## DECLARATION OF MARK C. ELLIOTT

    I, Mark C. Elliott, hereby state under the penalty of perjury that the following statements are

true and accurate to the best of my knowledge, and that I could testify to these matters if called to do

so:

    1.    I am Vice Provost for International Affairs of Harvard University ("Harvard" or the

"University"), and am also the Mark Schwartz Professor of Chinese and Inner Asian History.  As

Vice Provost, I have responsibility for supporting Harvard's community of international students,

scholars, and faculty at Harvard, as well as advancing Harvard's international academic initiatives

and Harvard's global strategy.

    2.    I have been deeply involved in the University's response to the COVID-19 pandemic.

Beginning in February 2020, members of Harvard's administration began developing policies and

guidance in response to the pandemic.  Since that time, I have worked with fellow administrators, as well as experts across the University and throughout the world, to make thoughtful and reasoned decisions for our operations that prioritize the safety of Harvard's students, faculty, and staff.  As the Vice Provost of International Affairs, I have been especially focused on providing guidance to international students, and have collaborated extensively with fellow University administrators and the Harvard International Office ("HIO").

3.      I have carefully reviewed the COVID-19 Guidance for the Student and Exchange Visitor Program ("SEVP") issued by United States Immigration and Customs Enforcement ("ICE") in response to the COVID-19 pandemic.  On March 13, 2020, ICE issued COVID-19 Guidance for Student and Exchange Visitor Program Stakeholders ("March 13 Guidance").  Pursuant to the March 13 Guidance, students in the United States holding F-1 or M-1 visas are allowed to "count online classes towards a full course of study" in the event their school temporarily stops in-person classes, regardless of whether the visa holders remain in the United States or departed the United States. Prior to the March 13 Guidance, international students were permitted to take only one online class per semester.  The March 13 Guidance stated that it would remain "in effect for the duration of the emergency."

4.      On March 10, 2020, Harvard President Lawrence Bacow announced that the University would transition to virtual instruction for the remainder of the Spring 2020 semester, and asked that students not return to campus after the upcoming spring break.  The HIO provided additional guidance to Harvard's international students to assist them with the transition to remote learning.

5.      Over the course of many weeks after the initial decision to transition to remote learning in March 2020, and in reliance on the March 13 Guidance and its representation that it would remain "in effect for the duration of the emergency," Harvard made preparations for the Fall

2020 semester.  In light of the public health risks presented by the COVID-19 pandemic, the majority of Harvard's 12 degree-granting schools will operate in a full remote learning environment for at least the Fall 2020 semester.

6.     On June 4, 2020, HIO provided by email information regarding remote learning to international students enrolled at several of Harvard's schools for the Fall 2020 semester.  An example of one such email, which was sent to incoming students at the Harvard Kennedy School ("HKS"), is attached as Exhibit 1.  An email to returning students enrolled at the Graduate School of Design, the Graduate School of Education, the T.H. Chan School of Public Health, Harvard Law School, the Harvard Divinity School, and HKS is attached as Exhibit 2.  The emails to new incoming students advised that students should plan to begin their studies remotely.  With respect to returning students, Harvard advised that "[c]urrent federal government guidance allows continuing international students and students in F-1 or J-1 status transferring from another U.S. institution to continue their studies remotely and remain in valid visa status."  Ex. 2.  In reliance on the March 13 Guidance, Harvard explained that the exception provided in the March 13 Guidance "will still apply to continuing students in summer and fall 2020."  Ex. 2.

7.     On July 6, 2020, ICE issued a "Broadcast Message: COVID-19 and Fall 2020" ("July 6 Directive").  The July 6 Directive largely withdraws the exception that ICE announced in March.  The July 6 Directive states that if a school determines that it will provide only online course instruction in the fall, students holding F-1 visas may not remain in the country to receive instruction.  It provides that students holding F-1 visas "must depart the country or take other measures, such as transferring to a school with in-person instruction to remain in lawful status[,] or potentially face immigration consequences including, but not limited to, the initiation of removal proceedings."  It is our current understanding that if the July 6 Directive takes effect, Harvard

students with F-1 visas who are enrolled in remote programs will face immigration consequences if they do not leave the country within 15 days of the start of the Fall 2020 term.

8.      The July 6 Directive, if it takes effect, will have significant negative impacts on Harvard as an institution and on Harvard's students.

