# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MASSACHUSETTS

_____
                                      )

PRESIDENT AND FELLOWS OF       )
HARVARD COLLEGE; and            )
MASSACHUSETTS INSTITUTE OF   )
TECHNOLOGY,                      )
                                        )
           Plaintiffs,           )      Civil Action No. 1:20-cv-11283
                                        )
      v.                         )
                                        )      Leave to File Granted
UNITED STATES DEPARTMENT      )      on July 13, 2020
OF HOMELAND SECURITY; U.S.     )
IMMIGRATION AND CUSTOMS      )
ENFORCEMENT; CHAD F. WOLF, in his )
official capacity as Acting Secretary of the )
United States Department of Homeland   )
Security; and MATTHEW ALBENCE, in his )
official capacity as Acting Director of U.S. )
Immigration and Customs Enforcement,   )
                                          )
           Defendants.         )
_____)

## BRIEF OF 59 INSTITUTIONS OF HIGHER EDUCATION
## AS AMICI CURIAE IN SUPPORT OF
## <u>PLAINTIFFS' MOTION FOR A PRELIMINARY INJUNCTION</u>

## TABLE OF CONTENTS

TABLE OF AUTHORITIES ........................................................................................................ ii

IDENTIFICATION OF AMICI........................................................................................................ iv

STATEMENT OF INTEREST........................................................................................................1

ARGUMENT .................................................................................................................................2

I.      The July 6 Directive Violates the Administrative Procedure Act......................................3

        A.      The July 6 Directive Is Arbitrary and Capricious Because It Entirely Fails
                to Address Substantial Reliance on the Government's Previous Policy..................4

        B.      The July 6 Directive Is Arbitrary and Capricious Because It Gives No
                Consideration to the Dilemmas It Imposes on Schools and Students.....................6

        C.      The July 6 Directive Is Arbitrary and Capricious Because It Entirely Fails
                to Consider the Enormous and Disruptive Compliance Burdens It Imposes.........11

        D.      The July 6 Directive Is Arbitrary and Capricious Because It Is Devoid of
                Any Reasoned Explanation or Justification..........................................................12

II.     The July 6 Directive Has Nationwide Significance and Merits Nationwide Relief ..........14

CONCLUSION.............................................................................................................................15

# TABLE OF AUTHORITIES

**Cases**

*Department of Homeland Security v. Regents of the University of California*, 140
S. Ct. 1891 (2020)...................................................................................................4

*Encino Motorcars, LLC v. Navarro*, 136 S. Ct. 2117 (2016) .......................................3

*Fisher v. University of Texas at Austin*, 136 S. Ct. 2198 (2016) ...................................1

*Michigan v. EPA*, 135 S. Ct. 2699 (2015) .....................................................................3

*Motor Vehicle Manufacturers Association of United States, Inc. v. State Farm
Mutual Automobile Insurance Co.*, 463 U.S. 29 (1983) .......................................2, 14

*National Mining Association v. United States Army Corps of Engineers*, 145 F.3d
1399 (D.C. Cir. 1998) ............................................................................................14

*Sackett v. EPA*, 566 U.S. 120 (2012) ............................................................................2

*Texas v. United States*, 809 F.3d 134 (5th Cir. 2015), *aff'd per curiam mem. by an
equally divided Court*, 136 S. Ct. 2271 (2016) ................................................. 14-15

*Trump v. International Refugee Assistance Project*, 137 S. Ct. 2080 (2017) .............15

**Statutes & Regulations**

5 U.S.C. § 706(2) .........................................................................................................14

5 U.S.C. § 706(2)(A).....................................................................................................3

8 U.S.C. § 1101(a)(15)(F)(i) .......................................................................................12

8 C.F.R. § 214.2(f)(6)(i)(G) ........................................................................................12

**Other Authorities**

John Bowden, *Cuccinelli Says Rule Forcing International Students To Return
Home Will 'Encourage Schools To Reopen*,' Hill (July 7, 2020), https://thehill.
com/homenews/administration/506248-cuccinelli-says-rule-forcing-internati
onal-students-to-return-home..................................................................................14

