# EXHIBIT A

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MASSACHUSETTS

_____

|  |  |
|---|---|
| : | |
| PRESIDENT AND FELLOWS OF HARVARD : | CIVIL ACTION |
| COLLEGE; and MASSACHUSETTS INSTITUTE OF : | |
| TECHNOLOGY, : | No. 1:20-cv-11283-ADB |
| : | |
| Plaintiffs, : | |
| : | |
| v. : | |
| : | |
| UNITED STATES DEPARTMENT OF HOMELAND : | |
| SECURITY; U.S. IMMIGRATION AND CUSTOMS : | |
| ENFORCEMENT; CHAD F. WOLF, in his official : | |
| capacity as Acting Secretary of the United States : | |
| Department of Homeland Security; and MATTHEW : | |
| ALBENCE, in his official capacity as Acting Director : | |
| of U.S. Immigration and Customs Enforcement, : | |
| : | |
| Defendants. : | |

_____

## BRIEF OF *AMICUS CURIAE* PRINCETON THEOLOGICAL SEMINARY IN SUPPORT OF PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTIVE RELIEF

**FICK & MARX LLP**

William W. Fick
24 Federal Street, 4th Floor
Boston, MA 02110
857-321-8360 x1001
wfick@fickmarx.com

**STEVENS & LEE, P.C.**

Hon. Thomas I. Vanaskie (Ret.)*
Geoffrey R. Johnson*
1818 Market Street, 29th Floor
Philadelphia, PA 19103
(215) 568-7560
tiv@stevenslee.com

Bradley L. Mitchell*
Michael A. Cedrone*
Princeton Pike Corporate Center
100 Lenox Drive, Suite 200
Lawrenceville, NJ 08648
(609) 243-9111
blm@stevenslee.com

*Pro hac vice admission pending*

## TABLE OF CONTENTS

TABLE OF AUTHORITIES ................................................................................................. iii

INTEREST OF *AMICUS CURIAE*............................................................................................1

SUMMARY OF ARGUMENT .................................................................................................2

ARGUMENT............................................................................................................................5

   I.    International Students are an Integral Part of PTS' Mission and Community ..............5

   II.   The July 6 Directive Will Irreparably Harm PTS' Global Standing .............................8

   III.  PTS Relies on Foreign Donors to Subsidize its Students' Tuition Costs....................11

CONCLUSION........................................................................................................................13

CERTIFICATE OF SERVICE ...............................................................................................14

ii

# TABLE OF AUTHORITIES

## Cases

*Alcantara v. Archambeault*,
    No. 20CV0756 DMS (AHG), 2020 WL 2315777 (S.D. Cal. May 1, 2020) ................4

*Basank v. Decker*,
    No. 20 CIV. 2518 (AT), 2020 WL 1481503 (S.D.N.Y. Mar. 26, 2020) .......................4

*Dep't of Homeland Sec. v. Regents of the Univ. of California*,
    140 S. Ct. 1891 (2020)...................................................................................................5

*Fisher v. Univ. of Texas at Austin*,
    570 U.S. 297 (2013).......................................................................................................5

*Hypertherm, Inc. v. Precision Prod., Inc.*,
    832 F.2d 697 (1st Cir. 1987).......................................................................................11

*Medina v. U.S. Dep't of Homeland Sec.*,
    313 F. Supp. 3d 1237 (W.D. Wash. 2018)...................................................................5

*Michigan v. E.P.A.*,
    135 S. Ct. 2699 (2015)..................................................................................................5

*Ross-Simons of Warwick, Inc. v. Baccarat, Inc.*,
    217 F.3d 8 (1st Cir. 2000)...........................................................................................12

## Other Authorities

Highlights at Princeton Theological Seminary, *Where International Students Come From*,
    https://s3.amazonaws.com/ptsem.edu-assets/content/pdfs/2019-
    20_Admissions_fact_sheet.pdf .....................................................................................1

M. Craig Barnes, *Update on Fall Planning*, PRINCETON THEOLOGICAL SEMINARY, (Jun. 5, 2020)
    https://www.ptsem.edu/alerts/statements......................................................................7

Mission & Vision, *Residential & Global*, PRINCETON THEOLOGICAL SEMINARY,
    https://www.ptsem.edu/discover/mission-vision ...........................................................8

