# EXHIBIT A

**UNITED STATES DISTRICT COURT**
**DISTRICT OF MASSACHUSETTS**

| | |
|---|---|
| PRESIDENT AND FELLOWS OF HARVARD COLLEGE, *et al.*,<br><br>Plaintiffs,<br><br>v.<br><br>UNITED STATES DEPARTMENT OF HOMELAND SECURITY, *et al.*,<br><br>Defendants. | Civil Action No. 1:20-cv-11283-ADB |

**BRIEF OF *AMICUS CURIAE***
**FOUNDATION FOR INDIVIDUAL RIGHTS IN EDUCATION**

**SUMMARY OF ARGUMENT**

Academic freedom is "a special concern of the First Amendment, which does not tolerate laws that cast a pall of orthodoxy over the classroom." *Keyishian v. Bd. of Regents*, 385 U.S. 589, 603 (1967). The Immigration and Customs Enforcement (ICE) policy at issue will result in such a "pall of orthodoxy" being cast over American college classrooms, as students exiled to foreign nations—where the First Amendment holds no sway, and where repressive state surveillance sharply limits freedom of expression and inquiry—will be subject to censorship. That inevitable, if unintended, result—already evident in the United Kingdom—will not only frustrate international students' ability to engage with U.S.-based classmates and teachers, but will also chill those within the United States from discussing subjects likely to result in foreign censorship. Because the United States "is deeply committed to safeguarding academic freedom, which is of transcendent value to all of us," this Court must take action to prevent ICE's policy from enabling foreign restrictions on academic freedom in college and university classrooms. *Id.*

## INTEREST OF *AMICUS*

The Foundation for Individual Rights in Education (FIRE) is a nonpartisan, nonprofit organization dedicated to promoting and protecting civil liberties at our nation's institutions of higher education. Since 1999, FIRE has successfully defended the expressive rights and academic freedom of thousands of students and faculty members across the United States—and, as American educational institutions expand their instruction globally, at those institutions around the world. FIRE defends fundamental rights at both public and private institutions through public commentary and advocacy, litigation on behalf of students and faculty members, and participation as *amicus curiae*. *See, e.g.*, *B.L. v. Mahanoy Area Sch. Dist.*, No. 19-1842, 2020 U.S. App. LEXIS 20365, at *21 (3d Cir. June 30, 2020) (citing with approval FIRE's *amicus curiae* brief in a case holding that a high school cheerleader's online speech was protected by the First Amendment). Amicus affirms that no counsel for a party authored this brief in whole or in part and that no person other than amicus, its members, or counsel has made any monetary contributions intended to fund the preparation or submission of this brief.

## ARGUMENT

### I. Academic Freedom and Freedom of Expression are Fundamental to the Function of Universities and Colleges

#### *A. Expressive rights are at their zenith at institutions of higher education.*

For decades, the Supreme Court of the United States has zealously guarded freedom of expression and academic freedom at our nation's institutions of higher education. "The essentiality of freedom in the community of American universities is almost self-evident." *Sweezy v. New Hampshire*, 354 U.S. 234, 250 (1957). Universities "occupy a special niche in our constitutional tradition," *Grutter v. Bollinger*, 539 U.S. 306, 329 (2003), and academic freedom

is "a special concern of the First Amendment, which does not tolerate laws that cast a pall of orthodoxy over the classroom." *Keyishian*, 385 U.S. at 603. The danger posed by threats to free inquiry and free expression are "especially real in the University setting, where the State acts against a background and tradition of thought and experiment that is at the center of our intellectual and philosophic tradition." *Rosenberger v. Rector & Visitors of the Univ. of Va.*, 515 U.S. 819, 835 (1995). Given the vital importance of free speech and free thought on campus and in the classroom, the Court has repeatedly emphasized our "national commitment to the safeguarding of these freedoms." *Regents of Univ. of Cal. v. Bakke*, 438 U.S. 265, 312 (1978).

Academic freedom and freedom of expression do not lose their salience in the context of private institutions, which are not legally bound by the First Amendment. Accordingly, the vast majority of private institutions—including plaintiffs Harvard University and Massachusetts Institute of Technology—affirmatively guarantee their students and faculty members freedom of expression and academic freedom in official policy materials.[1] These guarantees are of critical importance to the educational enterprise, even if often imperfectly observed by many institutions.

