**UNITED STATES DISTRICT COURT**
**DISTRICT OF MASSACHUSETTS**

_____
                                        )
**PRESIDENT AND FELLOWS OF**            )
**HARVARD COLLEGE; and**                )
**MASSACHUSETTS INSTITUTE OF**          )
**TECHNOLOGY,**                         )
                                        )
**Petitioners-Plaintiffs,**             )
                                        )        **Civil Action No. 20-cv-11283-ADB**
    **v.**                              )
                                        )
**UNITED STATES DEPARTMENT**            )
**OF HOMELAND SECURITY, et. al.**       )
                                        )
**Respondents-Defendants,**             )
_____ )

**OPPOSITION TO MOTION FOR A TEMPORARY RESTRAINING ORDER AND**
**REQUEST FOR A PRELIMINARY INJUNCTION**

## I.    INTRODUCTION

Petitioners ask this court to rewrite the black-letter requirements of the law and bind the

enforcement authority of the federal government, perversely as a consequence of the leniency

recently exercised when U.S. Immigration and Customs Enforcement (ICE) temporarily

permitted nonimmigrant students to pursue a full course of study through 100% online classes

because of the COVID-19 pandemic. Petitioners' request subverts the deference afforded

administrative agencies in complex and interrelated fields like immigration enforcement, which

requires coordination between multiple federal agencies including the U.S. Department of State

and several components within the U.S. Department of Homeland Security, including U.S.

Customs and Border Protection (CBP), U.S. Citizenship and Immigration Services (USCIS), and

ICE. Petitioners merely disagree with the exercise of ICE's discretion, but such discretion is not

a violation of law. Therefore, Petitioner's motion for a temporary restraining order must be denied.

## Background

Nonimmigrants who are admitted to the United States under a F-1 or M-1 visa are subject to the requirements set forth in 8 U.S.C. § 1101(f), (m) and 8 U.S.C. § 1184. *See also* 8 C.F.R. § 214.2(f), (m). A nonimmigrant who does not abide by the terms of his or her nonimmigrant status may be removable under INA § 237(a)(1)(C)(i), 8 U.S.C. § 1227(a)(1)(C)(i) for having "failed to maintain the nonimmigrant status . . . or to comply with the conditions of such status." Federal law requires DHS to track and monitor U.S. educational institutions that enroll nonimmigrant students, as well as the students themselves while they reside in the United States in an F or M nonimmigrant status. Section 641 of the Illegal Immigration Reform and Immigrant Responsibility Act of 1996 (IIRIRA), Pub. L. No. 104-208, Div. C, 110 Stat. 3009-546 (September 30, 1996), authorized the creation of a program to collect current and ongoing information provided by schools and exchange visitor programs regarding F, M, and J nonimmigrants during the course of their stay in the United States, using electronic reporting technology to the fullest extent practicable. IIRIRA further authorized DHS to certify schools participating in F or M student enrollment. DHS carries out these obligations through ICE's Student and Exchange Visitor Program (SEVP) which administers the Student and Exchange Visitor Information System (SEVIS). Over the past two decades, Congress has repeatedly stressed the importance of monitoring nonimmigrant students noting national security concerns. *See e.g.*, the Uniting and Strengthening America by Providing Appropriate Tools Required to Intercept and Obstruct Terrorism Act (USA PATRIOT Act) of 2001, Pub. L. No. 107-56 (Oct. 26, 2001); Enhanced Border Security and Visa Entry Reform Act of 2002, (EBSVERA) Pub. L.

No. 107-173, § 501 (May 14, 2002).  Significantly,  EBSVERA instituted a two-year recertification process for all SEVP-certified schools requiring them to demonstrate compliance with recordkeeping and reporting requirements relating to schools and nonimmigrant students. These statutes and their detailed requirements demonstrate clear congressional intent that ICE closely monitor schools and students through SEVIS and vigorously enforce all regulatory requirements.

Federal regulations promulgated in accordance with these authorities set forth the conditions of F and M nonimmigrant status, which require pursuit of a full course of study. *See* 8 C.F.R. § 214.2(f)(5), (m)(5) (discussing maintenance of a "full course of study" as a requirement to maintain nonimmigrant status). The regulations also provide, however, that most F-1 nonimmigrant students may take "no more than the equivalent of one class or three credits per session, term, semester, trimester, or quarter" online or through distance education as part of the full course of study requirement. *Id*. § 214.2(f)(6)(i)(G). An online or distance education course is defined as "a course that is offered principally through the use of television, audio, or computer transmission including open broadcast, closed circuit, cable, microwave, or satellite, audio conferencing, or computer conferencing." *Id*. F-1 students in a language study program and M-1 students may count no online or distance education courses toward a full course of study. 8 C.F.R. § 214.2(f)(6)(i)(G), (m)(9)(v). So, significantly, while some students are not permitted to take any online study, no nonimmigrant student may exceed the regulatory limit prescribed by § 214.2(f)(6)(i)(G).

