**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS**

PRESIDENT AND FELLOWS OF
HARVARD COLLEGE and
MASSACHUSETTS INSTITUTE OF
TECHNOLOGY,

                    *Plaintiffs*,

          v.

UNITED STATES DEPARTMENT OF
HOMELAND SECURITY, *et al.*,

                    *Defendants*.

Civil Action No. 1:20-cv-11283-ADB

**Leave to File Granted On
July 13, 2020 (ECF No. 85)**

**BRIEF OF *AMICI CURIAE* NEW YORK UNIVERSITY, UNIVERSITY OF
ROCHESTER, ICAHN SCHOOL OF MEDICINE AT MOUNT SINAI, GLENDALE
COMMUNITY COLLEGE, CABRILLO COLLEGE, THE CATHOLIC UNIVERSITY
OF AMERICA, SAN DIEGO COMMUNITY COLLEGE, THE COOPER UNION FOR
THE ADVANCEMENT OF SCIENCE & ART, RIDER UNIVERSITY, SANTA ROSA
JUNIOR COLLEGE, THE ART CENTER COLLEGE OF DESIGN, THE COAST
COMMUNITY COLLEGE DISTRICT, THE SOUTHERN CALIFORNIA INSTITUTE
OF ARCHITECTURE, THE SOUTH ORANGE COUNTY COMMUNITY COLLEGE
DISTRICT, AND THE MANHATTAN SCHOOL OF MUSIC IN SUPPORT OF
<u>PLAINTIFFS' MOTION FOR A PRELIMINARY INJUNCTION</u>**

Joseph C. O'Keefe (*pro hac vice* pending)
Om V. Alladi (*pro hac vice* pending)
PROSKAUER ROSE LLP
Eleven Times Square
New York, NY 10036-8299
Telephone: (212) 969-3000
Facsimile: (212) 969-2900
jokeefe@proskauer.com
oalladi@proskauer.com

William D. Dalsen (BBO# 689334)
Hena M. Vora (BBO# 704029)
PROSKAUER ROSE LLP
One International Place
Boston, MA 02110
Telephone: (617) 526-9600
Fax: (617) 526-9899
wdalsen@proskauer.com
hvora@proskauer.com

*Attorneys for Amici Curiae*

**<u>TABLE OF CONTENTS</u>**

**Pages(s)**

PRELIMINARY STATEMENT ....................................................................................1

INTEREST OF *AMICI CURIAE* ..............................................................................3

ARGUMENT ...............................................................................................................4

I.    The Immediate and Detrimental Effect of the July 6 Directive on Educational Institutions and Students Demonstrates Plaintiffs are Likely to Succeed on the Merits. ...........................................................................................4

    A.    The July 6 Directive Improperly Dictates Educational Policy ..................5

II.    The July 6 Directive Fails to Account for Its Effect on Public Health, Including the Burden Upon Immunocompromised Students, Faculty, and Staff ................8

III.    The July 6 Directive Imposes Significant and Unreasonable Operational Burdens on *Amici* and their Students Without Justification .................................11

    A.    The July 6 Directive Places Onerous Burdens on *Amici* ........................11

    B.    The July 6 Directive Fails to Articulate or Explain the Basis for its Goals. ............12

    C.    The July 6 Directive Does Not Take Into Account *Amici*'s Serious Reliance Interests. .....................................................................13

    D.    The July 6 Directive Will Result in Irreparable Harm. ...........................13

CONCLUSION...........................................................................................................15

# TABLE OF AUTHORITIES

**Page(s)**

CASES

*Allied-Signal, Inc. v. U.S. Nuclear Reg. Comm'n*,
  988 F.2d 146 (D.C. Cir. 1993) ........................................................................ 12

*Bowen v. Georgetown Univ. Hosp.*,
  488 U.S. 204 (1988) ........................................................................................ 4

*City of Phila. v. Sessions*,
  280 F. Supp. 3d 579 (E.D. Pa. 2017) ............................................................. 9

*Cook Cty., Ill. v. Wolf*,
  962 F.3d 208 (7th Cir. 2020) .......................................................................... 8

*Dep't of Homeland Sec. v. Regents of Univ. of Cal.*,
  140 S. Ct. 1891 (2020) ................................................................................ 4, 12

*Dep't of State v. Coombs*,
  482 F.3d 577 (D.C. Cir. 2007) ....................................................................... 4

