**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS**

| | |
|---|---|
| PRESIDENT AND FELLOWS OF HARVARD COLLEGE and MASSACHUSETTS INSTITUTE OF TECHNOLOGY, | |
| *Plaintiffs*, | Civil Action No. 20-cv-11283-ADB |
| vs. | |
| UNITED STATES DEPARTMENT OF HOMELAND SECURITY, et al., | **Leave to File Granted 7/13/2020** |
| *Defendants*. | |

*AMICUS CURIAE* **BRIEF OF AMERICAN FEDERATION OF TEACHERS,
COMMUNICATIONS WORKERS OF AMERICA,
SERVICE EMPLOYEES INTERNATIONAL UNION, AND
INTERNATIONAL UNION, UNITED AUTOMOBILE, AEROSPACE AND
AGRICULTURAL IMPLEMENT WORKERS OF AMERICA IN SUPPORT OF
PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION**

## I.      INTRODUCTION

International students are an integral part of our university communities. In March, U.S. Immigration and Customs Enforcement ("ICE") reacted to the novel coronavirus and corresponding disease and death, by issuing guidance that modified its requirements for international students in light of the adaptations colleges and universities adopted in response to the crisis. This guidance allowed international students to focus on their health, their studies, and work without fear that their lives would be derailed further.

Yet although the pandemic continues to rage, ICE betrayed those students on July 6, reversing its guidance to hold that certain essential accommodations to public health and safety will no longer suffice to meet visa requirements. The *amici* unions represent graduate workers on F-1 visas, who provide essential pedagogical and research services to universities as they pursue their education within the United States, as well as other university faculty and staff. These graduate workers took ICE at its word and took steps to continue to pursue their studies, in line with the reasonable adaptations that their universities were making to promote public health. ICE's sudden reversal would require *amici* union's graduate worker members to risk their health, and in some cases their safety, either by returning to their countries of citizenship or by entering unsafe in-person classes as teachers and students. Such a policy is cruel, irrational, and unnecessary. Whichever choice these individual graduate workers make—to leave or to risk further spread of the disease to their students, co-researchers, and others on campus—the unnecessary choice weakens the university communities of which graduate workers form an essential part.

Accordingly, *amici* support Plaintiffs' request for a preliminary injunction blocking the ICE July 6 guidance.

## II.   INTERESTS OF AMICI

*Amici Curiae* represent approximately 600,000 workers at universities around the country, including graduate student workers in F-1 nonimmigrant visa status. This brief represents not only the institutional interests of each *amicus* but also an outpouring of concern and resistance to ICE's actions, as hundreds of members joined together to support this brief by sharing their stories. More specifically:

**American Federation of Teachers (AFT)** represents approximately 1.7 million members, including approximately 230,000 workers in higher education.  AFT's members in higher education come from around the globe to study and work at American universities. AFT higher education members are on a variety of visas, including many graduate workers who are on F-1 visas and who serve as teaching assistants or in other working capacities for the institutions where they are enrolled as students. AFT members on F-1 visas are directly affected by the recent SEVP guidance, which threatens them with removal or expulsion in the middle of a global pandemic. AFT's U.S. citizen and permanent-resident members in higher education are also directly affected by the guidance, which potentially puts their lives at risk by pressuring their employers to force them to engage in in-person teaching when it is unsafe to do so.

**Communications Workers of America (CWA)** represents workers in private and public sector employment in 1,200 chartered local unions. CWA members work in telecommunications and information technology, the airline industry, news media, health care, education, and other fields. CWA locals represent over 10,000 workers in higher education, many of whom are international students on F-1 visas. These members' ability to protect their health, continue their education, teach undergraduates and engage in research will be adversely impacted by the directive that students who hold F-1 visas take classes in person or face deportation.

**Service Employees International Union (SEIU)** is a labor organization of two million diverse members who work in healthcare, the public sector, and property services throughout the United States, Canada, and Puerto Rico.  SEIU members are dedicated to improving the lives of workers and their families and creating a more just and humane society.  SEIU members include approximately 60,000 faculty, graduate assistants, and campus workers at more than seventy colleges and universities across the country.  SEIU members also include international students in F-1 nonimmigrant status who will be harmed by the federal government's unlawful in-person learning requirement if it is not enjoined.