9.      With respect to Harvard as an institution, Harvard has expended tremendous resources on developing protocols for its operations to protect the safety of its students, faculty, staff, and the surrounding community.  Because of the timing of the July 6 Directive, and the significant time and coordination required to implement public safety measures, Harvard will struggle to develop an entirely new set of guidance and potentially alter the structure of its remote learning programs at this stage, particularly if it seeks to prioritize the health and safety of its students, faculty, and staff.

10.     As described in more detail below, the July 6 Directive will make it impracticable for certain of Harvard's international students to continue to study at Harvard and make progress toward their degrees, while imposing academic and living conditions for others that will prompt them to take leaves from their programs—or drop out altogether.

11.     By virtue of the fact that the July 6 Directive is likely to result in far fewer international students enrolled at Harvard during the coming academic year, the July 6 Directive will affect Harvard in at least the following additional ways:

        a.      Harvard and its students benefit enormously from the participation of international students.  Indeed, many of Harvard's curricular programs depend critically on the presence and diversity of international students.  Harvard places great emphasis on a diverse student body, and international students offer perspectives that other students otherwise may never experience.  The curriculum at HKS, for example—where approximately 47% of students are international students—depends on the perspectives of international

students, including mid-career public officials from around the world who bring unique viewpoints about different approaches to governance and policy.  And even if students do not meet in classrooms, they can still—from appropriate distances or online—share valuable elements of on-campus life, such as participation in extracurricular activities.  The loss of international students from Harvard would deprive Harvard's students of one of the great benefits of their experience here.

b.      Several of Harvard's schools will also be harmed financially if a substantial number of international students do not enroll in the fall.  As one example, nearly 50% of GSD's student body is international; losing the tuition of even a portion of those students would be significant to GSD.

c.      Harvard relies on the contributions of its international graduate students as Teaching Fellows in its undergraduate courses.  Requiring these Teaching Fellows to provide instruction from remote locations in their home countries, potentially with considerable time-zone disparities and variable Internet connectivity, will make it harder for faculty to coordinate with their Teaching Fellows and obtain the full benefit of their pedagogy.

12.     Harvard's international students, many of whom remain in the United States based on the March 13 Guidance, will also face significant harm if the July 6 Directive takes effect.  The University has heard from students from all parts of the world who will face challenges by remaining in or being forced to return to their home countries, including:

a.      The possibility of being drafted into their home country's armed forces;

b.      Threats and abuse based on their sexual orientation;

c.      Lack of adequate mental health treatment from qualified professionals;

d.      Excessive costs, including exorbitant airline tickets that were a minimum of $4,000, or forfeiting a lease at the student's own expense;

      e.      Inadequate and unreliable Internet access or government-imposed Internet shutdowns and restrictions on access to online resources;

      f.      Time-zone differences that will force students to participate in or teach classes throughout the night.

13.      Even if Harvard were to implement in-person or hybrid (i.e., partial in-person, partial virtual) instruction, such that students on F-1 visas could remain in the United States, significant burdens would remain for international students.  Many of Harvard's international students are first-year students or students who have returned to their home countries.  These students would be unable to get to campus because of the State Department's suspension of consular processing of visa applications, which affects their ability to obtain initial visas if they are new students, or obtain new visa stamps to support their reentry if their current stamps have expired.  Other students face travel restrictions that prevent them from leaving their home countries or entering the United States (or both).  Moreover, students participating in hybrid programs from outside the United States—either because they choose to remain abroad or because they are unable to return to the United States— would relinquish their F-1 status and therefore lose their ability to access critical benefits of the F-1 visa program, such as Curricular Practical Training employment and Optional Practical Training employment at the end of the academic year.  This would further harm Harvard as an institution and the students who lose these opportunities.

14.      Although a hybrid program might allow domestic students to select only online courses if they have health conditions that place them at a greater risk (or simply want to avoid the greater risk of infection that in-person instruction imposes), under the July 6 Directive, F-1 students are denied this agency.  The July 6 Directive not only precludes F-1 students from an all-online course schedule, it mandates that F-1 students "tak[e] the minimum number of online classes

required to make normal progress in their degree program."  Accordingly, vulnerable or concerned

F-1 students would be forced to participate in in-person learning, despite the risks.

15.     By threatening to force many F-1 visa holders to withdraw from Harvard, the July 6

Directive puts Harvard to an impossible choice:  lose numerous students who bring immense benefits

to the school or take steps to retain those students that contradict Harvard's judgment about how best

to protect the health of the University's students, faculty, and staff.


I declare under penalty of perjury under the laws of the United States of America that the

foregoing is true and correct.


Executed on July 8, 2020

_/s/ Mark C. Elliott_____
Mark C. Elliott