Graduate Management Admission Council, *Early Warning Signals: Winners and
Losers in the Global Race for Talent* (2019), https://www.gmac.com/-/media/
files/gmac/research/talent-mobility/gmac-white-paper-early-warning-
signals.pdf ...............................................................................................................7

New York State, Guidance on Executive Order 202.6, *Guidance for Determining Whether a Business Enterprise Is Subject to a Workforce Reduction Under Recent Executive Orders* (updated June 29, 2020), https://esd.ny.gov/guidance-executive-order-2026 ...............................................................................................................5

New York Executive Order No. 202.8 (Mar. 20, 2020) ................................................5

*Retention and Reporting of Information for F, J, and M Nonimmigrants; Student and Exchange Visitor Information System (SEVIS)*, 67 Fed. Reg. 76,256 (Dec. 11, 2002) ......................................................................................................................13

*Special Requirements for Extension and Maintenance of Status of Students; Approval of Schools; and Withdrawal of School Approval*, 40 Fed. Reg. 32,312 (Aug. 1, 1975) ......................................................................................................................13

Max Jordan Nguemeni Tiako, *I'm a foreign medical student. ICE's new rules on remote courses are devastating*, Wash. Post (July 9, 2020), https://www.washingtonpost.com/outlook/2020/07/09/ice-foreign-students-online-courses-deportation/ ..........................................................................................................................8

United States Citizenship & Immigration Services, *Optional Practical Training (OPT) for F-1 Students*, https://www.uscis.gov/opt (last updated Apr. 22, 2020) ..........................................................................................................10

United States Immigration & Customs Enforcement, *Frequently Asked Questions for SEVP Stakeholders* about Guidance for the Fall 2020 Semester (last updated July 7, 2020), https://www.ice.gov/doclib/sevis/pdf/sevisFall2020_FAQ.pdf........................10

# IDENTIFICATION OF AMICI[1]

American University

Amherst College

Arizona State University

Barnard College

Boston University

Bowdoin College

Brandeis University

Brown University

Bucknell University

California Institute of Technology

Carnegie Mellon University

Case Western Reserve University

Colby College

Columbia University

Cornell University

Dartmouth College

DePaul University

Duke University

Emory University

Franklin & Marshall College

George Washington University

Georgetown University

Hobart and William Smith Colleges

Indiana University

Johns Hopkins University

Michigan State University

Middlebury College

Muhlenberg College

Northeastern University

Northwestern University

Pennsylvania State University

Princeton University

Purdue University

Rice University

Rutgers, The State University of New Jersey

Smith College

Stanford University

Suffolk University

Swarthmore College

Syracuse University

Trinity College

Tufts University

Tulane University

Union College

University of Chicago

University of Illinois

University of Michigan

University of Minnesota

University of Nebraska

University of Notre Dame

University of Pennsylvania

University of Southern California

Vanderbilt University

Washington University

Wellesley College

Wesleyan University

Williams College

Worcester Polytechnic Institute

Yale University

---

[1] This brief has not been authored, in whole or in part, by counsel to any party in this case. No party or counsel to any party contributed money intended to fund preparation or submission of this brief. No person, other than the *amici*, their members, or their counsel, contributed money that was intended to fund preparation or submission of this brief.

## STATEMENT OF INTEREST

*Amici curiae* are 59 diverse public and private colleges and universities from 24 states and the District of Columbia. The international student visa program enables *amici* to enroll collectively more than 213,000 international students every year. These students are core members of our institutions. They make valuable contributions to our classrooms, campuses, and communities—contributions that have helped make American higher education the envy of the world. International students contribute to a diversity of thought, background, and experience that "promotes learning outcomes, and better prepares students for an increasingly diverse workforce and society." *Fisher v. Univ. of Tex. at Austin*, 136 S. Ct. 2198, 2210 (2016) (quotation marks omitted). As President Martha E. Pollack of Cornell University observed, "When we discourage or turn away international students, we lose much more than the students themselves. We lose their inventions and innovation, their collaboration and contributions. We lose the richness of their learned experiences in other cultures, languages, communities and political systems."