*Mission Statement*, Princeton Theological Seminary,
    http://s3.amazonaws.com/ptsem/pdfs/Princeton-Theological-Seminary-Mission-
    Statement.pdf ................................................................................................................6

*Overview of Residential Study Program*, OMSC,
    https://www.omsc.org/residential-program-overview ...................................................8

*Partnership in the Gospel*, PRINCETON THEOLOGICAL SEMINARY (Oct. 24, 2017),
https://www.ptsem.edu/news/memorandum-of-understanding ........................................8

Princeton Theological Seminary, *Alumni Around the World*, 2017-2018 ANNUAL REPORT,
https://issuu.com/ptsem/docs/2017_18_pts_annual_report ...........................................1

Visiting Scholar Program, PRINCETON THEOLOGICAL SEMINARY,
https://www.ptsem.edu/discover/visiting-scholar-program ...........................................8

## INTEREST OF *AMICUS CURIAE*

*Amicus Curiae* Princeton Theological Seminary (hereafter, "PTS") is a private, not-for-profit graduate school in Princeton, New Jersey, and the second-oldest seminary in the United States. While a large number of PTS students are candidates for ministry in the Presbyterian Church, the majority of its students are enrolled in other educational programs, including candidature for other religious denominations, cross-disciplinary studies, and training in non-theological fields. Since being founded in 1812, PTS has opened wide the gates of higher education to talented students of all races, creeds, and other diverse backgrounds, including international students from all walks of life. There are 807 PTS international alumni from 51 countries,[1] and of the approximately 350 students admitted to PTS for the 2019-2020 year, 43 were international students from 14 different foreign countries.[2] As of the date of this submission, PTS estimates that 25 international students who are enrolled at PTS for the fall 2020 semester will potentially be adversely effected by the July 6, 2020 Directive issued by U.S. Immigration and Customs Enforcement ("ICE") (the "July 6 Directive") that is the subject of this action.

Historically, both PTS as an institution and its entire student roster have benefitted immensely from the school's internationally diverse student body. Indeed, as outlined below, international students not only meaningfully contribute to the PTS community (both in and outside the classroom), but often also become prominent and valued thought leaders internationally after

---

[1]  Princeton Theological Seminary, *Alumni Around the World*, 2017-2018 ANNUAL REPORT, https://issuu.com/ptsem/docs/2017_18_pts_annual_report.

[2]  Highlights at Princeton Theological Seminary, *Where International Students Come From*, https://s3.amazonaws.com/ptsem.edu-assets/content/pdfs/2019-20_Admissions_fact_sheet.pdf.

1

completing their studies at PTS. The impact these international students make around the world, in turn, greatly bolsters both PTS' global standing as a hospitable locus of ecumenical instruction, as well as its status with foreign charitable donors.

For these reasons, PTS is deeply concerned about the outcome of this case, and accordingly, PTS writes to share its unique perspective on the lasting harm that would befall it should this Honorable Court deny Plaintiffs' request for injunctive relief, thus permitting ICE to implement the July 6 Directive. Further, as the July 6 Directive contains no indication that ICE gave any consideration whatsoever to the near and long-term harm that the July 6 Directive will assuredly cause PTS and its entire school community, as well as like institutions that train religious leaders, the arguments herein also forcefully underscore Plaintiffs' likelihood of success on the merits of their claims. Altogether, then, PTS respectfully urges this Honorable Court to enjoin enforcement of the July 6 Directive pending resolution of Plaintiffs' claims.

## SUMMARY OF ARGUMENT

This matter involves a question of exceptional and immediate importance: whether this Court should enjoin ICE's enforcement of the July 6 Directive, an edict that rescinds and contradicts previous ICE guidance issued in response to the ongoing COVID-19 pandemic, and now arbitrarily provides that students on nonimmigrant visas (otherwise known as "F-1" visas) must attend in-person classes or have their visas revoked. Plaintiffs' application demonstrates how the July 6 Directive violates the Administrative Procedure Act, as well as the irreparable harm that enforcement of the Directive will cause to both Plaintiffs' curricula (which was crafted in reliance on the aforementioned initial ICE guidance) and Plaintiffs' international students generally.