***B. Free expression protects the right to criticize governments foreign and domestic.***

Academic freedom is a dead letter when students and faculty cannot freely discuss matters of profound social, economic, and political importance, or are prohibited from criticizing

[1] *See*, *e.g.*, HARVARD UNIV., 2019-2020 HARVARD COLLEGE HANDBOOK FOR STUDENTS 79 (rev. June 12, 2020), https://projects.iq.harvard.edu/files/studenthandbookpdf/files/2019-2020-college-student-handbook-06.12.2020.pdf ("freedom of speech and academic freedom" are values "essential to" the university, which "must affirm, assure and protect the rights of its members" to "advocate, and publicize opinion by print, sign, and voice"); MASS. INST. OF TECH., MIT MIND AND HAND BOOK, § II (8). Freedom of Expression (rev. July 2019), https://handbook.mit.edu/expression ("[f]reedom of expression is essential to the mission of a university"). These commitments create contractual rights inuring to the benefit of students and faculty. *See, e.g.*, *McAdams v. Marquette Univ.*, 914 N.W.2d 708, 737 (Wis. 2018) (university's commitment to academic freedom rendered a faculty member's blog post a "contractually-disqualified basis for discipline"); *Awad v. Fordham Univ.*, 2019 NY Slip Op 51418(U) (Sup. Ct. 2019) (private university's refusal to recognize a chapter of Students for Justice in Palestine was contrary to the university's mission statement guaranteeing freedom of inquiry).

governments or government officials—whether our own[2] or foreign.[3] The First Amendment and the principles it embodies do not permit such a result. *Keyishian*, 385 U.S. at 603.

## II. ICE's Policy Will Chill Academic Freedom and Expression at Home and Abroad

ICE's policy will have a predictable and severe impact on the freedom of expression and academic freedom rights of students and faculty members, both within and outside the United States.

### *A. ICE's policy will jeopardize the expressive and academic freedom rights of half a million students affected by the policy.*

Under ICE's policy, hundreds of thousands of students enrolled at American institutions will be forced to return to or remain in countries governed by regimes that, to varying degrees, actively impose legal and technical restrictions on expression. These restrictions will limit student and faculty expression that would otherwise take place in American classrooms, where it would be protected by the First Amendment or private institutions' commitments to expressive rights. Sadly, the increasing interconnectedness of international expression—the very technology which allows a student in Hong Kong to participate in class in Cambridge—also facilitates state censorship of that in-class expression.[4]

Some 1.1 million international students attend American universities and colleges.[5] Of these, approximately 502,470 students originate from—and will presumably return to—repressive states where the government blocks or filters online communication, forces the

---

[2] *Texas v. Johnson*, 491 U.S. 397, 417–18 (1989) (First Amendment right to burn the American flag).

[3] *Boos v. Barry*, 485 U.S. 312, 321 (1988) (regulation aimed at shielding "foreign diplomatic personnel . . . from speech that is critical of their governments" failed First Amendment scrutiny).

[4] "[W]hile the sovereign power of the federal government may still give it some leeway to deny entry at the border to speech and speakers from abroad, the digitization and globalization of speech on the internet has made physical border restrictions largely irrelevant." Joseph Thai, The Right to Receive Foreign Speech, 71 Okla. L. Rev. 269, 274 (2018).

[5] INST. OF INT'L ED., *Open Doors Report on International Educational Exchange, International Students by Academic Level and Place of Origin, 2016/17-2018/19* (2019), *available at* https://www.iie.org/Research-and-Insights/Open-Doors/Data/International-Students/Places-of-Origin (hereinafter "IIES Statistics").

removal of certain online content, or punishes online expression by banning "fake news," blasphemy, or insults to state institutions or officials.[6]