Ensuring compliance with these requirements is shared by U.S. Department of State (issuing F-1 and M-1 nonimmigrant student visas and administering the J-1 program), U.S. Customs and Border Protection (admission), and ICE, specifically the SEVP. SEVP provides

approval and oversight to schools authorized to enroll F and M nonimmigrant students and gives guidance to both schools and students about the nonimmigrant student regulatory requirements. SEVP is part of the National Security Investigations Division and acts as a bridge for government organizations that have an interest in information on nonimmigrants whose primary reason for coming to the United States is to study.

## COVID-19

ICE, in coordination with DHS and other federal, state and local agencies has implemented a variety of programs, including altered enforcement priorities and adapted agency policies and practices in response to the unprecedented global pandemic of the novel coronavirus disease 2019(COVID-19). The goals of these adaptations are to ensure safety of the public and help detect and slow the spread of the virus. ICE recognizes this is an extremely fluid situation and provides updates on www.ice.gov to provide the public of notice of these policies as they relate to multiple facets of ICE operations.

## SEVP Policies

At issue in this case is a July 6 policy announcement, which provided notice to schools and nonimmigrant students of how ICE would exercise its discretion beginning in the fall of 2020 in light of the impact of COVID-19 on educational institutions. *See* Broadcast Message: Fall 2020 Guidance (July 2020), https://www.ice.gov/coronavirus.[1] However, the July 6 policy announcement is but the latest discretionary decision in a series of actions by SEVP in response to the COVID-19 pandemic.

---

[1] SEVP Broadcast messages are available at https://www.ice.gov/coronavirus under the tab "nonimmigration students and SEVP-certified schools" in the "guidance documents" section. Also relevant is the "Frequently Asked Questions" tab.

Beginning on January 29, 2020, SEVP issued a broadcast message in response to several inquiries regarding COVID-19 and the potential impact on F and M nonimmigrant students. *See* Broadcast Message: COVID-10 F and M Nonimmigrants (Jan. 2020). The broadcast message focused on international travel and permissible reductions of courses if medically authorized. The broadcast also reminded schools of flexibilities already built into the federal regulations to address various needs of nonimmigrant students in light of COVID-19. The January guidance allows for impacted parties to submit comments to the broadcast message and clearly states that it "is not a substitute for applicable legal requirements, nor is it itself a rule or a final action by SEVP."

On March 9, 2020, SEVP issued another broadcast message, superseding the January broadcast, advising F and M nonimmigrant students, SEVP-certified schools, and other stakeholders that ICE would be offering certain flexibilities to nonimmigrant students who were seeking to maintain their status in light of the COVID-19 pandemic. *See* Broadcast Message: COVID-19 and potential Procedural Adaptations for F and M Nonimmigrant Students (Mar. 2020). Appendix 1 of the March 9 broadcast message explains the requests that SEVP made of schools in March to maintain integrity of the nonimmigrant student program in accordance with these flexibilities. SEVP also released "COVID-19: Guidance for SEVP Stakeholders" on March 13, 2020, to provide clarification on the effects of the March 9 announcement.

Specifically, in the March 9 Broadcast, 2019, SEVP announced that it would temporarily decline to enforce the online course limitation provisions in the federal regulations due to changing practices of schools nationwide due to COVID-19. SEVP's guidance emphasized that this guidance was temporary and applied only to students currently enrolled in a program of study not new or initial students who were outside the United States at the time the

announcement was made.  However, the March 9 Broadcast still required that "schools and students should document any decisions [to adapt procedures and policies to address COVID-19] made and be able provide this information to SEVP upon request."  The Broadcast also explains "SEVP recognizes that the COVID-19 crisis is fluid and rapidly changing. For that reason, SEVP is not requiring prior notice of procedural adaptations, leaving room for schools to comply with state or local health emergency declarations. However, as noted in the Appendix, SEVP must be notified of procedural adaptations within ten business days of the change."  The Appendix sets forth the reporting requirements schools must comply with, including requiring schools to provide detailed information within 10 business days if the school decides to provide online instruction, utilize an alternative physical location, or whether the school will temporarily close.

As with the January broadcast, the March broadcast provides an opportunity for comments and reiterated that it "is not a substitute for applicable legal requirements, nor is it itself a rule or a final action by SEVP." The March broadcast also explicitly indicates "SEVP is monitoring this situation closely. The program will supplement this guidance with additional information and will adjust guidance as needed."