*FCC v. Fox Television Stations*,
  556 U.S. 502 (2009) ........................................................................................ 13

*Fisher v. Univ. of Tex.*,
  570 U.S. 297 (2013) ........................................................................................ 14

*Grutter v. Bollinger*,
  539 U.S. 306 (2003) ................................................................................. 5, 7, 14

*Keyishian v. Bd. of Regents of Univ. of State of N.Y.*,
  385 U.S. 589 (1967) ........................................................................................ 14

*Michigan v. EPA*,
  576 U.S. 743 (2015) ........................................................................................ 12

*Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*,
  463 U.S. 29 (1983) .......................................................................................... 12

*Nat'l Immigration Project of Nat'l Lawyers Guild v. Exec. Office of Immigration
  Review*,
  No. 1:20-CV-00852 (CJN), 2020 WL 2026971 (D.D.C. Apr. 28, 2020) ..................................... 9

*Office of Commc'n of United Church of Christ v. FCC*,
   779 F.2d 702 (D.C. Cir. 1985) .................................................................................. 4

*Regents of Univ. of Cal. v. Bakke*,
   438 U.S. 265 (1978) ................................................................................................... 5

*Ryan v. U.S. Immigration & Customs Enf't*,
   382 F. Supp. 3d 142 (D. Mass. 2019) ....................................................................... 4

*SEC v. Chenery Corp.*,
   332 U.S. 194 (1947) ................................................................................................. 12

*Sierra Club v. Trump*,
   929 F.3d 670 (9th Cir. 2019) ..................................................................................... 4

*Wilderness Watch, Inc. v. U.S. Fish & Wildlife Serv.*,
   629 F.3d 1024 (9th Cir. 2010) ................................................................................... 4

STATUTES

5 U.S.C. § 706(2)(C) ........................................................................................................ 4

6 U.S.C. § 111(b)(1) ......................................................................................................... 5

6 U.S.C. § 111(b)(1)(G) ................................................................................................... 5

OTHER AUTHORITIES

Elaheh Koolaee, "Science Diplomacy of the Islamic Republic of Iran in the South
   Caucasus," Int'l Studies Journal, 15(4), at 2, 7 (Feb. 6, 2019) ................................ 10

"Exploring Engineering Education in Broader Context: A Framework of
   Engineering Global Preparedness," American Society for Engineering
   Education, 121st Annual Conference & Exhibition, at 2-6 (June 2014),
   https://tinyurl.com/ybfesewu ...................................................................................... 9

"The Federal Role in Education," U.S. Dep't of Education, (May 25, 2017)
   https://www2.ed.gov/about/overview/fed/role.html .................................................... 5

Initial Fall Reopening Guidance, Massachusetts Department of Education (June 25,
   2020) https://www.mass.gov/doc/dese-fall-reopening-guidance/download ................. 5

George D. Vavougios, "Potentially irreversible olfactory and gustatory impairments
   in COVID-19: Indolent vs. fulminant SARS-CoV-2 neuroinfection," Brain,
   Behavior, and Immunity, 87:107-08 (Apr. 2020) ...................................................... 13

*What we know (so far) about the long-term health effects of COVID-19*, Advisory
  Board (June 2, 2020), https://tinyurl.com/yaamg5mr .................................................................. 13

## **PRELIMINARY STATEMENT**[1]

Hundreds of thousands of students from around the world study in the United States in secondary, undergraduate, graduate, and professional programs.  *Amici* represent a broad range of those institutions that, collectively, educate tens of thousands of international students each year. A significant portion of *Amici*'s student bodies each year and for the Fall 2020 semester consists of international students,[2] who have been and remain critical not only to creating diversity of experience and viewpoint in the classroom, but to the international standing of the United States and its educational institutions.

Although the benefits of diversity in classrooms cannot be denied, the July 6 Directive purports to require *Amici* and others either to abandon a critical and substantial part of their student populations at the eleventh hour, or to defer to the judgment of ICE as to how schools should educate all of their students regardless of circumstances or educational need in the midst of a dangerous and unprecedented pandemic.

*Amici* stand with their international students.  The July 6 Directive is an arbitrary and capricious exercise of government authority that seeks to make the availability of international study in the United States dependent upon whether international students temporarily attend classes virtually, and must be enjoined.  *Amici* respectfully submit Plaintiffs are likely to succeed on the merits of their claims, and that the Court should grant the preliminary injunction Plaintiffs seek, for three reasons.