**International Union, United Automobile, Aerospace and Agricultural Implement Workers of America (UAW)** is a labor organization with more than 400,000 active and more than 580,000 retired members throughout the United States, Canada, and Puerto Rico.  The UAW and its affiliated Local Unions represent over 70,000 workers in higher education, including thousands of academic student workers at Harvard University and numerous other public and private universities in the United States.  Many of these workers are foreign-born and hold F-1 nonimmigrant student visas permitting them to study, live, and work in the United States.  ICE's action has severely disrupted these UAW members' educational and employment plans.

## III.   ARGUMENT

As Plaintiffs establish in their Memorandum in Support of the Motion for Temporary Restraining Order (TRO), they are likely to succeed on the merits, the absence of preliminary relief is likely to result in irreparable harm to Plaintiffs, and the balance of hardships weighs heavily in favor of granting provisional relief.  ECF No. 5; *see also Winter v. Nat. Res. Def. Council, Inc.,* 555 U.S. 7, 20 (2008) (setting forth four-factor inquiry for provisional relief, including factor requiring the weighing of the "public interest"). Amici, as representatives of tens

of thousands of student workers at higher education institutions across the country, as well as of thousands of student workers at Harvard, offer further analysis of both how the July 6 Directive is arbitrary and capricious and how it will result in irreparable harm to Amici's members who, despite being non-parties, will be affected in ways pertinent to the balance-of-hardships analysis. *See, e.g., Corp. Techs., Inc. v. Harnett,* 943 F. Supp. 2d 233, 247 (D. Mass. 2013) (considering impact on third parties in analyzing the "public interest" prong of the preliminary-injunction test).

### A.  The July 6 Directive Was Arbitrary and Capricious

The Supreme Court has been clear that in rulemaking an agency "must examine the relevant data and articulate a satisfactory explanation for its action including a 'rational connection between the facts found and the choice made'" and that a rule is arbitrary and capricious if the agency "entirely fail[s] to consider an important aspect of the problem" or "offer[s] an explanation for its decision that runs counter to the evidence before the agency." *Motor Vehicle Mfrs. Ass'n of the U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43(1983).  The experience of Amici's members helps to demonstrate that, far from having a rational connection between the facts and the July 6 Directive, ICE failed to consider the facts, including the challenges facing students on F-1 visas, and that when properly considered, the experiences of student workers make clear that the July 6 Directive is arbitrary and capricious.

   **1.  ICE failed to consider circumstances requiring students to remain in the country for online coursework and erroneously assumed that students never need to be present in the United States if their classes are online.**

The purported rationale underlying ICE's July 6 Directive is "students . . . do not need to be present in the United States" if their classes are online. ICE, Frequently Asked Questions for

SEVP Stakeholders about Guidance for the Fall 2020 Semester (July 7, 2020).[1] This rationale

seems to have been transplanted wholesale from 2002, when the Immigration and Naturalization

Service, promulgating its original restrictions on online courses under qualitatively different

conditions, likewise asserted that "the entry of a foreign student into the United States becomes

unnecessary if the bulk of the program does not require the student's physical presence."

Retention and Reporting of Information for F, J, and M Nonimmigrants; Students and Exchange

Visitor Information System (SEVIS), 67 Fed. Reg. 34,862, 34,866 (May 16, 2002). Without

endorsing or faulting that determination, the state of the world in 2002 has little bearing on

whether a student may need to be physically present in the United States to *continue* a course of

study that was never designed to be online but that has been moved online as an improvised

adaptation to avoid mass illness and death in the midst of a worldwide pandemic.