Since the pandemic's onset, *amici* have spent countless hours and resources preparing for the fall term, which begins imminently. In making these plans, *amici* relied on federal guidance allowing international students to attend all-online courses during the pandemic, guidance which was to remain "in effect for the duration of the emergency." March 13, 2020 COVID-19: Guidance for SEVP Stakeholders, ECF No. 6-2 ("March 13 Guidance") at 1-2. The emergency persists, yet the government's policy has suddenly and drastically changed, throwing *amici*'s preparations into disarray and causing significant harm and turmoil. *Amici* have a substantial interest in this case.

**ARGUMENT**

*Amici* strongly support Plaintiffs' motion to enjoin Defendants' July 6, 2020 directive. *See* July 6, 2020 Broadcast Message: COVID-19 and Fall 2020, ECF No. 6-3 ("July 6 Directive"). A fundamental principle of administrative law is that the government must provide a reasoned explanation for its actions and consider all important aspects of a problem before imposing burdens on regulated parties. *See Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983). The July 6 Directive fails this basic requirement.

Defendants are already preventing returning students from reentering the country based on the July 6 Directive. For example, on July 8, 2020, a DePaul University student returning from South Korea was prevented from entering the country at the San Francisco airport on the ground that he had not yet registered for classes—and thus could not establish that at least some of his coursework would be in-person, as required by the July 6 Directive. *Amici* have received reports of other students who likewise have been told they will be unable to obtain visas until their schools comply with the July 6 Directive. Accordingly, nationwide relief is needed now.[2]

Urgent relief is also needed because, as a result of the July 6 Directive, universities are scrambling to revisit decisions made after months of careful planning in reliance on the government's prior guidance. *Amici* must review and potentially revamp hundreds of course offerings and housing arrangements. Within days, they must submit updated program certifications, and within weeks, they must submit updated certifications for each and every international student enrolled in the fall—all while complying with governmental public health orders at the state, county, and local levels, taking into account faculty and staff needs, and

---

[2] The July 6 Directive "has all the hallmarks of APA finality"; the government is applying it with the force of law, and so it is reviewable now. *Sackett v. EPA*, 566 U.S. 120, 126 (2012).

supporting tens of thousands of students who are understandably anxious about their immigration status, health, and education. Because Plaintiffs are likely to succeed on the merits, the July 6 Directive should be enjoined nationwide.

## I.   The July 6 Directive Violates the Administrative Procedure Act.

Under the Administrative Procedure Act ("APA"), a court "shall ... hold unlawful and set aside agency action ... found to be ... arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A). To satisfy this standard, an agency must "examine the relevant data and articulate a satisfactory explanation for its action including a rational connection between the facts found and the choice made." *State Farm*, 463 U.S. at 43. When an agency changes its policy, it must "provide a reasoned explanation for the change" that addresses the "facts and circumstances that underlay or were engendered by the prior policy," including "serious reliance interests." *Encino Motorcars, LLC v. Navarro*, 136 S. Ct. 2117, 2125-26 (2016). An agency must also consider the burdens its policy imposes on regulated parties. *See Michigan v. EPA*, 135 S. Ct. 2699, 2707 (2015) ("[R]easonable regulation ordinarily requires paying attention to the advantages *and* the disadvantages of agency decisions.").

The July 6 Directive is arbitrary and capricious for four reasons. First, it entirely fails to address the reliance that schools and students across the nation placed on the government's March 13 Guidance, which afforded schools broad flexibility to navigate the current public health crisis. Second, it entirely fails to consider the dilemmas schools and students will face in conforming to the new policy, and does not explain why those dilemmas are justified. Third, it does not consider in any way the substantial compliance burdens it imposes on schools. Fourth, it includes no reasoned explanation for the new policy.

A.      **The July 6 Directive Is Arbitrary and Capricious Because It Entirely Fails to Address Substantial Reliance on the Government's Previous Policy.**

Just weeks ago, the Supreme Court held the government's attempted rescission of the DACA program arbitrary and capricious because the government had failed to address the effect of its actions on numerous stakeholders, including DACA recipients, their families, their employers, and their colleges and universities. *Dep't of Homeland Sec. v. Regents of the Univ. of Cal.*, 140 S. Ct. 1891, 1914 (2020). As the Court recognized, when an administrative agency has a choice among various policy options, it is "*required* to assess whether there were reliance interests, determine whether they were significant, and weigh any such interests against competing policy concerns." *Id.* at 1915 (emphasis added).