PTS writes now as *amicus curiae* to explain how its longstanding, unique institutional

2

perspective underscores the profound irreparable damage that would result to it from implementation of the July 6 Directive. These considerations plainly support Plaintiffs' request for immediate injunctive relief. With this context, PTS offers three main points for the Court's consideration.

First, international students are *vital* to PTS' entire scholastic community: indeed, PTS cannot fulfill its mission without their participation inside and outside the classroom. While the diversity of thought and perspective attributable to international students is a treasured aspect of all forms of higher education, it has added importance for institutions such as PTS, where theological training—a precursor to, *inter alia*, preaching the gospel around the world—is distinctly shaped from the open exchange of ideas by students with different worldviews. Moreover, while PTS intends to implement a hybrid model of classroom instruction for the upcoming school year, class is but merely one aspect of a holistic PTS education, and PTS has specific plans for in person community gatherings—to be conducted in accordance with social distancing rules and open to *all* students, American and international alike—that are intended to supplement the greater educational experience. Enforcement of the July 6 Directive, however, would irreversibly damage these essential plans for the upcoming school year, depriving PTS, its faculty, and its students of the multi-faceted education they so greatly treasure.

Second, as a direct result of its longstanding commitment to educating students from around the globe, PTS has a worldwide reputation as a welcoming community for the next generation of international leaders. It is impossible to understate the damage that the July 6 Directive will have on PTS' well-established reputational interest. Based on its global standing as a hospitable scholastic institution, PTS has established robust international educational offerings,

3

including through the Overseas Ministry Study Center, the Visiting Scholar Program, and the hosting of yearly conferences with international guests. The July 6 Directive would irreparably undermine PTS' global standing, wreaking untold havoc on PTS' valued international offerings in both the near and short-term. What's more, insofar as the July 6 Directive threatens to eviscerate PTS' relationship with its international students in both the present and beyond, it will no doubt also embitter future international leaders who otherwise would have been educated at PTS, thereby alienating these individuals from PTS and diminishing their view of the United States as a whole.

Finally, insofar as many of PTS' largest donors are internationally based, forcing PTS to abruptly shut the door that it has for so long proudly opened for international students will have crippling consequences for PTS from a funding perspective. Under the societal and religious mores of PTS' international donors, stranding international students on the eve of the upcoming school year will be perceived as such a shocking affront that PTS'  relationships with those donors may never recover. Moreover, the financial impact of losing PTS' international donors will not simply be felt by PTS itself. Rather, the severe financial ramifications will be borne by the students, both domestic and international, whose education PTS subsidizes from its endowment every year. Consequences like these are quintessential irreparable harm.

To avoid these irreparable consequences, PTS respectfully asks that this Court grant Plaintiffs' request for prompt injunctive relief. In analogous contexts, district courts across the country have enjoined ICE from engaging in arbitrary conduct that would otherwise cause irreparable harm. *Cf. Alcantara v. Archambeault*, No. 20CV0756 DMS (AHG), 2020 WL 2315777, at \*7-10 (S.D. Cal. May 1, 2020) (granting a temporary restraining order releasing medically vulnerable detainees from ICE custody); *Basank v. Decker*, No. 20 CIV. 2518 (AT),

4

2020 WL 1481503, at *2 (S.D.N.Y. Mar. 26, 2020) (entering a temporary restraining order preventing ICE from arresting alien detainees with serious medical conditions for civil immigration detention purposes during pendency of their immigration proceedings due to the COVID-19 pandemic where there would be irreparable harm absent such relief); *Medina v. U.S. Dep't of Homeland Sec.*, 313 F. Supp. 3d 1237, 1240 (W.D. Wash. 2018) (enjoining the government from terminating an individual's DACA status and work authorization pending the adjudication on the merits of his claims under the Administrative Procedure Act).

Further, while ICE's July 6 Directive is bereft of any suggestion that Defendants ever weighed—let alone acknowledged—the immediate and lasting harms to PTS and its community, because it "should have considered those matters but did not," its "failure" to do so "was arbitrary and capricious in violation of the APA." *Dep't of Homeland Sec. v. Regents of the Univ. of California*, 140 S. Ct. 1891, 1915 (2020); *Michigan v. E.P.A.*, 135 S. Ct. 2699, 2707 (2015) ("[R]easonable regulation ordinarily requires paying attention to the advantages *and* the disadvantages of agency decisions." (emphasis in original)). Thus, separate and apart from the irreparable injury analysis, the detailed and demonstrable harms set forth herein reinforce Plaintiffs' likelihood of success on the merits of its claims.