The lion's share of these students—some 370,000—hail from the People's Republic of China, the nation rated by Freedom House as "the world's worst abuser of internet freedom" for four consecutive years.[7] An additional 6,917 students originate from—and would presumably attend virtual classes from—Hong Kong, where expressive rights are rapidly deteriorating as the Chinese Communist Party imposes the "Great Firewall" to suppress its critics.[8] ICE's policy requires those students to study under the watchful eye of the Chinese government's sophisticated regime of internet censorship and surveillance. This system denies internet users access to material required for basic academic discussions. Students studying remotely from China will, for example, be barred from discussing historical accounts of the Tiananmen Square massacre or China's current use of concentration camps.[9]

While China represents the most dramatic threat—in both size and sophistication—to students' expressive rights, it is not the only such actor. Some 10,000 students could return to Turkey, where political speech, including criticism of President Erdogan, can lead to prison, and

---

[6] These include Azerbaijan (489), Bahrain (422), Belarus (378), China (369,548), Cuba (163), Egypt (3,675), Ethiopia (2,061), Iran (12,142), Kazakhstan (1,879), Myanmar (1,773), Pakistan (7,957), Russia (5,292), Saudi Arabia (37,080), Sudan or South Sudan (382), Syria (566), Thailand (6,503), Turkey (10,159), United Arab Emirates (2,361), Uzbekistan (571), Venezuela (7,760), and Vietnam (24,392). We additionally include Hong Kong (6,917) in this estimate in light of China's dramatically escalating limits on expression there. The number of students is drawn from the IIES Statistics, *supra*, and compared to the score data in Freedom House's 2019 study. *See generally*, FREEDOM HOUSE, FREEDOM ON THE NET 2019, https://freedomhouse.org/sites/default/files/2019-11/11042019_Report_FH_FOTN_2019_final_Public_Download.pdf; *see also* the score data and research methodology *available at* https://freedomhouse.org/report/freedom-net.

[7] Adrian Shahbaz & Allie Funk, *The Crisis of Social Media*, FREEDOM HOUSE, Oct. 22, 2019, https://freedomhouse.org/report/freedom-net/2019/crisis-social-media.

[8] Lily Kuo, *China's Great Firewall descends on Hong Kong internet users*, THE GUARDIAN, July 8, 2020, https://www.theguardian.com/world/2020/jul/08/china-great-firewall-descends-hong-kong-internet-users.

[9] Austin Ramzy & Chris Buckley, *Leaked China Files Show Internment Camps Are Ruled by Secrecy and Spying*, N.Y. TIMES, Nov. 24, 2019, https://www.nytimes.com/2019/11/24/world/asia/leak-chinas-internment-camps.html.

where universities have been purged of dissenting academics.[10] Others—like nearly 8,000 students from Pakistan—may return to states where "blasphemous" speech may be met with state-sanctioned or extrajudicial death.[11]

### ***B. The policy will chill discussion within the United States, importing a "pall of orthodoxy" over American classrooms.***

The policy will not only implicate the rights of displaced students, but also impact the First Amendment rights of students and faculty who remain in the United States. The First Amendment protects not only the right to speak, but also to hear. "It is now well established that the Constitution protects the right to receive information and ideas." *Stanley v. Georgia*, 394 U.S. 557, 564 (1969). The right to the exchange of views unencumbered by censorship is "fundamental to our free society." *Id.* Nowhere is this more important than in college classrooms, the quintessential "marketplace of ideas." *Keyishian*, 385 U.S. at 603.

These are not idle concerns. China's entanglement with American companies is already impacting higher education, even before the policy's implementation. The videoconferencing company Zoom, which says its platform is used by nearly all major American universities,[12] announced last month that it would develop the means to block users by location in response to government takedown demands.[13] This announcement followed controversy over Zoom's handling of takedown demands from China regarding Zoom meetings in which participants discussed the Tiananmen Square massacre. Zoom's proposed solution, while pledging that it will

---

[10] Suzy Hansen, *'The Era of People Like You Is Over': How Turkey Purged Its Intellectuals*, N.Y. TIMES MAG., July 24, 2019, https://www.nytimes.com/2019/07/24/magazine/the-era-of-people-like-you-is-over-how-turkey-purged-its-intellectuals.html.

[11] *See, e.g.*, *Junaid Hafeez: Academic sentenced to death for blasphemy in Pakistan*, BBC, Dec. 21, 2019, https://www.bbc.com/news/world-asia-50878432.