On March 13, SEVP issued an addendum to the March 9th guidance, entitled "COVID-19: Guidance for SEVP Stakeholders" in order to respond to several inquiries received by SEVP after issuance of the March 9 Broadcast. Relevant to this case, SEVP advised, "If a school closes temporarily but offers online instruction or another alternative learning procedure, nonimmigrant students should participate in online or other alternate learning procedures and remain in active status in SEVIS. Schools must notify SEVP of COVID-19 procedural changes within 10 business days. Given the extraordinary nature of the COVID-19 emergency, SEVP will allow F-1 and/or M-1 students to temporarily count online classes towards a full course of study in excess

of the limits stated in 8 CFR 214.2(f)(6)(i)(G) and 8 CFR 214.2(m)(9)(v). This temporary provision is only in effect for the duration of the emergency and in accordance with the procedural change documents filed in a timely manner to SEVP." The supplemental guidance concludes with the following:

> NOTE: Due to the fluid nature of this difficult situation, this guidance may be subject to change. SEVP will continue to monitor the COVID-19 situation and will adjust its guidance as needed.

On March 24, 2020, SEVP issued a supplemental broadcast message identifying the location of publicly available COVID-19 related guidance and reminding stakeholders to "notify SEVP of any procedural adaptation due to COVID-19 within 10 business days of the change." The March 24 guidance also allows for individuals to provide comments, advises the situation remains fluid and includes the same disclaimer as both the January and March 9 Broadcast messages.

On April 15, 2020, SEVP issued a supplemental broadcast message, reminding stakeholders to "submit their procedural modifications to SEVP within 10 business days of the date of determining the change, in accordance [with the March 9] Broadcast." At the time of the broadcast, SEVP had received 6,000 operational modification documents from schools across the nation. The April Broadcast includes the same opportunity to comment and disclaimer as in previous broadcasts.

On July 6, 2020, ICE issued a press release and SEVP issued a broadcast message, which outlines the temporary procedural adaptions which shall be implemented for the fall 2020 semester. The Broadcast recognizes "[t]here will still be accommodations to provide flexibility to schools and nonimmigrant students, but as many institutions across the country reopen, there is a concordant need to resume the carefully balanced protections implemented by federal

regulations." The goal of this announcement was to provide advance notice to SEVP stakeholders that a temporary rule change would be forthcoming that would impact schools and students beginning in the Fall 2020 semester. "This message is intended to provide additional time to facilitate the implementation of these procedures." The July 6 Broadcast contains the same disclaimer as on other broadcast messages.

SEVP also issued a Frequently Asked Questions (FAQ) section, which explains the March 9 guidance is currently in effect through the end of the summer semesters. The FAQ also provides an explanation justifying the change in policy for the fall semesters, namely "to maximize flexibility for students to continue their studies, while minimizing the risk of transmission of COVID-19 by not admitting students into the country who do not need to be present to attend classes in-person."

One of the main policy decisions Petitioners take issue within this case is the following guidance:

> "Students attending schools operating entirely online may ***not*** take a full online course load and remain in the United States. The U.S. Department of State will not issue visas to students enrolled in schools and/or programs that are fully online for the fall semester nor will U.S. Customs and Border Protection permit these students to enter the United States. Active students currently in the United States enrolled in such programs must depart the country or take other measures, such as transferring to a school with in-person instruction to remain in lawful status or potentially face immigration consequences including, but not limited to, the initiation of removal proceedings."

This guidance reflects the coordination between SEVP, CBP and the U.S. Department of State regarding nonimmigrant F and M visa holders and the interrelationship between these agencies

in enforcing immigration law as applied to nonimmigrant students. In addition, the July 6 broadcast message set forth several reporting requirements.[2]

Students will not be permitted to enter or remain in the United States to attend schools who are conducting classes entirely online, consistent with the current regulatory limitations found at 8 C.F.R. 214.2(f), (m), but they are not barred from continuing to attend all classes at these schools from abroad, and their SEVIS records may remain in active status while studying online, outside the United States. SEVP's guidance for Fall 2020 will take effect at the start of a school's defined fall semester. The reporting requirement is essential and is the primary means to ensure students and schools are following the statutory and regulatory requirements of their nonimmigrant status.

The requirement to depart is grounded in statute. INA § 237(a)(1)(C)(i), 8 U.S.C. § 1227(a)(1)(C)(i). If students fail to maintain their nonimmigrant student status, they must depart or risk being placed in removal proceedings. *Id*. This is not new. The regulation explicitly excludes 100% online course loads. Petitioners do not argue ICE should revert to the black letter of the regulation, but instead contest ICE's discretionary decision to temporarily adjust its enforcement posture while nation is in the grips of the COVID-19 pandemic. The July 6 policy announcement is nothing more than a reminder that students must depart should they violate the terms of their nonimmigrant student visa.

SEVP guidance has repeatedly advised stakeholders that the agency's position during the pandemic is fluid. Given the volatile nature of the pandemic, SEVP guidance warns all schools

---

[2] First, schools must reissue Forms I-20 to all students within 21 business days of July 6 to reflect any relevant changes in the student's program enrollment and information, pursuant to 8 C.F.R. 214.3(g)(2). Second, schools that offer entirely online classes or programs or will not reopen for the fall 2020 semester must complete an operational change plan and submit it to SEVP later than Wednesday, July 15, 2020. (3) All other operational plans implemented by the school must be reported within 10 days of the change. (4) For all students attending schools in the United States this fall 2020, the school must issue new Forms I-20 to each student.

and students - the guidance may be altered or superseded *at any time*.  At no time did the agency issue a final rule limiting SEVP's discretionary enforcement authority during the pandemic.