---

[1] Capitalized terms not defined herein have the meaning ascribed to them in the Complaint (ECF No. 1).

[2] For example, New York University alone anticipates instructing over 15,000 international students this coming fall that make up approximately 23 percent of its undergraduates, 40 percent of its graduate students, and 11 percent of its professional students.  The University of Rochester alone anticipates instructing over 4,000 international students that will make up approximately 30 percent of its programs.  Collectively, *Amici*'s new and incoming international students hail from over 148 countries, and represent a diverse array of cultural and social backgrounds and experiences.

*First*, the July 6 Directive improperly dictates educational policy and teaching methodology for both international and domestic students at institutions throughout the United States.  The July 6 Directive requires schools instituting hybrid programs either (i) to mandate that thousands of international students return to campus for in-person instruction regardless of whether that is safe, necessary, or feasible; or (ii) to require all students, international and domestic, to take courses entirely online.  Both choices ignore *Amici*'s months of careful planning to continue educating students this fall during the pandemic, and both choices disregard *Amici*'s careful balancing of a diverse array of educational needs to determine which students—regardless of whether they are international or domestic—must or should be instructed in-person on campus.

The result is that ICE is improperly dictating how *Amici* and others educate all of their students regardless of educational need.  The July 6 Directive forces *Amici* first to choose between retaining international students at the expense of having ICE direct how best to educate all students, or sending their international students home at irreparable cost.  It forces *Amici* with hybrid programs to place students, faculty, and staff at an unknown degree of greater risk as they attempt to adjust, in nearly no time, to accommodate thousands of suddenly non-exempt international students for in-person instruction.  And it forces *Amici* with entirely online programs to send their international students out of the country to uncertain Internet access and country-by-country Internet censorship that may render continued education from abroad impracticable.  All of this dictates educational policy, beyond the scope of DHS's authority and expertise—and even if these effects could be authorized, the July 6 Directive is arbitrary and capricious because ICE did not consider those effects at any level.

*Second*, the July 6 Directive fails to account for its detrimental effects on public health.  Under its terms, *Amici* with hybrid programs must prioritize in-person instruction of international

students regardless of educational need or the effect on students who must be taught in person (*e.g.*, medical students).  The result is to put international students at unnecessary additional risk of exposure to COVID-19.  Further, there is no indication ICE considered the effect of the July 6 Directive upon the training of scientists and doctors, or upon research programs critical to the fight against COVID-19, including in particular the effect on the training of new physicians and scientists and the effect on programs critical to the fight against COVID-19 (*e.g.*, post-doctoral students researching and developing viral detection and antibody testing at the Icahn School of Medicine at Mount Sinai, as well as vaccines and treatments), and on other scientific research.  ICE's failure to consider those effects render the July 6 Directive arbitrary and capricious.

*Third*, the July 6 Directive is improper, and an injunction should be granted, because of the abrupt and baseless burdens it places on *Amici* and their students.  The July 6 Directive would require *Amici* to undertake in weeks what they previously had months to carefully plan and accomplish—namely, to institute new operational change plans and certify thousands of Form I-20 submissions.  Particularly in view of ICE's prior guidance, the July 6 Directive obliterates *Amici*'s serious and reasonable reliance interests on that prior guidance to prepare for the Fall 2020 semester that begins next month.  And, the July 6 Directive would cause irreparable harm not only by exposing all students, faculty, and staff to increased medical risk, but by jeopardizing *Amici*'s ability to recruit and retain international students—and with it, the diversity of experience and viewpoint so critical to *Amici*'s educational missions.