   In issuing its March guidance, the agency appears to have recognized that the current

situation is entirely different from 2002, explaining that currently-enrolled students could

"continue to make normal progress in a full course of study as required by federal regulations"

amid the many adaptations, including online-only classes, that educational institutions were

making to mitigate the effects of the pandemic. ECF No. 6-1 at 1. But in reflexively reverting

back to its 2002 rationale even though the world had not reverted back to pre-COVID

conditions—i.e. that universities were moving courses that were not originally intended to be

held online to that format as a necessary accommodation for public health and safety—the

agency acted capriciously, as it made no effort to consider the circumstances facing students who

did not intend to pursue an online education but were forced to continue their pre-existing studies

---

[1] *Available at* https://www.ice.gov/doclib/sevis/pdf/sevisFall2020_FAQ.pdf.

online due to the pandemic. If the Agency had cared to look, it would have learned that many students do, in fact, need to be physically present to continue their studies, even if their formal coursework is entirely online.

In many circumstances, students require resources that are available only on or near campus to continue their studies. For example, a student at Tufts University and a member of SEIU Local 509 was permitted to take off campus a powerful computer system necessary for his complex research—research that never would have been part of the online-by-design courses contemplated by the 2002 rule. If, however, he is forced to leave the United States, he will not be able to take that computer system to his country of citizenship, and it would be prohibitively expensive for him to recreate it there. Thus, being physically present in the United States is essential to continuing his course of study. This problem is not unique to students in the sciences. Many humanities students need physical access to on-campus libraries and archives to continue their research. For example, Nace Zavrl, a member of the Harvard Graduate Student Union-UAW (Local 5118), will not be able to prepare adequately for his comprehensive examinations and continue his research in film historiography without access to the University archives.

Moreover, many students would face significant logistical challenges if they attempted to take or teach courses online from their country of citizenship. If S.A., a member of UAW Local 4121 at the University of Washington, is forced to return to Nepal, he not only will be required to participate in classes that are not (and could not reasonably be expected to be) scheduled to accommodate his 13-hour time difference, but will also have to contend with the inconsistent internet connections there, delaying his progress in his program. Similarly, if she was forced to leave the U.S., one member of the Professional Staff Congress (AFT Local 2334) at The Graduate Center, City University of New York would have to try to find and pay for internet at

hotels in her home country to teach and attend classes due to a lack of stable internet at home. And Yan Wu, a member of Graduate Employee Organization, UAW 2322, at University of Massachusetts Amherst, would need to attend and teach her courses from China—contending not only with a 12-hour time difference but also figuring out how to communicate across the country's internet-censorship regime. These circumstances—all the products of American universities that were not designed to be online struggling to do their best to adapt—are just a few of many that student workers across the county have reported to their unions.

In issuing the July 6 Directive, the Agency displayed no consideration of these practical realities in its bald assertion that students did not need to be physically present if their formal coursework had been adapted from in-person to online under the constraints of the pandemic. *See Sorenson Commc'ns Inc. v. FCC*, 755 F.3d 702, 708 (D.C. Cir. 2014) (rejecting an agency decision grounded in "unsubstantiated conclusion[s]").

## 2. The Agency failed to consider students' reliance interests.

When ICE announced in March that it would recognize online coursework "for the duration of the emergency," ECF 6-2 at 1, the agency induced "legitimate reliance" on the part of international students that they would be permitted to continue their studies in the United States and would not need to risk their health to do so. *See Smiley v. Citibank (S.D.), N. A.*, 517 U.S. 735, 742, (1996). When policies "may have engendered serious reliance interests that must be taken into account . . . [, i]t would be arbitrary and capricious to ignore such matters." *Dep't of Homeland Sec'y v. Regents of the Univ. of Cal.*, 140 S. Ct. 1891, 1913 (2020) (quoting *Encino Motorcars v. Navarro*, 136 S. Ct. 2117, 2126 (2016) and *FCC v. Fox Television Stations, Inc.*, 556 U.S. 502, 515 (2009)) (internal quotation marks omitted).

Here, students across the country were led to believe, due to ICE's guidance, that they

could remain in the United States notwithstanding that almost all universities were moving to all

or partial online classes. They planned their lives accordingly. Countless students faced the

choice presented to Gabriela Quijano, a member of GEO-UAW 2322 at University of

Massachusetts Amherst:

> By the end of the spring semester I was considering what job offer to accept for the
> fall semester and what to do with my house lease, while thinking deeply about the
> uncertainty of the situation that the pandemic was leading. In consultation with the
> needs of my department, I decided to stay in Amherst and renew my lease.