Yet now, the government has again reversed an administrative policy without any apparent consideration of the reliance its prior policy engendered. In March, Defendants recognized that schools "may need to adapt their procedures and policies to address the significant public health concerns associated with the COVID-19 crisis." March 9, 2020 Broadcast Message: Coronavirus Disease 2019 (COVID-19) and Potential Procedural Adaptations for F and M Nonimmigrant Students, ECF No. 6-1 ("March 9 Guidance") at 1. At that point, Defendants were "focused on ensuring" that international students could "continue to make normal progress in a full course of study;" in light of the circumstances, they "intend[ed] to be flexible with temporary adaptations." *Id.* Defendants specifically announced that "[g]iven the extraordinary nature of the COVID-19 emergency, [the Student and Exchange Visitor Program ("SEVP")] will allow [international students] to temporarily count online classes towards a full course of study" in excess of the limits that ordinarily apply. March 13 Guidance at 1. And while Defendants stated SEVP would "continue to monitor the COVID-19 situation and will adjust its guidance as needed," they also stated "[t]his temporary provision" would remain "in effect for the duration of the emergency." *Id.*

Since March, in compliance with notice requirements, colleges and universities have informed Defendants on an ongoing basis of operational changes on their campuses. Defendants therefore have been well aware of these plans and schools' reliance on the March 13 Guidance. Defendants' only response has been an auto-reply thanking *amici* for submitting their plans.

Now, with the fall term less than a month away for some schools, and the COVID-19 emergency worse than ever,[3] the government has taken almost the diametrically opposite position: F-1 student visa holders cannot take a fully online course load while remaining in the United States. When issuing this new directive—with no warning or demonstrated need for a change—the government did not even mention, let alone consider, the reliance interests engendered by its March 13 Guidance. Those interests cannot be overstated.

Since in-person classes discontinued in the spring, *amici* have spent the last several months engaged in a careful and detailed assessment of how to safely bring students back to campus. The health and well-being of *amici*'s students, faculty, and staff is paramount. While the precise details of *amici*'s respective plans for the fall term vary, all recognize that the ongoing public health emergency will require flexibility. Some *amici* will have online-only course offerings. Others will have hybrid programs, providing access to both in-person and online courses. But even these *amici* are preparing for the possibility that they may have to discontinue in-person classes entirely during the middle of the term, necessitating a transition to online-only learning.[4] Some *amici* have already

---

[3] *See generally* John Hopkins Coronavirus Resource Center, https://coronavirus.jhu.edu/data.

[4] Indeed, *amici* cannot predict or control whether state or local governments will issue directives—like those issued around the country in the spring semester—barring them from holding in-person classes. *See, e.g.*, N.Y. Exec. Order No. 202.8 (Mar. 20, 2020) (requiring 100% reduction in workforce); N.Y. State, Guidance on Executive Order 202.6, *Guidance for Determining Whether a Business Enterprise Is Subject to a Workforce Reduction Under Recent Executive Orders* (updated June 29, 2020), https://esd.ny.gov/guidance-executive-order-2026 (allowing "remote instruction or streaming of classes" to continue but prohibiting "in-person congregate classes").

planned to move to online-only learning following the Thanksgiving break, to avoid the risk of infection from students returning to campus after visiting with family and friends. What all of these plans have in common is their reliance on and continued need for the flexibility provided by the March 13 Guidance: based on Defendants' own guidance, *amici* reasonably acted in the belief that they could settle on whatever plan best advanced academic and public health imperatives, without disadvantaging thousands of international students.

For example, after careful consideration, Princeton University plans for undergraduates to return to campus for one semester during the 2020-21 academic year, with first-years and juniors on campus in the fall, and sophomores and seniors in the spring. That plan was premised on the assumption that international students would be able to remain in the United States during their off-campus semester while learning remotely. Princeton now may be forced to reassess its plan, with just weeks to go before the fall semester, lest sophomore and senior international students be forced to leave the country—and potentially be unable to return for the spring.