## ARGUMENT

### I.   International Students are an Integral Part of PTS' Mission and Community

Generally speaking, the educational benefits of a diverse student body are well-settled. *See Fisher v. Univ. of Texas at Austin*, 570 U.S. 297, 310 (2013) (discussing "the educational benefits that flow from student body diversity" (citation and quotation marks omitted)). Such benefits, however, are all the more apparent at PTS, a professional and graduate school whose mission is to

5

prepare men and women "for *leadership worldwide* in congregations and the larger church, in classrooms and the academy, and in the public arena."[3] The "rich racial and ethnic diversity" of the PTS community is inextricably intertwined with its mission to provide "a residential community of worship and learning," where intellectual rigor and the exchange of diverse viewpoints—including those of international students—meaningfully enrich both the personal and academic development of the entire student body.[4]

This is no small point. Because PTS has a global reputation as a residential school of faith and scholarship, students—both American and international—eagerly attend PTS precisely because they will receive an education that is internationally focused, not only in its academics, but also in the broader scholastic community. Anecdotally speaking, this is why students from around the world—from Iowa to Kenya, and everywhere in between—choose to conduct their studies at PTS. It is thus plain that implementation of the July 6 Directive will cause untold damage to PTS and its covenant community by radically changing this dynamic.

Crucially, notwithstanding the fact that PTS will conduct most of its courses online during the fall 2020 semester due to COVID-19, before the July 6 Directive was announced PTS outlined specific plans to maintain continuity in the sense of community that has long characterized student residential life at PTS. Specifically, for the upcoming school year all students, including international students, have been encouraged by PTS to reside on campus even for remote

---

[3] *Mission Statement*, Princeton Theological Seminary, http://s3.amazonaws.com/ptsem/pdfs/Princeton-Theological-Seminary-Mission-Statement.pdf (emphasis added).

[4] *Id.*

instruction, as PTS has announced plans to organize the students into small groups of ten (or less) from across the school called "Quaranteams." Each week, these groups will meet in-person—while observing social distancing and other related rules—for "worship, prayer, and shared meals," thus "provid[ing] a point of connection for every student" and demonstrating PTS' commitment to the "important value of living in residence alongside a diverse group of people."[5] While PTS recognizes that these procedures "will not replace the community that organically forms through courses, student groups, and residential life" in non-pandemic life, these efforts underscore PTS' ongoing commitment to maintaining—as best it can in a COVID-19 world—a scholastic community characterized by the robust and warm exchange of globally diverse views.

Accordingly, implementation of the July 6 Directive would irreparably damage PTS' efforts to guide its school community through the COVID-19 crisis, cruelly dividing its student body between American and international students in a way that is wholly anathema to PTS' commitment to cultivating a hospitable and diverse community. What's more, the July 6 Directive will not only rob PTS' international students of the benefit of this educational experience—one which, as an aside, each and every international student made enormous sacrifices for—it will also irreversibly deprive PTS' administration, faculty, and remaining students of the residential (indeed, familial) community they hold dear.

---

[5] *See* M. Craig Barnes, *Update on Fall Planning*, PRINCETON THEOLOGICAL SEMINARY (Jun. 5, 2020), https://www.ptsem.edu/alerts/statements.

7

**II.    The July 6 Directive Will Irreparably Harm PTS' Global Standing**

Because of its longstanding commitment to being a global nexus of welcoming and collaborative scholarship, PTS has a hard-earned reputation as one of the premier theological schools in the world. Indeed, apart from the international students who are integral to the PTS residential community at PTS, "[t]he world itself is [the] classroom, and students extend their learning in many locations throughout the globe with field education experiences, travel courses, and academic exchange programs." [6] PTS' global standing has helped it forge longstanding relationships with international churches, and further uniquely positioned PTS to host yearly conferences and colloquia with leading international scholars. PTS' concerted efforts at global outreach have also resulted in, *inter alia,* memoranda of understanding with leading international universities in several countries, including France, Germany, South Africa, and South Korea (with more such memoranda now in development). [7]

Additionally, in reliance on its international standing PTS has also invested an immeasurable amount of time, energy and capital in creating on-campus programs for international scholars. These offerings include the Overseas Ministry Study Center—a residential program that brings ten scholars and church leaders to PTS' campus for a year of coordinated study [8]—as well

---

[6]  Mission & Vision, *Residential & Global*, Princeton Theological Seminary, https://www.ptsem.edu/discover/mission-vision.