[12] ZOOM, ZOOM FOR HIGHER EDUCATION (Aug. 2019), https://zoom.us/docs/doc/Zoom%20for%20Higher%20Education.pdf.

[13] ZOOM, *Improving Our Policies as We Continue to Enable Global Collaboration*, June 11, 2020, https://blog.zoom.us/improving-our-policies-as-we-continue-to-enable-global-collaboration.

not allow China's takedown requests to "impact anyone outside of mainland China," is to develop technology that will block users in a country when authorities "determine activity on our platform is illegal within their borders."[14] In other words, Zoom will remove students if their government objects to class material or discussion, effectuating a dictator's veto on speech.

The United Kingdom's response to Chinese students studying in its colleges remotely from China offers a stark preview of the self- and institutional censorship that is being designed to preserve relationships with foreign states. Four universities in the United Kingdom are currently testing a system, aided by a Chinese internet firm, that would provide Chinese students with a filtered selection of class readings, with "sensitive" material removed from their courses.[15]

Such arrangements, when predictably applied to students at American colleges, will not only have the effect of removing foreign students' views from classrooms, but will also chill the speech of faculty and students here in the United States. Faculty members will rationally choose to self-censor in light of the obvious risks that their international students may be cut off from classes—or even subject to civil, criminal, or extrajudicial penalties—if views students' foreign authorities find offensive, embarrassing, or inconvenient are discussed. (For example, a University of Minnesota student whose tweets compared China's president to Winnie the Pooh found himself facing a six-month prison sentence for "provocation" after returning to Wuhan.[16])

---

[14] Sarah McLaughlin, *Free speech coalition warns Zoom: China's censorship requests could impact online teaching*, FIRE, June 15, 2020, https://www.thefire.org/free-speech-coalition-warns-zoom-chinas-censorship-requests-could-impact-online-teaching. Zoom has not responded to queries from FIRE, the National Coalition Against Censorship, and PEN America concerning whether it will monitor academic discussions hosted by American universities.

[15] Sean Coughlan, *UK universities comply with China's internet restrictions*, BBC, July 9, 2020, https://www.bbc.com/news/education-53341217.

[16] Ryan Faircloth, *Report: University of Minnesota student sentenced to prison in China for tweets posted in U.S.*, STAR TRIB., Jan. 23, 2020, https://www.startribune.com/report-university-of-minnesota-student-sentenced-to-prison-in-china-for-tweets-posted-in-u-s/567217862.

Students abroad will likewise need to consider whether their research, writing, or classroom contributions, if considered subversive to foreign authorities, could yield legal liability.

These chilling results would import precisely the "pall of orthodoxy" over the classroom that our constitutional system has long sought to avoid. Any policy that allows for such a result should be considered unacceptable in a nation that prides itself on the freedoms offered, and protected by, its academic institutions.

## CONCLUSION

"Teachers and students must always remain free to inquire, to study and to evaluate, to gain new maturity and understanding; otherwise our civilization will stagnate and die." *Sweezy*, 354 U.S. at 250.

For these reasons, FIRE respectfully submits that a preliminary injunction should be entered.

Respectfully submitted,

FOUNDATION FOR INDIVIDUAL RIGHTS IN EDUCATION, INC.,

By its attorneys,

/s/ *Jeffrey J. Pyle*
Jeffrey J. Pyle (BBO #647438)
PRINCE LOBEL TYE LLP
One International Place, Suite 3700
Boston, MA 02110
(617) 456-8000 (tel)
(617) 456-8100 (fax)
jpyle@princelobel.com
*Counsel of Record*

Adam B. Steinbaugh (PA Bar No. 326475)
FOUNDATION FOR INDIVIDUAL RIGHTS IN EDUCATION, INC.
510 Walnut Street, Suite 1250
Philadelphia, PA 19106
(215) 717-3473 / (215) 717-3440 (fax)
adam@thefire.org

**CERTIFICATE OF SERVICE**

I hereby certify that this document filed through the CM/ECF system will be sent electronically to the registered participants as identified on the Notice of Electronic Filing and paper copies will be sent to those indicated as non-registered participants on July 13, 2020.

/s/ *Jeffrey J. Pyle*
Jeffrey J. Pyle