Instead, SEVP continues to adapt and adjust enforcement priorities in accordance with the law and as a proper exercise of the agency's discretion.  Petitioners' motion for a temporary restraining order seeks to freeze a single policy decision in time. If granted, the agency will be unable to respond to new developments of this unprecedented health crisis until Petitioners, or other similarly situated private entities, deem appropriate. The court should deny the motion for a temporary restraining order.

## II.   PETITIONERS ARE NOT ENTITLED TO A TEMPORARY RESTRAINING ORDER OR ANY INJUNCTIVE RELIEF

### A.   LEGAL STANDARD

Preliminary injunctive relief, whether sought through a TRO or a request for preliminary injunction, "is an extraordinary and drastic remedy, one that should not be granted unless the movant, by a clear showing, carries the burden of persuasion." *Mazurek v. Armstrong*, 520 U.S. 968, 972 (1997).  Preliminary injunctions are designed to preserve the relative positions of the parties until a determination of the merits can be reached.  *See Verhoeven v. Brunswick School Committee*, 207 F.3d 1, 3 (1st Cir. 1999). This form of relief "is never awarded as of right." *Peoples Fed. Sav. Bank v. People's United Bank*, 672 F.3d 1, 8-9 (1st Cir. 2012) (*quoting Voice of the Arab World, Inc. v. MDTV Med. News Now, Inc.,* 645 F.3d 26, 32 (1st Cir. 2011)).  A judge should use his or her authority to grant such injunctive relief "sparingly." *Mass. Coal. of Citizens with Disabilities v. Civil Def. Agency & Office of Emergency Preparedness,* 649 F.2d 71, 76 n.7 (1st Cir. 1981).

The burden of proof requires the moving party to demonstrate that: (1) he has a substantial likelihood of success on the merits of his claims; (2) that he will suffer irreparable harm unless the injunction issues; (3) that his harm outweighs any damage to the opposing party; and (4) that the injunction would not be adverse to the public's interest. *See Winter v. NRDC*, 555 U.S. 7, 20 (2008); *Planned Parenthood League of Mass. v. Bellotti*, 641 F.2d 1006, 1009 (1st Cir. 1981). The Supreme Court requires the moving party to demonstrate that the irreparable harm is likely – not just possible – before a preliminary injunction may issue. *Winter*, 555 U.S. at 22.

In order to receive a preliminary injunction, Petitioners must demonstrate likely success on the merits of their case. *See Esso Standard Oil Co. v. Monroig-Zayas*, 445 F.3d 13, 18 (1st Cir. 2006). If they cannot do so, "the remaining factors 'become matters of idle curiosity,'…insufficient to carry the weight of this extraordinary relief on their own." *Chambers v. NH Prison*, 562 F. Supp. 2d 197, 199 (D.N.H. 2007) (quoting *Ross-Simons of Warwick, Inc. v. Baccarat, Inc.*, 102 F.3d 12, 18-19 (1st Cir. 1996)). Importantly, even if this Court finds that Petitioners are likely to succeed on the merits of their claims, "unless [Petitioners] also demonstrate[] [they] will suffer irreparable harm without the requested relief," a preliminary injunction will not issue. *Id.* (referencing *Ross-Simons of Warwick, Inc.*, 102 F.3d at 19). The two – likelihood of success and irreparable harm – must "must be juxtaposed and weighed in tandem." *Ross-Simons of Warwick, Inc.*, 102 F.3d at 19.

**B. Petitioners are unlikely to succeed on the merits of their claims.**

**1. Petitioners are unlikely to succeed on the merits of their APA claims, as Respondents' decisions were not arbitrary or capricious and were made after considering important aspects of the problem before the agency.**

Petitioners are unlikely to succeed on the merits of their APA claims because arguments that the agency did not consider important aspects of the COVID-19 emergency are likely to fail.

11

The agency's guidance to its stakeholders was not contained solely in the broadcast messages published regularly beginning as early as January 29, 2020, but also included information on the ICE websites, including https://www.ice.gov/coronavirus, and in the FAQ documents posted on the site, both of which were updated regularly as well. The FAQ documents have all included the following statement:

> Note: SEVP continues to actively monitor COVID-19 and provide up-to-date information to stakeholders, including designated school officials (DSOs) and F and M students. Due to the fluid nature of this situation, the answers in this document may be subject to change. Refer to ICE.gov/COVID19 for the most up-to-date version of this FAQ.