## INTEREST OF *AMICI CURIAE*

*Amici* are academic institutions with campuses located throughout the United States that recruit, teach, and train thousands of new and continuing international students each year in undergraduate, graduate, and professional programs.  *Amici* are concerned with this case because the July 6 Directive, if not enjoined, would force *Amici* to make abrupt pedagogical, safety, and

administrative changes to their academic programs for international and domestic students, faculty, and staff, and would risk *Amici* losing a substantial and critical portion of their student populations during the 2020–2021 academic year.  Further, as with Plaintiffs (ECF No. 1) and other *amici* (ECF No. 27), ICE's abrupt policy change—from exempting international students from in-person instruction to requiring their instruction to be in-person if any students receive in-person instruction—has created painful uncertainty for *Amici* and their students.[3]

## ARGUMENT

I.    **The Immediate and Detrimental Effect of the July 6 Directive on Educational Institutions and Students Demonstrates Plaintiffs are Likely to Succeed on the Merits.**

The law is clear that an agency cannot exceed its delegated authority and courts are empowered to enjoin an attempt to do so.  *See* 5 U.S.C. § 706(2)(C); *Bowen v. Georgetown Univ. Hosp.*, 488 U.S. 204, 208 (1988) ("It is axiomatic that an administrative agency's power to promulgate legislative regulations is limited to the authority delegated by Congress."); *Ryan v. U.S. Immigration & Customs Enf't*, 382 F. Supp. 3d 142, 159 (D. Mass. 2019) (granting preliminary injunction in part on grounds ICE exceeded delegated authority); *see also Dep't of Homeland Sec. v. Regents of Univ. of Cal.*, 140 S. Ct. 1891, 1923 (2020) (Sotomayor, J. concurring); *Sierra Club v. Trump*, 929 F.3d 670, 693 (9th Cir. 2019).  Even where an agency acts within the scope of its authority, such action cannot be arbitrary and capricious.  One factor showing an action was arbitrary and capricious is an agency's failure to consider a vital element of the problem before it.  *See Office of Commc'n of United Church of Christ v. FCC*, 779 F.2d 702, 714 (D.C. Cir. 1985); *see also Wilderness Watch, Inc. v. U.S. Fish & Wildlife Serv.*, 629 F.3d 1024, 1039 (9th Cir. 2010); *Dep't of State v. Coombs*, 482 F.3d 577, 581 (D.C. Cir. 2007).

---

[3] No counsel for a party authored this brief in whole or in part, and no party, party's counsel, or person other than *Amici* contributed money intended to fund the preparation or submission of this brief.

### A.    The July 6 Directive Improperly Dictates Educational Policy.

DHS and its constituent parts, including ICE, have no authority to direct educational practice and teaching methods used by public or private institutions located throughout the United States. DHS's primary mission is to prevent acts of terrorism, and it also enforces the immigration laws of the United States. *See* 6 U.S.C. § 111(b)(1). While ICE previously set parameters for international students alone, DHS has no expertise, and no authority, to dictate which students schools may select to "contribute the most to the 'robust exchange of ideas,'" *cf. Grutter v. Bollinger*, 539 U.S. 306, 324 (2003) (quoting *Regents of Univ. of Cal. v. Bakke*, 438 U.S. 265, 313 (1978)), or how any student, regardless of immigration status, should or must be instructed.[4]

The July 6 Directive flies in the face of DHS's mandate to "ensure that the civil rights and civil liberties of persons are not diminished by efforts, activities, and programs aimed at securing the homeland." 6 U.S.C. § 111(b)(1)(G). Indeed, the July 6 Directive diminishes the rights of educational institutions to provide educational services by taking the unprecedented step of dictating how institutions with international students must provide instruction. On the one hand, under the terms of the directive—and notwithstanding the continuing public health emergency— schools with institutional needs that require a hybrid instruction approach (*i.e.*, a mix of online and in-person instruction) are stripped of the ability to choose the best means of educating all of their students physically located in the United States. ECF No. 1-1 at 3 (school must certify "the student is not taking an entirely online course load for the fall 2020 semester" but only "the minimum

---

[4] Nor could DHS have such authority, as education has traditionally been and remains the responsibilities of States and local governments. *See* "The Federal Role in Education," U.S. Dep't of Education, (May 25, 2017) https://www2.ed.gov/about/overview/fed/role.html (last visited 7/12/20) ("Education is primarily a State and local responsibility. It is states and communities, as well as public and private organizations of all kinds, that establish schools and colleges, develop curricula, and determine requirements for enrollment and graduation."); *see also* Initial Fall Reopening Guidance, Massachusetts Department of Education (June 25, 2020) https://www.mass.gov/doc/dese-fall-reopening-guidance/download (requiring schools prepare flexible reopening plans to adapt to outbreak).

number of online classes required to make normal progress in their degree program."). On the other hand, the July 6 Directive provides that an international student cannot have entirely online courses unless (1) all students, international and domestic, have entirely online courses; and (2) the international student leaves the United States. *Id.* ("Only students enrolled at a school that is *only* offering online coursework can engage in remote learning from their home country," and requiring recordkeeping where student is "outside the US but taking full time online courses *as that is the only choice offered by the school*.") (emphases added).