Mir Masood Ali, a member of the University of Illinois-Chicago Graduate Employee

Organization, AFT Local 6297, signed a lease on a new apartment after his department

(Computer Science) moved all classes online, trusting that he would not have to return home and

endanger his parents, who are at high risk from the disease.

This reliance was heightened for those students who have medical conditions rendering

them particularly vulnerable to COVID-19. They trusted ICE's assurances that they did not need

to return to their countries of citizenship, risking exposure to the virus along the way, and that

they could continue their studies safely. For example, D.J., a member of the Graduate Employee

Organization, UAW Local 1596, at University of Massachusetts Boston, suffers from an auto-

immune disease that places her at severe risk of infection but has been able to continue studying,

researching, and teaching the effects of pesticides on the environment within her department and

through the New England Aquarium. ICE's changed policies would require her to either expose

herself to infection through her studies or in the course of last-minute travel to her country of

citizenship.

ICE's July directive shows that it did not consider any of these reliance interests. At a time when communities across the country continue to be ravaged by COVID-19, there is no explanation "why it deemed it necessary to overrule its previous position," *Encino Motorcars*, 136 S. Ct. at 2126, and disrupt the lives of students who made plans believing that they could continue residing at their universities "for the duration of the emergency."

ICE may argue that it discouraged such reliance interests by stating that "[d]ue to the fluid nature of this difficult situation, this guidance may be subject to change." ECF 6-2 at 2. But that disclaimer does not and cannot absolve the agency of its obligation to consider what reliance interests it engendered. *Regents*, 140 S. Ct. at 1913–14.  If it had actually considered those reliance interests, it would have found no way that the disclaimer justifies the precipitous and surprising manner in which ICE has reversed course here, for implicit in the disclaimer is that any change would be announced with sufficient lead time to allow those who had relied on the March guidance to adjust to any change without serious disruptions to their reliance interests.

   3. **The Agency failed to consider the harm caused by the Directive's effective date.**

As this Court is aware, the July 6 Directive impacts students who, in reliance on the agency's March guidance, have already made plans to continue their studies during a school year which begins in less than two months. In addition to the harm caused by the timing of the July 6 Directive's effective date, which the agency did not consider prior to implementation, the agency's failure to give students (and the universities) adequate time to make alternative arrangements renders the directive arbitrary and capricious.

There can be no serious dispute that the speed with which ICE seeks to implement this about-face in policy has created significant confusion, anxiety, and harm to students. For example, one member of the Boston College Graduate Employees Union-UAW could similarly

face major challenges due to this abrupt change in policy. This member takes multiple

prescription medications, one of which is not available in their home country. If they were forced

to return on such short notice, they are unsure how quickly they could find medical care to secure

an appropriate substitute medication. Furthermore, they would be out thousands of dollars on a

lease they signed based on their understanding they would be remaining in the U.S.

ICE, however, has provided no explanation for why it considered immediate

implementation to be necessary or why it rejected an alternative of implementing changes to the

March guidance with more notice. *See* ECF No. 1-1; Frequently Asked Questions at 2. This is

fatal because "when an agency rescinds a prior policy its reasoned analysis must consider the

'alternative[s]' that are 'within the ambit of the existing [policy].'" *Regents*, 140 S. Ct. at 1913

(quoting *State Farm*, 463 U.S. at 51). Put another way, the agency must have a reasoned

explanation for rejecting the "reasonably obvious alternatives" available to it. *Stauffer v. Internal

Revenue Serv.*, 285 F. Supp. 3d 474, 484 (D. Mass. 2017) (quoting *Nat'l Shooting Sports Found.,

Inc. v. Jones*, 716 F.3d 200, 215 (D.C. Cir. 2013)).