Meanwhile, both Amherst College and Wellesley College decided for health and safety reasons to limit in-person classes only to students living in college-provided housing; others will take online classes only. International students who have signed leases to live off campus will now need to break those leases and move on campus, in order to access in-person classes and to avoid falling out of status. The colleges, meanwhile, after months of careful planning, may now need to scramble to find additional on-campus housing without endangering student health.

**B.    The July 6 Directive Is Arbitrary and Capricious Because It Gives No Consideration to the Dilemmas It Imposes on Schools and Students.**

The July 6 Directive is also unlawful because Defendants failed to consider the practical consequences of their last-minute about-face. The serious economic costs for the nation appear to

have been given no consideration,[5] nor the likely disruption of progress on federally-funded research grants with work being performed by international students. But equally important, from *amici*'s perspective, is Defendants' disregard of potentially life-altering choices the July 6 Directive forces on *amici* and their international students.

Under the July 6 Directive, international students who are enrolled in an online-only program, but remain physically within the United States, may be subject to deportation. Consequently, schools that have chosen online-only programs for the fall, because of concern for the safety of students, faculty, and staff, now must choose between opening their campuses regardless of the public health risks, or forcing their international students to leave the country—despite those students having signed leases, enrolled children in school, and otherwise justifiably organized their lives around remaining in the United States during the next school year.

Moreover, the July 6 Directive states that international students who begin the term taking in-person classes, but whose "school changes its operational stance mid-semester" to offer only online courses, "must leave the country" or somehow transfer mid-semester "to a school with in-person instruction." July 6 Directive at 2. There is no assurance it will be possible for a student to leave the United States in such a situation, and a mid-semester transfer would likely be impossible. Students in hybrid programs are thus faced with the untenable dilemma of either returning home now and disrupting their academic progress, or staying here and gambling that their school will remain open—and if it closes, that they will be able to find a way home despite limited flight availability, widespread travel restrictions, and the risk of infection in travel. Indeed, all of these

---

[5] *See, e.g.*, Graduate Mgmt. Admission Council, *Early Warning Signals: Winners and Losers in the Global Race for Talent* (2019), https://www.gmac.com/-/media/files/gmac/research/talent-mobility/gmac-white-paper-early-warning-signals.pdf.

harms are magnified for students with underlying health conditions who may be endangered by international travel or who have family members in high-risk groups.

Students expelled from the country will then need to continue their studies under challenging conditions such as attending classes in the middle of the night, with unreliable internet connections, and for some students, the threat of government censorship or civil strife. A Yale University medical school student who previously attempted to work remotely from his home country, Cameroon, found it impossible to perform at the same level for exactly these reasons: "In Cameroon, there's simply no sustainable infrastructure in place for distance learning that would allow students to keep up with the pace of classes in the United States."[6]

The July 6 Directive fails to consider, let alone justify, imposing these burdens. For example, a Carnegie Mellon student from India is due to complete his year-and-a-half-long program in December 2020. He has invested substantially in his education, and hoped to gain practical experience in the United States following graduation. If he begins the semester in residence, but the university later is forced to move to online-only instruction due to rising COVID-19 cases, the student will be required to leave the United States. But if he is unable to find a flight home because of travel restrictions, he will be out of status, unable to finish his degree in lawful status, and unable to obtain employment authorization following graduation.

Similar examples abound. An Amherst student from Syria entered the United States on an F-1 visa in the fall of 2019. If the college is required to move to online learning, he will be forced to leave the United States and may not be able to return to complete his degree. Likewise, a Bucknell student from an African country, who remained on campus after in-person classes were

---

[6] Max Jordan Nguemeni Tiako, *I'm a foreign medical student. ICE's new rules on remote courses are devastating*, Wash. Post (July 9, 2020), https://www.washingtonpost.com/outlook/2020/07/09/ice-foreign-students-online-courses-deportation/.

suspended in the spring, would suffer enormous consequences if in-person classes were again suspended this fall. The cost of last-minute international travel would be prohibitive, and her home lacks internet access, making it nearly impossible for her to complete her coursework there. A Rice student currently working on COVID-19 research and developing low-cost ventilators will be forced out of the country, ceasing this critical work. As a Cornell student put it, since July 6 "it has been difficult for me to sleep…. Anxiety will continue…with the uncertainty of being at risk of having to leave the country at any time if the university is forced to close its campus due to a possible outbreak. If I am forced to leave, there is no certainty that I will find a flight as my country closed its borders months ago and cases are increasing rapidly there. Also, there is no certitude that I will be able to come again for the spring semester… I feel it like a punch in the face after making such enormous efforts and sacrifices to achieve a lifetime dream."