[7]  *See, e.g.*, *Partnership in the Gospel*, Princeton Theological Seminary (Oct. 24, 2017), https://www.ptsem.edu/news/memorandum-of-understanding.

[8]  *Overview of Residential Study Program*, OMSC, https://www.omsc.org/residential-program-overview.

8

as the Visiting Scholar Program,[9] which for the last ten years has facilitated the ability of 132 scholars from 28 countries to research at the PTS library (widely known as one of the largest theological libraries in the world).

Simply stated, through years of diligent commitment to providing a hospitable environment for global scholars PTS has solidified its international reputation as a bastion of theological study *for all*. Yet, in one fell swoop, and presumably without any consideration of the effect the July 6 Directive would have on PTS' global standing, ICE seeks to implement a policy that will irreparably damage PTS' reputational interests. By operation of the July 6 Directive, PTS will be compelled to estrange its international students, which will in turn cause international scholars— with whom PTS presently enjoys fruitful relationships—to view PTS as altogether unreliable. Further, it is not hard to imagine how enforcement of the July 6 Directive could cause leading international scholars—who will see how poorly students from foreign countries are treated under the Directive—to eschew participating in the international conferences and colloquia that PTS offers and hosts.

Worse still, international church leaders may view PTS' begrudging—but nevertheless compelled—compliance with the July 6 Directive as a signal of PTS' complicity in ICE's cruel policy, causing such leaders to forever doubt—long after the current pandemic has abated— whether candidates for future leadership in their seminaries could (or should) ever again attend PTS. This is a very real concern for PTS, which has long benefitted from the contributions of

---

[9]  Visiting Scholar Program, PRINCETON THEOLOGICAL SEMINARY, https://www.ptsem.edu/discover/visiting-scholar-program.

SL1 1649311v4 098105.00038

international theology students, whom are among the best and brightest young adults in their home countries.

Surely, when these students complete their studies at an American seminary or divinity school, such as PTS, they often return to their home countries and eventually inherit positions of leadership. This is especially true in countries in the Southern, Eastern, and Mideastern hemispheres, where religious leaders have much greater social influence than they do under Western mores. By way of example, PTS international alumni who have gone on to become valued and influential thought leaders in their respective home communities include:

- **The Reverend Dr. Samuel B. Reeves**, who upon returning to Liberia after its devastating civil war, became the pastor of the leading congregation of Monrovia, shaping the church's ministry to address the social, economic, and religious needs of the people based on his teaching at PTS.

- **Dr. Sang Chang**, a North Korean émigré who returned to South Korea after her theological training at PTS to lead a prestigious women's school in Seoul, become president of the World Council of Churches, and perform extensive work for women's rights, particularly in the area of sex trafficking.

- **Rev. Kyung Chik Han**, who was known for his tireless devotion for the poor, including North Korea defectors, and founded the Youngnak Presbyterian Church in Seoul, South Korea, which founded 500 churches.

- **Najla Kassab Abousawan**, who recently became the president of the World Communion of Reformed Churches, which is a global organization of all denominations related to the Reformed tradition (*i.e.* Presbyterians).

- **Patriarch Abune Paulos**, a scholar, peace advocate, and leader of the Ethiopian Orthodox Church, who studied at PTS while exiled in the United States and later became part of the solution to the Darfur conflict, as well as president of the World Council of Churches.

Of course, in addition to this sample of prominent PTS international alumni, many prominent international reformers who are now household names (*i.e.* Dietrich Bonhoeffer and

10

Archbishop Desmond Tutu) studied theology at international seminaries before returning to their home countries to make their mark on the world. Yet, notwithstanding the demonstrated and enduring track record of international leaders attending schools of theology on their respective journeys to minister around the world, the July 6 Directive would prophylactically—and perhaps permanently—sever this reciprocal exchange which has contributed so much not only to the international community, but also to the global standing of the United States itself. Implementation of ICE's July 6 Directive could extinguish the future contribution of the next Dietrich Bonhoeffer before that individual's life journey truly began. Such harm to society is difficult, if not impossible, to calculate.