*Frequently Asked Questions for SEVP Stakeholders about COVID-19*, pg.1 (https://www.ice.gov/doclib/coronavirus/covid19faq.pdf). This notice clearly indicates the agency's continuing evaluation of the COVID-19 situation as it developed, and the agency's posture as it changed. This alone demonstrates that ICE considered *at least* two important aspects of the situation that Petitioners fail to recognize, the fluid nature of the COVID-19 pandemic and the urgent need for stakeholders, including schools, to have access to guidance regarding the impact of the pandemic. In the agency's July 6 policy announcement, it states "DHS is adopting a new approach to carefully balance public health concerns against the varied approaches that schools and universities are taking to combat the spread of COVID-19." *Id*. Here again, ICE has indicated additional factors of critical importance that were considered, and ultimately balanced, in the approach up to and including the July 6 policy announcement, public health concerns and the variety of approaches schools were taking as a result of such concerns. Both by providing notice that its guidance was subject to change, and regularly updating, expanding upon, and adjusting its guidance to stakeholders, ICE has demonstrated that it not only considered important aspects of the emergency it faced, but also that it nimbly reacted to

changes in the emergency, shifted its posture accordingly, and responded to its stakeholders' questions and requests for additional information to keep them appropriately advised.

Further, the content of the July 6 policy announcement, demonstrates ICE's reasoned consideration of both its obligations to fulfill its congressional directive to vigorously enforce statutory and regulatory requirements, and the need for U.S. educational institutions to maintain some measure of flexibility in their modes of instruction, given the ongoing and volatile nature of the COVID-19 pandemic. If ICE had not considered the schools impacted by its decision, or the vast differences among them regarding plans for reopening in the fall, perhaps the agency would have completely rescinded its March 9, 2020 broadcast message and reverted back to enforcement of the black letter of the regulations, returning to business as usual as before the COVID-19 emergency. To have done so would have severely limited the options for schools, limiting F-1 students to count no more than one class or three credits per semester or term offered fully online or by distance education towards the full course of study requirement for maintaining their F nonimmigrant status. *See* 8 C.F.R. § 214.2(f)(6)(i)(G). Instead, ICE made the decision to exercise its discretion to "modify" its posture announced in its March guidance. *See* July 6 broadcast message, pg. 1. The agency offered three possible scenarios, including offering students the ability to exceed the regulatory limitations on online study at schools employing a hybrid approach of offering both in person and online classes.[3] This agile approach to the Fall 2020 semester demonstrates that ICE considered and balanced the equities of schools, foreign students, and the agency's need to uphold and enforce the immigration laws and regulations

---

[3] ICE also offered two other scenarios for schools with plans to reopen in the fall: 1) for schools intending to operate entirely online, foreign students would be able to fully participate in these programs from outside the United States, and 2) for schools intending to operate as normal, with fully in-person classes, nonimmigrant students in the United States would be bound by existing regulations limiting F students, with the exception of F nonimmigrant students enrolled in English language programs, to count one class or three credits of online or distance education study towards the full course of study regulatory requirements for such students. M nonimmigrant students, in accord with existing regulations, would also be prohibited from engaging in online study under this scenario.

within the United States. Any further reliance interests that schools may have had in the March 13, 2020 guidance are necessarily inconsequential, as the guidance clearly indicates that it is only temporary, and SEVP-approved schools and foreign students are required to be aware of the obligations and restrictions governing their actions under federal regulations. *See* COVID-19 Guidance for SEVP Stakeholders, (March 13, 2020).

Importantly, Petitioners' argument, that the agency should have considered certain factors before making the July 6 policy announcement, is based on a fallacy, that the government's decision suddenly "forced" students holding F-1 visas to attend classes in person as a condition of maintaining their nonimmigrant status. *See* Pl. Compl. at 16. In fact, the regulations governing the maintenance of nonimmigrant status for aliens present in the United States pursuant to an F visa, are settled and long-standing, and have required that students complete their program of study in person, rather than fully online or through distance education, for close to twenty years. *See* 8 C.F.R. § 214.2(f)(6)(i)(G). In the May 16, 2002, Notice of Proposed Rulemaking, which proposed to add subsection (G) to 8 CFR 214.2(f)(6)(i), the Immigration and Naturalization Service explained, "[w]hile on-line and distance education programs can be highly innovative means to augment or even conduct an educational program, the entry of a foreign student into the United States becomes unnecessary if *the bulk of the program* does not require the student's physical presence. Therefore, this rule proposes to limit the enrollment of F-1 and M-1 students in courses that are on-line or through distance education programs and do not require the student's actual presence." 67 FR 34862 at 34866 (emphasis added). A solely online program of study provides a nonimmigrant student with enormous flexibility to be present anywhere in the United States for up to an entire academic term, whether that location has been reported to the government, which raises significant national security concerns. Additionally, such programs

could allow a nonimmigrant student to conduct activities other than full-time studying, which undermines the purpose of the F-1 nonimmigrant visa. There has been, and continues to be, a clear intent in the regulations governing nonimmigrant students that such students continue to meet the congressionally-mandated requirements to be considered F nonimmigrant students, including that such students sought "to enter the United States temporarily and *solely for the purpose* of pursuing… a course of study." 8 U.S.C. § 1101(a)(15)(F)(i).