The result of this "immigration" guidance is to dictate pedagogy and educational policy for international and domestic students alike. If a school is not entirely online, international students must remain in the United States and select specific courses that will provide for the required minimum in-person instruction; if a school is entirely online, international students must depart the United States on pain of removal. For many students, this creates a catch-22: for programs that are entirely online, the only way to pursue a degree is to depart the United States, but their departure may make the pursuit of their degree impracticable due to home-country restrictions on seeking online instruction, censorship, or lack of access to broadband Internet; for programs with hybrid plans, more students must risk exposure to COVID-19, and institutions will be unable to provide any online accommodation to immunocompromised international students.

Both "options" lay waste to any decision by *Amici* that a hybrid plan best meets the health and educational needs of the institution and the student body. ICE's sudden policy reversal requires *Amici* who wish to retain an essential population of international students either to accommodate all of those students for some amount of in-person instruction regardless of *Amici*'s plans, prepared over months, to balance the need for in-person instruction with online instruction

for the fall semester while keeping their students, faculty, and staff safe; or to abandon any plan for any students, international or not, to receive in-person instruction.

The July 6 Directive thus dictates pedagogy by disregarding it. Where *Amici* prioritized certain courses for in-person instruction by their nature or necessity (*e.g.*, the last two years of medical school, ensemble music rehearsal and instruction, graduate programs with clinical course requirements, or programs requiring use of specialized laboratory equipment), ICE now dictates in-person instruction based on immigration status regardless of whether the subject-matter of the course would require it. ICE also imposes that burden regardless of whether *Amici* can provide in-person instruction to thousands of international students with nearly no notice, while also providing in-person instruction where necessary regardless of a student's immigration status (*e.g.*, the last two years of medical school, ensemble music rehearsal and instruction, graduate programs with clinical course requirements, or programs requiring use of specialized laboratory equipment).

The net result of the July 6 Directive—and perhaps its intent, *see* Complaint ¶ 75—is to use "immigration" guidance as a cudgel to push all educational institutions in the United States to provide all or virtually all instruction in a classroom setting, regardless of the danger and infeasibility of doing so. That far exceeds ICE's scope of delegated authority, constitutes an unreasonable intrusion into academic affairs, interferes with *Amici*'s latitude and efforts to achieve a robust exchange of ideas through international diversity, *cf. Grutter*, 539 U.S. at 324, and supplies an additional reason Plaintiffs are likely to succeed on the merits.

Even if ICE had authority to issue the July 6 Directive, it failed to consider the impact its sudden policy shift would have on educational methods. ICE's decision to treat all hybrid models the same alone demonstrates the July 6 Directive is improper: it disregards whether necessity driven by a diverse array of institutional and educational needs (e.g., core course requirements,

subject matter, geography, campus design, and health and safety needs of faculty and staff) dictated which students must receive priority for in-person instruction (*e.g.*, future physicians and musicians).  Further, ICE's decision to require all students, international and domestic, to forego in-person instruction to permit international students to study entirely online in effect dictates instruction methods for both groups of students.  There is no evidence ICE gave any consideration whatsoever to the far-reaching impact of its abrupt new guidance on an institution's ability and approach to providing educational services, and there can be no question that effect is a vital issue ICE was required to consider to issue valid guidance.  Plaintiffs are likely to succeed on the merits for that independent additional reason.

Setting aside hybrid programs, requiring international students to leave the United States to pursue entirely online programs will make pursuit of those programs impossible for many.  Internet connectivity is not uniform throughout the world, and many international students lack access to sufficient bandwidth from their home countries to pursue an entirely online program.  Even where bandwidth is not an issue, many students hail from literally the opposite side of the world, making live class attendance online onerous.  Further, many countries restrict access to content hosted in the United States.  It is therefore no answer to say international students may simply leave the United States to "continue their studies" online—and even if it could be, there is no indication ICE considered the technological limitations and restrictions (or even time-zone difficulties) international students would face if forced to learn online from abroad.