Moreover, the fact that ICE implemented its policy without giving those harmed by their

reliance on the March guidance the time to make alternative arrangements renders the directive

arbitrary and capricious. In *National Association of Independent Television Producers and

Distributors v. FCC*, 502 F.2d 249 (2d Cir. 1974) ("*Television Producers*"), the Second Circuit

addressed a challenge to the effective date of an agency rule, reversing a prior rule, and

reallocating "prime time" television programming hours between network-television-produced

and independently-produced shows. In that case, the producer adversely affected by the

reallocation introduced substantial evidence to the agency that the new rule would cause

substantial economic harm to those producers who had invested in productions in reliance on the

pre-existing allocation of programming hours. *Id.* at 254. The Second Circuit held that the

agency's failure to respond to the independent producers' submissions in a manner that was

adequately supported in the record, coupled with the fact that the agency had not adequately

explained why it chose a short lead time for the allocation change in question, rendered the

agency's choice of effective date arbitrary and capricious. *Id.* at 254-55. Thus, the Court found

that the effective date of the new rule was unreasonable "because it does not give independents

who have produced programs for access time in reliance on the rule sufficient opportunity to

withdraw from these ventures without unnecessary expense." *Id.* at 253-54.

Like in *Television Producers,* the agency here adopted a rule that, even if one were to

find that it could be justified under some circumstances, was implemented with an effective date

that will cause substantial and irreparable harm to the students and their families. If anything,

ICE's unexplained urgency in adopting its new rule strongly suggests that its motivation is not in

ensuring that F-1 visas are granted only to individuals who need them to complete their course of

study but rather is part of an effort to force the universities to conduct in-person classes, which

raise questions of education and public health policy well outside ICE's purview. *Cf. Dep't of*

*Commerce v. New York*, 139 S. Ct. 2551, 2575–76 (2019) (pretextual agency decision-making

violates APA).

*     *     *

In short, the agency's July 6 Directive is arbitrary and capricious in multiple respects.

The Directive is founded upon ICE's unexamined and ultimately false assumption that students

studying at universities that are holding classes online this fall do not need to be physically in the

United States to continue their course of studies. The Directive fails to consider the students'

substantial reliance interests. And even if the agency had a rational basis for such a directive,

12

ICE's effective date is arbitrary and capricious as it was implemented with less than two months' notice, causing substantial harm to students who reasonably relied upon the agency's prior guidance.

### B.  Irreparable Harm

Although mindful of the Court's request that *amici* focus on the merits of Plaintiffs' case, the *Amici* unions would be remiss if they did not highlight some of the substantial, and life-altering, costs their members would incur if the agency's rule is not enjoined.

If the Agency's policy is allowed to take effect, the members of *amici* unions will suffer immediate and irreparable harm. They will be forced to make a sudden choice between traveling home or attending in-person classes in the United States, and they will risk their health whichever path they choose—either by participating in in-person educational activities that place them at risk or by spending extended time traveling internationally, sometimes to countries where they lack health coverage or where health infrastructures are less well developed. Such exposures risk permanent damage to students' respiratory and other systems, to a degree that doctors are only beginning to understand. The possibility of severe and permanent damage to students' health, including risk of death, poses a clear case of irreparable injury. *See Battista v. Clarke*, 645 F.3d 449, 451-56 (1st Cir. 2011) (affirming that a risk of medical harms from denial of treatment constitutes irreparable injury).

Moreover, because many students will not be able to complete online coursework in many of their countries of origin, *see supra* at 7-8, the ICE guidance will have the effect of terminating their studies entirely. Courts regularly recognize that expulsion from an educational program constitutes a form of irreparable harm meriting injunctive relief. *See, e.g., McLaughlin v. Mass. Maritime Acad.*, 564 F. Supp. 809, 811 (D. Mass 1983).

Nicole Moeller Gonzalez, a member of Syracuse Graduate Employees United, SEIU Local 200, vividly illustrates this dilemma. Because she is immunocompromised, she has taken only online courses and is performing her teaching-assistant duties online. If the policy goes into effect, she must choose between exposing herself in the classroom or traveling to her home country to continue her education there. If she does leave the United States, she is likely to lose her teaching position, as her university does not pay workers while they are outside the country. This threatens her ability to continue with her degree on schedule.