Furthermore, those who choose to stay must find in-person classes in which to enroll in order to avoid falling out of status, potentially without regard to how directly those classes further their educational goals—and regardless of whether an underlying health condition makes attending such classes potentially life-threatening. Forcing international students to select coursework based on immigration rules, rather than academic priorities, is irrational. This pointless burden could have long-term consequences. One Cornell student currently enrolled in a master's program, with the goal of applying for a Ph.D. program, hoped to strengthen his application by enrolling in certain required courses that will be offered only online. But the July 6 Directive will needlessly force him to choose different classes instead, harming his Ph.D. application.

Some *amici* with hybrid programs are concerned that they may not have the ability to provide in-person classes for all international students. Many professors are reluctant to teach in-person courses because they are in high-risk groups and fear for their health. Yet, under the July 6

Directive, a professor's health-based decision to teach online could have life-altering immigration consequences for her students. For example, a student from Egypt, with two primary-school-age children, originally enrolled in four courses that met in-person or in a hybrid format. Three have already been changed to online-only, and if the professor in the fourth does the same the student and his family will suddenly find themselves out of status.

As for international students currently abroad, travel restrictions will make it impossible for many to return this fall, so they will have no choice but to continue their education online. FAQs issued by ICE after the July 6 Guidance state that students abroad can maintain active F-1 visa status when enrolled in online courses, regardless of whether their university offers a hybrid or online-only program.[7] Notwithstanding this clarification, some *amici* have been wrongly advised by SEVP officials that students in hybrid programs could lose their student-visa status if they are enrolled in only online courses abroad. Were that the case, it would be devastating for many students. One benefit of attending an American university is the opportunity to engage in practical training following graduation, under the OPT program.[8] But the OPT program is available only for students who have been continuously enrolled for the full academic year immediately preceding graduation. Because of the uncertainty engendered by Defendants' hasty release of the July 6 Guidance, these students face the dilemma of either taking a leave of absence for a year—which could have significant financial consequences for students—or giving up the

---

[7] *See* U.S. Immigr. & Customs Enf., *Frequently Asked Questions for SEVP Stakeholders about Guidance for the Fall 2020 Semester* (last updated July 7, 2020), https://www.ice.gov/doclib/sevis/pdf/sevisFall2020_FAQ.pdf.

[8] After studying for at least one academic year, F-1 students are eligible to seek employment opportunities through OPT. OPT allows students to gain up to 12 months of real-world work experience in their field of study, either during their academic coursework or after earning their degrees. U.S. Citizenship & Immigr. Servs., *Optional Practical Training (OPT) for F-1 Students*, https://www.uscis.gov/opt (last updated Apr. 22, 2020).

opportunity for practical training. As one student at Washington University in St. Louis described the situation: "It feels like I'm about to lose everything I worked for."

     C.     **The July 6 Directive Is Arbitrary and Capricious Because It Entirely Fails to Consider the Enormous and Disruptive Compliance Burdens It Imposes.**

The July 6 Directive also fails to consider or justify the enormous compliance burdens it requires schools to undertake. Schools must submit an "Operational Change Plan" by July 15 for online-only schools and by August 1 for others—meaning that schools have been given just days to reconsider and potentially revamp the detailed operational plans they developed over the last few months. Schools must also issue to all international students new Form I-20s by August 4 certifying, for students attending in the United States, "that the student is not taking an entirely online course load [for the fall 2020 semester], and that the student is taking the minimum number of online classes required to make normal progress in their degree program." July 6 Directive at 2. That is untenable for virtually all institutions, for reasons the government failed even to consider.