Relatedly, should this Court deny Plaintiffs' request to enjoin the July 6 Directive, PTS' international students will be thrown off campus before the end of their studies, leaving them disillusioned and embittered. Assuredly then, when these students later become leaders in their home countries, they will no doubt remain bitter about how they were treated in the United States after making enormous sacrifices to study here. This result will not only damage PTS, but the United States too, in perpetuity. *See Hypertherm, Inc. v. Precision Prod., Inc.*, 832 F.2d 697, 700 (1st Cir. 1987) (holding that substantial damage to business reputation is a sufficient showing of irreparable harm to justify "immediate redress" in the form of preliminary injunctive relief).

## III.   PTS Relies on Foreign Donors to Subsidize its Students' Tuition Costs

While the above certainly establishes the irreparable harm the July 6 Directive will cause PTS, the Directive will also have the near and long-term effect of irreparably harming PTS' funding efforts. This is yet another reason why the July 6 Directive must be enjoined pending this Court's resolution of Plaintiffs' meritorious claims in this case.

11

As explained, PTS has over 800 international alumni, many of whom have risen to significant leadership positions in their native countries. For example, one of PTS' most generous donors is a congregation in Seoul, South Korea, that supports Korean students enrolled at PTS in the upcoming school year. Left unrestrained, ICE's policy will require PTS to abruptly close its doors to these international students, thereby forcing them to return to South Korea embarrassed and dejected, as well as with their studies incomplete. Such action would be beyond offensive not only to these students but also to all of PTS' international donors who have generously contributed financially to PTS over the years. Once PTS is forced to cross that Rubicon, causing untold damage to these longstanding donor relationships, those connections will likely never be made whole.

Furthermore, while a diminished donor base causes an obvious harm to PTS itself, the real victims of this unfortunate series of events will be the PTS student community, including American-born students, whose education is largely funded—in whole or in part—by grants and scholarships paid from PTS' endowment. Thus, when PTS protests about the profound financial impact the July 6 Directive will have on their fundraising efforts, it speaks not from a place of self-interest, but rather out of serious concern for the marked impact that losing international donors will have on its ability to subsidize its students' education costs. To be sure, depriving PTS of its capacity to help its students pay for their education will seriously jeopardize PTS' ability to fulfill its stated institutional mission. *Ross-Simons of Warwick, Inc. v. Baccarat, Inc.*, 217 F.3d 8, 13 (1st Cir. 2000) ("It is settled beyond peradventure that irreparable harm can consist of a substantial injury that is not accurately measurable or adequately compensable by money damages." (citation and quotation marks omitted)).

12

## CONCLUSION

Defendants' utter failure to consider any of these consequences of its abrupt action in the midst of a worldwide pandemic is quintessential arbitrary conduct. The harm of PTS is immediate and devastating to its mission. For the foregoing reasons, PTS respectfully requests that this Court grant the preliminary injunctive relief sought by Plaintiffs.

Respectfully submitted,

Dated: July 13, 2020

/s/ William W. Fick
FICK & MARX LLP
24 Federal Street, 4th Floor
Boston, MA 02110
857-321-8360 x1001
wfick@fickmarx.com

Hon. Thomas I. Vanaskie (Ret.)*
Geoffrey R. Johnson*
STEVENS & LEE, P.C.
1818 Market Street, 29th Floor
Philadelphia, PA 19103
(215) 568-7560
tiv@stevenslee.com

Bradley L. Mitchell*
Michael A. Cedrone*
STEVENS & LEE
A PA Professional Corporation
Princeton Pike Corporate Center
100 Lenox Drive, Suite 200
Lawrenceville, NJ 08646
(609) 243-9333
blm@stevenslee.com

*Counsel for Amicus Curiae*

*\*Pro hac vice admission pending*

13

## **CERTIFICATE OF SERVICE**

I, William W. Fick, hereby certify that this document filed through the ECF system will be sent electronically to the registered participants as identified on the Notice of Electronic Filing (NEF), and paper copies will be sent to those indicated as non-registered participants on July 13, 2020.

*/s/ William W. Fick*
William W. Fick

14