### 2. Petitioners are unlikely to succeed on the merits of their APA claims, as Respondents' actions were not arbitrary or capricious and were supported by a reasoned basis and justification.

Petitioners' arguments that the agency did not offer a rationale or justification for the July 6 broadcast message are also likely to fail. The Supreme Court has made clear that, "[t]he scope of review under the 'arbitrary and capricious' standard is narrow and a court is not to substitute its judgment for that of the agency." *Motor Vehicle Mfrs. Ass'n of United States, Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983). Additionally, it is appropriate to "uphold a decision of less than ideal clarity if the agency's path may reasonably be discerned." *Id.* (citing *Bowman Transp. Inc. v. Arkansas-Best Freight System*, 419 U.S. 281, 286 (1974)). There is a clear correlation between the existing obligations of aliens present in the country for the purposes of studying at a U.S. educational institution, and the requirements outlined by ICE in the July 6 policy announcement. Rather than completely rescinding the March guidance and reverting to business as usual with respect to schools and foreign students, ICE announced a measured transition to begin a move toward reopening schools and allowing students to return to classrooms. Petitioners acknowledge that ICE justified its shift in posture by stating, "as many institutions across the country reopen, there is a concordant need to resume the carefully balanced protections implemented by federal regulations." July 6 broadcast message, pg. 1.

Further rationale and justifications were provided when ICE explained that as the Fall 2020 semester was rapidly approaching, and the agency learned more about the variety of reopening plans schools were developing, the decision had to be made to strike some balance that would allow the flexibility that schools would need to allow foreign students to continue to study, while minimizing the risk of further COVID-19 transmission from new arrivals. *See Frequently Asked Questions for SEVP Stakeholders about Guidance for the Fall 2020 Semester*, at 1, https://www.ice.gov/doclib/sevis/pdf/sevisFall2020_FAQ.pdf.  As such, ICE offered its rationale and justification for the decision throughout the July 6 policy announcement. It is not necessary that Petitioners agree with the government's rationale for it to be considered sufficient for the purposes of meeting APA requirements.

### 3. The July policy is exempt from the APA's notice and comment requirements.

The July 6 policy announcement was not subject to the APA's notice and comment requirements because it was not a legislative rule, but, at most, a statement of policy.  The APA provides an exception to its notice-and-comment requirements for "general statements of policy."  5 U.S.C. § 553(b)(A).  A statement of policy "genuinely leaves the agency and its decisionmakers free to exercise discretion" when applying the policy and does not create a "binding norm." *American Bus. Ass'n v. United States*, 627 F.2d 525, 529 (D.C. Cir. 1980).

In this case, ICE's July 6 policy announcement was not a rule subject to the notice-and-comment requirements of § 553, as it was not intended to have any legal effect or impose any binding norms. The July 6 policy announcement—by its own express terms—was intended solely to provide advance notice to the public that, through a forthcoming publication in the Federal Register, DHS would be implementing a revised policy.  Through the July 6 Directive, DHS announced that it would publish a "Temporary Final Rule" to address the interplay of

schools offering online coursework due to COVID-19 and the ability of F-1 nonimmigrants to maintain their status. The July 6 directive was publicly released and sent directly to SEVP-certified schools as a Broadcast Message to give stakeholders the opportunity to prepare in advance for a regulatory change that would likely require immediate action. Nothing in the July 6 policy announcement itself requires ICE to take administrative compliance actions against schools that do not complete reporting in accordance with the deadlines laid out.[4] Nor does the July 6 policy announcement mandate that ICE initiate removal proceedings against F-1 nonimmigrants for failure to abide by the terms of their nonimmigrant status. DHS would most likely defer from taking such action until a regulatory change was properly made in accordance with section 553 of the APA.

Implicit in Plaintiffs' argument here is the contention that DHS's March 2020 announcement was a modification of federal regulations that could only be subsequently modified through the APA's notice-and-comment process. Yet, the July 6 policy announcement has no legal effect and establishes no such binding norms. DHS's March 2020 announcement was issued as a function of DHS's "absolute discretion" to decline to bring enforcement actions against F-1 students and certified schools who would have been operating in violation of the federal regulations when shifting to a fully online instruction model in light of the COVID-19 emergency. *See Heckler v. Chaney*, 470 U.S. 821, 831 (1985) (holding that "an agency's decision not to prosecute or enforce, whether through civil or criminal process, is a decision generally committed to an agency's absolute discretion"). Thus, the July 6 policy announcement