## II.     The July 6 Directive Fails to Account for Its Effect on Public Health, Including the Burden Upon Immunocompromised Students, Faculty, and Staff.

Another measure of whether agency action is arbitrary and capricious is whether the agency considered the effect of its action on public health.  *See Cook Cty., Ill. v. Wolf*, 962 F.3d 208, 231 (7th Cir. 2020) (invalidating agency action as arbitrary and capricious for failure to consider

significant impact of COVID-19 health risk); *City of Phila. v. Sessions*, 280 F. Supp. 3d 579, 622 (E.D. Pa. 2017) (invalidating DHS action because of DHS's failure to consider the public health risk it would create); *cf. Nat'l Immigration Project of Nat'l Lawyers Guild v. Exec. Office of Immigration Review*, No. 1:20-CV-00852 (CJN), 2020 WL 2026971, at *11 (D.D.C. Apr. 28, 2020) (sustaining agency action implementing risk mitigation strategy to reduce public contact and decrease risk of increased COVID-19 infection during the pandemic). Here, there is no indication ICE considered public health effects.

*First*, there is no indication ICE considered the effect of the July 6 Directive upon the training of doctors and upon research programs critical to the fight against COVID-19. For example, *amici* New York University, University of Rochester, and Icahn School of Medicine at Mount Sinai have graduate-level medical programs that include not only Doctor of Medicine programs training the next classes of front-line physicians, but master's, doctoral, and post-doctoral programs that include research and development of viral detection and antibody tests critical to assessing exposure to COVID-19 (as well as the development of vaccines and treatments). ICE's failure to consider the effect of the July 6 Directive upon medical programs specifically, especially under the circumstances, is another reason the July 6 Directive is arbitrary and capricious, and demonstrates Plaintiffs are likely to succeed on the merits.

The adverse effect of the July 6 Directive upon public health is not limited to medicine. Cultural exchange drives global cooperation and innovation.[5] International students not only foster

---

[5] *See, e.g.*, "Exploring Engineering Education in Broader Context: A Framework of Engineering Global Preparedness," American Society for Engineering Education, 121st Annual Conference & Exhibition, at 2-6 (June 2014), https://tinyurl.com/ybfesewu (last visited 7/12/20) (explaining "the necessity that U.S. engineering graduates be capable of collaborating across national boundaries to successfully encounter worlds of professional practice that are increasingly global in nature," and the "growing consensus that globalization requires U.S. engineering students to acquire new skills" by cross-cultural exchange).

the dialogue that enables global efforts to address the world's modern challenges,[6] but provide the skill and expertise to address problems from COVID-19 to climate change head on.

*Second*, there is also no evidence ICE accounted for the effect of the July 6 directive on immunocompromised or medically vulnerable international students, faculty, and staff during a pandemic, or the potential contribution to community spread by effectively requiring large student populations to return to densely populated campuses.  For example, *amicus* the University of Rochester has already received accounts from students grappling with whether to remain in the United States to attend classes in-person (and in doing so, expose immunocompromised family members to significant risk), or travel abroad and face similarly significant risks.  Further, schools may be unable to find faculty to teach in-person, especially given the resurgence of COVID-19.

In all events, the July 6 Directive requires *Amici* to make difficult choices about whether their faculty, staff, and domestic students are required to attend on-campus classes in order to ensure international students may stay, especially if such students have regular contact with immunocompromised, elderly, or other vulnerable populations.  There is no indication ICE considered the effect of the July 6 Directive on *domestic* students or faculty required to teach or attend courses in person, but there can be no question the July 6 Directive generally requires more students, faculty, and staff to expose themselves to significant risk during a pandemic.  ICE's failure to consider the effect of its action on domestic students, faculty, and staff is another independent reason Plaintiffs are likely to succeed on the merits.

---

[6] *See, e.g.*, Elaheh Koolaee, "Science Diplomacy of the Islamic Republic of Iran in the South Caucasus," Int'l Studies Journal, 15(4), at 2, 7 (Feb. 6, 2019) (discussing the positive effects of student cultural exchanges, and explaining the virtues of "science diplomacy," which "is the use of scientific interactions among nations to address the common problems facing humanity and to build constructive, knowledge-based international partnerships")

The July 6 Directive also fails to make reasonable accommodation for any *further* change in conditions resulting from COVID-19, which conflicts with a school's ability and need to act nimbly in response to a potential outbreak.  For example, should a school face a campus outbreak and transition to online learning, the directive evidently would require all international students to depart the United States or transition to another program when public-health concerns are at their highest.  Similarly, minor children who must quarantine during the school year at residential schools (and take classes online for a period of time) could be subject to removal (and international travel) at the worst and most dangerous possible moment.  ICE's failure to make reasonable accommodation for these scenarios, particularly while the situation involving the pandemic remains fluid, is another reason Plaintiffs are likely to succeed on the merits.