Finally, ICE's effort to force international students into the classroom has caused and will continue to cause emotional distress and Severe and irreparable harm to students' mental health. Amid the omnipresent concerns and uncertainties of the COVID-19 pandemic, ICE has introduced new dangers and uncertainties. Even at schools that are currently offering hybrid instruction, where students have the choice to engage in in-person classes (with the attendant risks), many fear that their campuses may again shut down mid-semester, subjecting them to the mental, psychological, and emotional trauma of the sudden risk of deportation without warning. One member of GSEU Stony Brook University (CWA Local 1104) described this risk as inflicting a "sense of anxiety and panic. I do not know how I am supposed to continue my studies or teach my students to the fullest of my abilities knowing that I might have to leave the country or get deported halfway through my studies."

With international air travel significantly restricted, many members are uncertain whether they will be able to return to their country of citizenship—or if they will even be allowed to do so. Trinidad and Tobago is one of several countries that have closed their borders in response to their pandemic, with approximately 1,000 Trinidadian citizens already seeking permission to repatriate from the U.S. This leaves Trinidadian student workers, like Florence Dou of UAW

Local 4121 at the University of Washington, uncertain whether they could even receive

permission to return. Sri Lanka has similarly closed its international border. Thus, if SEIU Local

509 member and Tufts University student Anuja Jayasekara braved a multiple-stop, 26-hour

flight (at exorbitant cost), it is not clear if she would even be able to enter her home country.

Where a defendants' action causes individuals to "likely suffer emotional distress,

concern about potential financial disaster, and possibly deprivation of life's necessities[,] . . .

these facts would show harm that, in this sort of case, is 'irreparable.'" *United Steelworkers of*

*Am. v. Textron, Inc.*, 836 F.2d 6, 8 (1st Cir. 1987). The ICE policy change threatens irreparable

harm.

IV.    CONCLUSION

*Amici* respectfully request that this Court grant Plaintiffs' Motion for Preliminary

Injunction blocking the July 6 guidance.

Dated: July 13, 2020                                        Respectfully Submitted,

*/s/ Abigail V. Carter*                                     David Strom
Abigail V. Carter*                                          Jessica Rutter
Elisabeth Oppenheimer (BBO # 686312)                        American Federation of Teachers
Joshua Rosenthal*                                           555 New Jersey Ave. NW
BREDHOFF & KAISER, P.L.L.C.                                 Washington, D.C. 20001
805 15th St., N.W.                                          Tel: (202) 879-4400
Ste. 1000                                                   Fax: (202) 393-6385
Washington, D.C. 20005                                      dstrom@aft.org
(202) 842-2600                                              jrutter@aft.org
eoppenheimer@bredhoff.com                                   *Counsel for Amicus Curiae AFT*
acarter@bredhoff.com
jrosenthal@bredhoff.com                                     Atul Talwar
                                                            Communications Workers of America
*Counsel for Amici Curiae*                                  80 Pine Street, 37th Floor
*AFT, CWA, SEIU, UAW*                                       New York. NY 10005
                                                            Tel: (212) 344-2515
 *Admitted pro hac vice*                                    Fax: (212) 425-2947
                                                            atalwar@cwa-union.org
                                                            *Counsel for Amicus Curiae CWA*

15

Nicole G. Berner
Monica T. Guizar
Service Employees International Union
1800 Massachusetts Avenue, NW
Washington, DC 20036
Tel. (202) 730-7168
Fax (202) 429-5565
nicole.berner@seiu.org
monica.guizar@seiu.org

*Counsel for Amicus Curiae SEIU*

Niraj R. Ganatra
Ava Barbour
International Union, United Automobile,
Aerospace and Agricultural Implement
Workers of America (UAW)
8000 East Jefferson Avenue
Detroit, MI 48214
Tel: (313) 926-5216
Fax: (313) 926-5240
nganatra@uaw.net
abarbour@uaw.net

*Counsel for Amicus Curiae UAW*