First, the July 6 Directive requires the issuance of new Form I-20s certifying the classes students are taking. Yet for many schools, this will be impossible because August 4 is well *before* the deadline for students to register for classes. Second, moving up the registration deadline will not solve the problem because state and local orders, as well as existing public health guidance, limit the number of in-person classes that *amici* can and should provide. Third, even if courses and schedules could be quickly reworked, and students could be quickly registered, the July 6 Directive imposes an insurmountable administrative burden. For example, Michigan State anticipates that it will need to issue between 3,000 and 4,000 individualized I-20s—a task it estimates will consume 800 staff hours—in less than a month. Each I-20 must address whether a "student is taking the minimum number of online classes required to make normal progress"—yet schools may have hundreds of majors or degree programs and students are at varying levels of progress, making

individual assessments quite complex. A failure to comply will leave international students unable to enter the country or at risk of deportation.

> ### D.   The July 6 Directive Is Arbitrary and Capricious Because It Is Devoid of Any Reasoned Explanation or Justification.

Despite its disregard of substantial reliance interests and imposition of irrational dilemmas, burdensome compliance requirements, and terrible human consequences for students, the July 6 Directive provides no explanation at all, let alone a reasoned one, for its dictates. It refers only vaguely to "a concordant need to resume the carefully balanced protections implemented by federal regulations." July 6 Directive at 1. But it does not explain what prompted this need mid-pandemic, or how this directive is consistent with basic principles of academic freedom and institutional autonomy—hallmarks of the American system of higher education that are even more critical during one of the gravest public health crises of modern times.

To the extent the July 6 Directive refers to a regulation that limits the amount of online coursework a student may take and remain eligible for a student visa, *see* 8 C.F.R. § 214.2(f)(6)(i)(G), the policy behind that regulation does not explain or justify the July 6 Directive. That regulation interprets the statutory phrase "full course of study." *Id.* Congress provided for the nonimmigrant admission of "a bona fide student qualified to pursue *a full course of study* and who seeks to enter the United States temporarily and solely *for the purpose of pursuing such a course of study* … at an established college, university," or other qualifying institution. *See* 8 U.S.C. § 1101(a)(15)(F)(i) (emphasis added).

The term "full course of study" is not defined in the statute. In 1975, the INS first promulgated regulations affording deference to institutions' determinations regarding what constituted a "full course of study": a full course of study was a course load "certified by an authorized official of the institution as a full course of study"; alternatively, it consisted of 12 hours

of instruction per week. *See Special Requirements for Extension and Maintenance of Status of Students; Approval of Schools; and Withdrawal of School Approval*, 40 Fed. Reg. 32,312, 32,312 (Aug. 1, 1975). The deference and flexibility afforded to schools in the March 13 Guidance was consistent with the agency's decades-old interpretation of the statute.

In 2002, the INS amended its regulations to address online and distance learning. On the theory that "students can enroll in [an online] course without being admitted to the United States," *Retention and Reporting of Information for F, J, and M Nonimmigrants; Student and Exchange Visitor Information System (SEVIS)*, 67 Fed. Reg. 76,256, 76,263 (Dec. 11, 2002), INS said a visa-eligible student could count no more than one online class per term toward the student's full course of study. 8 C.F.R. § 214.2(f)(6)(i)(G).

The March 13 Guidance recognized, however, that this rationale made no sense under present circumstances. The pandemic forced most colleges and universities to temporarily move their in-person classes online. The *only* way for most students to continue engaging in a "full course of study" was through online learning. Accordingly, Defendants told schools and international students they could "temporarily count online classes towards a full course of study" in excess of the ordinary limits, and that "[t]his temporary provision" would remain "in effect for the duration of the emergency." March 13 Guidance at 1-2. The March 13 Guidance faithfully executed Congress's purpose in requiring a "full course of study."

The July 6 Directive does the opposite. Nothing has materially changed since March. Indeed, in many parts of this country, the pandemic has worsened considerably. If a student could study in a fully online environment in March while satisfying Congress's requirement that they take a "full course of study," there is no rational reason they cannot do so today. The government has provided no reason for its abrupt and unexplained shift.