---

[4] To the extent that the July 6 Directive sets deadlines for SEVP-certified schools to report changes to their operational plans and re-issue I-20s, these deadlines were intended to provide DHS with enough time to obtain and digest the information necessary to uphold its statutory obligations to collect, verify, and monitor information on those in F-1 status. *See* 8 U.S.C. § 1372. For instance, without knowing whether a school would be open for the Fall 2020 semester, DHS would lack the information needed to determine whether an F-1 student seeking admission to the United States to pursue a course of study at that school were eligible for admission.

did not implement a change to the federal regulations regarding the amount of online coursework F-1 nonimmigrants could take and remain in compliance with the terms of their status. As stated in the July 6 broadcast message, the actual "procedures and responsibilities" comprising the regulatory change would be published "in the near future as a Temporary Final Rule in the Federal Register." But the July 6 policy announcement itself was released "to provide additional time to facilitate the implementation of these procedures."

### C. Petitioners have not demonstrated they will suffer irreparable harm and the balance of equities favors defendants.

Irreparable injury is "an injury that cannot adequately be compensated for either by a later-issued ... injunction, after a full adjudication on the merits, or by a later-issued damages remedy." *Rio Grande Cmty. Health Ctr., Inc. v. Rullan*, 397 F.3d 56, 76 (1st Cir. 2005). Petitioners must "demonstrate that irreparable injury is likely in the absence of an injunction," not merely that it is a possibility. *Winter*, 555 U.S. at 375, 129 S.Ct. 1093 (emphasis in original), *see also Nunes v. Mass. Dep't of Corr.*, 766 F.3d 136, 145 (1st Cir. 2014). And when irreparable harm is lacking, that suffices to defeat the current motion. Plaintiffs fail to meet this standard.

Petitioners take issue with the change in policy regarding fully online coursework. Petitioners argue this policy disincentivizes universities from providing online course work despite "hundreds of universities, including Harvard and MIT, [who] have taught their students remotely." TRO Mot. at 1. But the July policy does not require universities to cease providing online learning classes. In fact, the policy explicitly recognizes that universities may choose to do so, and if so, students choosing a 100% online learning program do not need to be physically present in the United States.

Petitioners express frustration in this change of policy but the frustration is due to a self-perceived requirement to provide increased in-person classes in order to comply with the July

policy. TRO Mot. at 5. That is not so. Petitioners may continue with their curriculum as they see fit, admitting into the fall semester the same number of students as anticipated. The July policy announcement only requires fully online nonimmigrant students continue their online studies from abroad and schools to timely report programmatic changes to SEVP. The July policy announcement does not restrain Petitioners educational programs, which they intend to provide "robust and meaningful learning experiences through online media." TRO Mot. at 6. Nonimmigrant students may still participate in this learning experience and maintain an active SEVIS status. Petitioners do not explain how physical presence in the United States is required for one to participate in a 100% online learning experience. Nor do they explain how the lack of physical presence by their nonimmigrant students participating in the online programs would negatively impact other students, who are also participating in the online course, or the administration of their set curriculum.

This argument also cuts against Petitioner's claim the diversity of their student body will decline as a result of the July policy announcement as students may still choose to participate in this "robust and meaningful experience" through online learning. Petitioners have not demonstrated, nor do they argue, if they implemented a 100% online curriculum, *fewer* students would choose to attend Harvard or MIT. Petitioners argue instead, if nonimmigrant students are not permitted to be present in the United States, nonimmigrant students may not choose to attend Harvard or MIT. TRO Mot. at 17-18. But Plaintiffs cannot argue there is a correlation between physical presence in the United States and the quality of education these reputable organizations provide if they are requiring the majority of current students, U.S. citizens, Lawful Permanent Residents (LPR) and nonimmigrants alike, to participate in online learning classes. Arguably, if Harvard and MIT decided to move to 100% online programs, their institutions may be less appealing to U.S. citizen or LPR students as well, but Petitioners do not argue their operations have been adversely impacted by less U.S. citizen

or LPR student enrollment. Therefore, Petitioners have not demonstrated an irreparable injury to their educational operations if nonimmigrant students who choose to participate in 100% online coursework may not be admitted into or permitted to remain in the United States.

Without proof of irreparable injury to Harvard or MIT's operations or student diversity, Petitioners have failed to meet their burden to demonstrate "likely" irreparable harm to warrant the temporary restraining order.