III.    **The July 6 Directive Imposes Significant and Unreasonable Operational Burdens on *Amici* and their Students Without Justification.**

A.    **The July 6 Directive Places Onerous Burdens on *Amici*.**

Another vital issue ICE plainly did not consider is the impossible administrative burden imposed on educational institutions to comply with the July 6 Directive.  For example, New York University has over 15,000 international students registered for the Fall 2020 semester.  The University of Rochester—which has welcomed international students to its campus since 1852—today has over 4,000 international students comprising over 30 percent of its student body.  Fully 50 percent of the Manhattan School of Music's enrollment consists of international students.  In each case, *Amici* would need to do in days or weeks what it previously had months to accomplish: create a new operational change plan (in 9 days), re-certify each student's Form I-20 (in 21 days), and simultaneously devise a safe way for all students, faculty, and staff to proceed.  This failure, particularly just weeks ahead of the start of the fall semester, is another reason Plaintiffs are likely to succeed on the merits.

11

The July 6 Directive also places a significant and immediate burden on *Amici*'s students. International students who attend an entirely online program must either transfer to another school or leave the country within weeks during a pandemic.  Doing so is not trivial:  students will need to transfer their SEVIS certification to the new school, which likely cannot be done before the fall semester begins; even if that could be done, students will be required to complete new Form I-20 and return it to their new schools no later than 15 days before starting at their new institution.  And, students unable to return within 5 months will be required to pay a new SEVIS fee and complete a new Form I-20 to return to their school.

**B.      The July 6 Directive Fails to Articulate or Explain the Basis for its Goals.**

Even if the burdens imposed by the July 6 Directive could be justified by some articulated reason, the July 6 Directive is fundamentally improper due to the lack of stated basis to issue it. "It is a foundational principle of administrative law that judicial review of agency action is limited to the grounds that the agency invoked when it took the action." *Dep't of Homeland Sec.*, 140 S. Ct. at 1908 (quoting *Michigan v. EPA*, 576 U.S. 743, 758 (2015)).  Agencies must provide the "essential facts" upon which their decisions were based. *SEC v. Chenery Corp.,* 332 U.S. 194, 196 (1947).  An agency decision with only a "conclusory" rationale must be invalidated.  *See Allied-Signal, Inc. v. U.S. Nuclear Reg. Comm'n*, 988 F.2d 146, 152 (D.C. Cir. 1993).

Here, ICE provided no explanation for its decision.  The only rationale articulated by ICE is the need to "resume the carefully balanced protections implemented by federal regulations." ECF No. 1-1 at 2.  This is entirely conclusory; it fails to explain what data was reviewed, or articulate any connection between the facts and the decision.  An appropriate explanation consists of an agency "examin[ing] the relevant data and articulat[ing] a satisfactory explanation for its action[s]." *Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co*., 463 U.S. 29, 43 (1983).

**C.     The July 6 Directive Does Not Take Into Account *Amici*'s Serious Reliance Interests.**

As noted by Plaintiffs and by other *amici* (ECF No. 27), educational institutions throughout the United States—including *Amici* and their students—relied on ICE's prior guidance to prepare for the Fall 2020 semester.  The July 6 Directive is a complete reversal of its prior guidance, which exempted international students from the in-person course requirement "for the duration of the emergency"; that guidance was a significant input into *Amici*'s evaluations and decisions to design safe and effective programs for all of its students regardless of their immigration status.  *Amici*'s evaluation and decision process, carried out over the course of months, constitutes "serious reliance interests" that required a "more detailed justification" for the abrupt change effected by the July 6 Directive.  *See FCC v. Fox Television Stations*, 556 U.S. 502, 514–16 (2009).

**D.     The July 6 Directive Will Result in Irreparable Harm.**

While Plaintiffs have addressed the other bases on which they are entitled to injunctive relief, *Amici* would respectfully highlight two reasons why they, too, will suffer irreparable harm if the July 6 Directive is not enjoined.