That is unsurprising, given that the true motivation for the July 6 Directive has nothing to do with ensuring that students engage in a "full course of study" or with protecting the integrity of the student visa program. Instead, its purpose—as expressed by Acting Deputy Secretary of Homeland Security Ken Cuccinelli—is to "encourage schools to reopen." John Bowden, *Cuccinelli Says Rule Forcing International Students To Return Home Will 'Encourage Schools To Reopen*,' Hill (July 7, 2020), https://thehill.com/homenews/administration/506248-cuccinelli-says-rule-forcing-international-students-to-return-home. In essence, Defendants are using the vulnerability of international students as leverage to force a broad reopening for reasons wholly disconnected from the underlying statute and regulation, and without regard to students' ability "to continue to make normal progress in a full course of study." March 9 Guidance at 1. Defendants have thus violated the APA by promulgating a policy based "on factors which Congress has not intended it to consider." *State Farm*, 463 U.S. at 43.

In sum, the government has failed to explain why it is rational to eliminate the flexibility previously afforded to colleges and universities to design programs that best serve all of their students during the present emergency. The July 6 Directive is an archetype of arbitrary and capricious agency action, and it directly threatens human health and safety.

## II.     The July 6 Directive Should Be Enjoined Nationwide.

This case is brought under the APA, which empowers courts to "hold unlawful and set aside agency action." 5 U.S.C. § 706(2). Here, the challenged agency action is the July 6 Directive. Under the APA, "[w]hen a reviewing court determines that agency regulations are unlawful, the ordinary result is that the rules are vacated—not that their application to the individual petitioners is proscribed." *Nat'l Min. Ass'n v. U.S. Army Corps of Engineers*, 145 F.3d 1399, 1409 (D.C. Cir. 1998). Thus, an APA challenge by a single plaintiff may result in system-wide relief. *E.g.*, *Tex. v. United States*, 809 F.3d 134, 188 (5th Cir. 2015), *aff'd per curiam mem. by an equally divided*

*Court*, 136 S. Ct. 2271 (2016) (upholding nationwide injunction against immigration directive). This is particularly so when colleges and universities like *amici* are similarly situated to the Plaintiffs. *See Trump v. Int'l Refugee Assistance Project*, 137 S. Ct. 2080, 2083, 2087 (2017) (affirming preliminary injunction as to "parties similarly situated" to the plaintiffs).

Immediate, system-wide relief is necessary. First, immigration law is quintessentially federal; it should be applied evenly throughout the nation. Second, narrower relief would spur duplicative emergency litigation in every district court or would require hundreds of colleges and universities to join this suit as intervenors. Third, while percolation of an issue is sometimes valuable, that must be weighed against the urgent need for relief necessitated by Defendants' last-minute action. Fourth, the July 6 Directive is being implemented, now, by embassies, consulates, and ports of entry as they assess the validity of an I-20 form. Having multiple sets of rules, varying by school or judicial district, will sow confusion and chaos and lead to inconsistent outcomes.

## CONCLUSION

International students are a vital part of our scholarly communities, and their participation in academic life enhances the educational experience for all. The July 6 Directive will inevitably force some international students to withdraw from our colleges and universities. In all cases— and in addition to the tremendous harm this will do to these students—our universities and our society will suffer. The preliminary injunction should be granted on a nationwide basis.

Respectfully submitted,

Dated: July 12, 2020

/s/ Matthew E. Price_____
Matthew E. Price (Bar No. 668990)
Ishan K. Bhabha (*pro hac vice* forthcoming)
Lindsay C. Harrison (*pro hac vice* forthcoming)
Lauren J. Hartz (*pro hac vice* forthcoming)
Jenner & Block LLP

1099 New York Avenue NW, Suite 900
Washington, DC 20001
(202) 639-6873
mprice@jenner.com
ibhabha@jenner.com
lharrison@jenner.com
lhartz@jenner.com

*Counsel for Amici Curiae*

**CERTIFICATE OF SERVICE**

I hereby certify that on July 13, 2020, I electronically filed the foregoing with the Clerk

of the Court by using the CM/ECF system, which will provide electronic notice and an electronic

link to this document to all attorneys of record.

/s/ Matthew E. Price
Matthew E. Price (Bar No. 668990)