Finally, the balance of equities weighs against issuing a temporary restraining order preventing SEVP from exercising its discretion in enforcing the statutory and regulatory requirements of nonimmigrant student programs. Any order that enjoins a governmental entity from enforcing actions taken pursuant to statutes enacted by the duly elected representatives of the people constitutes an irreparable injury that weighs heavily against the entry of injunctive relief. *See New Motor Vehicle Bd. v. Orrin W. Fox Co.*, 434 U.S. 1345, 1351 (1977). It is also well-settled that the public interest in enforcement of United States immigration laws is significant. *United States v. Martinez-Fuerte*, 428 U.S. 543, 556-58 (1976); *Landon v. Plasencia*, 459 U.S. 21, 34 (1982); *Blackie's House of Beef, Inc. v. Castillo*, 659 F.2d 1211, 1221 (D.C. Cir. 1981) ("The Supreme Court has recognized that the public interest in enforcement of the immigration laws is significant."). A TRO would irreparably harm the United States and the public. The public has an interest in ICE, as well as CBP and the U.S. Department of State, being allowed to enforce immigration laws without undue interference in the manner, and in accordance with the statutes, proscribed by Congress- which includes requiring schools to meticulously monitor and report the educational conditions of their nonimmigrant students so ICE may ensure compliance with immigration laws. The alleged administrative inconveniences do not outweigh the harm that would be imposed by "injunctive relief [that] deeply intrudes into the core concerns of the executive branch," *Adams v. Vance*, 570 F.2d 950, 954 (D.C. Cir. 1978), and

undermines the "efficient administration of the immigration laws…." *Innovation Law Lab v. McAleenan*, 924 F.3d 503, 510 (9th Cir. 2019).

## IV.   PETITIONERS LACK ARTICLE III STANDING ON BEHALF OF STUDENTS

The majority of Petitioners' alleged harms draws from the alleged impact to nonimmigrant students. But Petitioners lack third-party standing to bring claims on behalf of these unidentified students. "Standing to sue is a doctrine rooted in the traditional understanding of a case or controversy. The doctrine developed in our case law to ensure that federal courts do not exceed their authority as it has been traditionally understood." *Spokeo, Inc. v. Robins*, 136 S. Ct. 1540, 1547 (2016). The "irreducible constitutional minimum of standing" contains three requirements. *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560 (1992). First, a plaintiff must have suffered an "injury in fact"—an invasion of a legally protected interest which is (a) concrete and particularized, and (b) "actual or imminent, not 'conjectural' or 'hypothetical.'" *Id*. Second, the injury has to be "fairly . . . trace[able] to the challenged action of the defendant, and not . . . the result [of] the independent action of some third party not before the Court." *Id*. Third, it must be "likely," as opposed to merely "speculative" that the injury will be "redressed by a favorable decision." *Id*. at 560-61 (internal citations omitted). "Because standing is fundamental to the ability to maintain a suit, and because ... the complainant [has] the burden of clearly alleging facts sufficient to ground standing, ... where standing is at issue, heightened specificity is obligatory at the pleading stage." *United States v. AVX Corp.*, 962 F.2d 108, 115 (1st Cir. 1992).

Petitioners allege the July policy announcement negatively impacts the students who attend these universities, but Petitioners may not raise alleged harms on behalf of students. TRO Opp. at 6-7. As a general rule, a party, organizational or otherwise, generally "lacks a judicially cognizable interest in the prosecution or nonprosecution of another," *Linda R.S. v. Richard D.*,

410 U.S. 614, 619 (1973), including "enforcement of the immigration laws," *Sure-Tan, Inc. v. NLRB*, 467 U.S. 883, 897 (1984). The First Circuit requires litigants who are asserting third-party standing to demonstrate the following: [1] that the litigant personally has suffered an injury in fact that gives rise to a sufficiently concrete interest in the adjudication of the third party's rights; [2] that the litigant has a close relationship to the third party; and [3], that some hindrance exists that prevents the third party from protecting its own interests." *Council of Ins. Agents & Brokers v. Juarbe–Jimenez*, 443 F.3d 103, 108 (1st Cir.2006) (internal quotations omitted). Petitioners do not specify a nonimmigrant student who has suffered an injury-in-fact who is also hindered from protecting their own interests. Petitioners merely allege a variety of potential burdens some nonimmigrant students may or may not experience if required to continue their 100% online education outside the United States. Petitioners also make no attempt to demonstrate a "close relationship" between the school and any nonimmigrant student to satisfy the requirements for third-party standing. As Petitioners cannot establish third-party standing on behalf of nonimmigrant students, these alleged harms cannot be the basis to issue a temporary restraining order in this case. Petitioners are educational organizations and the *only* harms to themselves that they allege are speculative and relate to the desire to implement additional in-person classes and an alleged loss to the diversity of their student body. Petitioners allegations regarding the speculative impact on nonimmigrant students is not properly before the court as Petitioners lack standing to bring such claims.

## V. CONCLUSION

The court should deny Petitioners' request to enter a temporary restraining order preventing the

implementation of the July policy announcement.

Respectfully submitted,

ANDREW E. LELLING
United States Attorney

Dated: July 13, 2020                    By:  */s/ Rayford A. Farquhar*
                                             RAYFORD A. FARQUHAR
                                             Assistant United States Attorney
                                             United States Attorney's Office
                                             John Joseph Moakley U.S. Courthouse
                                             1 Courthouse Way, Suite 9200
                                             Boston, MA 02210
                                             617-748-3284
                                             Email:  rayford.farquhar@usdoj.gov