*First*, the July 6 Directive requires *Amici* pursuing hybrid programs to expose all of their students, faculty, and staff to increased risk of contracting COVID-19.  Put simply, the July 6 Directive requires *Amici* to jettison their carefully designed plans for fall instruction and react quickly to decide how to instruct their students safely for no articulated reason.  That yields an unquantifiable and avoidable risk, particularly given the world does not yet understand the full extent of damage COVID-19 causes to the human body.[7]

---

[7] *See, e.g.*, George D. Vavougios, "Potentially irreversible olfactory and gustatory impairments in COVID-19: Indolent vs. fulminant SARS-CoV-2 neuroinfection," Brain, Behavior, and Immunity, 87:107-08 (Apr. 2020); *What we know (so far) about the long-term health effects of COVID-19*, Advisory Board (June 2, 2020), https://tinyurl.com/yaamg5mr (describing long term increases in the risk of blood clotting, stroke, embolisms, heart damage, lung damage, and various neurological complications).

*Second*, the July 6 Directive limits *Amici*'s ability to recruit and select the students best suited to create a marketplace of ideas through a diverse and international student body. Courts have long emphasized the importance of promoting diversity and freedom in educational environments, recognizing that, due to the classroom's vital role as a "marketplace of ideas," constitutional protections are "nowhere more vital than in the community of American schools." *Keyishian v. Bd. of Regents of Univ. of State of N.Y.*, 385 U.S. 589, 603 (1967) (citation omitted). "The Nation's future depends upon leaders trained through wide exposure to that robust exchange of ideas which discovers truth out of a multitude of tongues, [rather] than through any kind of authoritative selection." *Id.* (alteration in original, internal citation and quotation marks omitted). Diversity similarly "helps to break down racial stereotypes, and enables [students] to better understand" those with different backgrounds. *Grutter v. Bollinger*, 539 U.S. 306, 330 (2003) (alteration in original). As a result, diversity helps impart the "skills needed in today's increasingly global marketplace" by "expos[ing] [students] to widely diverse people, cultures, ideas, and viewpoints." *Id.*; *see also Keyishian*, 385 U.S. at 603.

The July 6 Directive risks the marketplace of ideas for both the international students it may force out of academic programs, and for domestic students seeking a new and broad array of perspectives. Among other things, the resulting lack of diversity of experiences and viewpoints makes it harder to break down racial and cultural barriers. *See Grutter*, 539 U.S. at 330. Innovative ideas stem from diversity, and the Supreme Court has long recognized that "enhanced classroom dialogue" is a critical benefit to the educational environment. *Fisher v. Univ. of Tex.*, 570 U.S. 297, 308 (2013). Without international student participation, this benefit—which *Amici* are committed to providing to their students—is lost.

## <u>CONCLUSION</u>

*Amici* respectfully request that the Court enter a preliminary injunction enjoining Defendants from enforcing the July 6 Directive.


Dated: July 13, 2020                    Respectfully submitted,

                                        /s/ *William D. Dalsen*
                                        William D. Dalsen (BBO #689334)
                                        Hena M. Vora (BBO #704029)
                                        PROSKAUER ROSE LLP
                                        One International Place
                                        Boston, MA 02110
                                        Telephone: (617) 526-9600
                                        Fax: (617) 526-9899
                                        wdalsen@proskauer.com
                                        hvora@proskauer.com

                                        Joseph C. O'Keefe (*pro hac vice* pending)
                                        Om V. Alladi (*pro hac vice* pending)
                                        PROSKAUER ROSE LLP
                                        Eleven Times Square
                                        New York, NY 10036-8299
                                        Telephone: (212) 969-3000
                                        Facsimile: (212) 969-2900
                                        jokeefe@proskauer.com
                                        oalladi@proskauer.com

                                        *Attorneys for Amici Curiae New York University, University of Rochester, Icahn School of Medicine at Mount Sinai, Glendale Community College, Cabrillo College, The Catholic University of America, San Diego Community College, The Cooper Union for the Advancement of Science & Art, Rider University, Santa Rosa Junior College, the Art Center College of Design, the Coast Community College District, the Southern California Institute of Architecture, the South Orange County Community College District, and the Manhattan School of Music*

15