# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MASSACHUSETTS

|  |  |
|---|---|
| PRESIDENT AND FELLOWS OF HARVARD COLLEGE; and MASSACHUSETTS INSTITUTE OF TECHNOLOGY,<br><br>      Plaintiffs,<br><br>  v.<br><br>UNITED STATES DEPARTMENT OF HOMELAND SECURITY; U.S. IMMIGRATION AND CUSTOMS ENFORCEMENT; CHAD F. WOLF, in his official capacity as Acting Secretary of the United States Department of Homeland Security; and MATTHEW ALBENCE, in his official capacity as Acting Director of U.S. Immigration and Customs Enforcement,<br><br>      Defendants. | Civil Action No. 1:20-cv-11283-ADB<br><br>**ORAL ARGUMENT SCHEDULED JULY 14, 2020 3:00 PM** |

## REPLY IN SUPPORT OF PLAINTIFFS' MOTION
## FOR A PRELIMINARY INJUNCTION

# TABLE OF CONTENTS

Page

TABLE OF AUTHORITIES ................................................................................... ii

INTRODUCTION ................................................................................................1

ARGUMENT .....................................................................................................2

I.     HARVARD AND MIT ARE LIKELY TO SUCCEED ON THE MERITS.......................2

       A.     The Directive Is Arbitrary And Capricious ......................................... 2

       B.     The Directive Violates The APA's Notice-And-Comment Requirement ............. 7

       C.     Harvard And MIT Have Standing To Challenge The Directive........................... 9

II.    THE EQUITABLE FACTORS FAVOR ENTRY OF AN INJUNCTION ...........................10

III.   A PROGRAM-WIDE INJUNCTION IS NECESSARY TO PROVIDE COMPLETE RELIEF ..............13

CONCLUSION..................................................................................................15

# TABLE OF AUTHORITIES

**Page(s)**

## CASES

*Amerijet International, Inc. v. Pistole,*
753 F.3d 1343 (D.C. Cir. 2014) ............................................................................6

*Appalachian Power Co. v. EPA,*
208 F.3d 1015 (D.C. Cir. 2000) .........................................................................7, 8

*SEC v. Chenery Corp.,*
332 U.S. 194 (1947) ..............................................................................................5

*Dep't of Homeland Sec. v. Regents of the Univ. of California,*
140 S. Ct. 1891 (2020) ....................................................................1, 2, 4, 5, 15

*Does I thru XXIII v. Advanced Textile Corp.,*
214 F.3d 1058 (9th Cir. 2000) ............................................................................10

*Michigan v. EPA,*
135 S. Ct. 2699 (2015) ..........................................................................................2

*Eulitt v. Maine Dep't of Education,*
386 F.3d 344 (1st Cir. 2004) ...............................................................................10

*General Electric Co. v. EPA,*
290 F.3d 377 (D.C. Cir. 2002) ..............................................................................7

*Heartland Academy Community Church v. Waddle,*
427 F.3d 525 (8th Cir. 2005) ..............................................................................10

*IRAP v. Trump,*
857 F.3d 554 (4th Cir. 2017) ..............................................................................14

*Lewis v. Casey,*
518 U.S. 343 (1996) ............................................................................................14

*Madsen v. Women's Health Center, Inc.,*
512 U.S. 753 (1994) ............................................................................................14

*McLouth Steel Products Corp. v. Thomas,*
838 F.2d 1317 (D.C. Cir. 1988) ............................................................................8

*Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mutual Auto. Ins. Co.,*
463 U.S. 29 (1983) .......................................................................................3, 5, 6

*National Mining Ass'n v. U.S. Army Corps of Eng'rs,*
　　145 F.3d 1399 (D.C. Cir. 1998) .................................................................15

*New Hampshire Hosp. Ass'n v. Azar,*
　　887 F.3d 62 (1st Cir. 2018) .......................................................................7

*Dep't of Commerce v. New York,*
　　139 S. Ct. 2551 (2019) ...........................................................................2, 7

*OSG Bulk Ships, Inc. v. United States,*
　　132 F.3d 808 (D.C. Cir. 1998) ..................................................................4

*Parks School of Business, Inc. v. Symington,*
　　51 F.3d 1480 (9th Cir. 1995) ...................................................................10

*Preminger v. Peake,*
　　552 F.3d 757 (9th Cir. 2008) ...................................................................9

*Professional Ass'n of College Educators v. El Paso County Cmty. Coll. Dist.,*
　　730 F.2d 258 (5th Cir. 1984) ...................................................................14

*Regents of the Univ. of California v. DHS,*
　　908 F.3d 476 (9th Cir. 2018) ...................................................................15

*Runyon v. McCrary,*
　　427 U.S. 160 (1976) .................................................................................10

*Washington v. Trump,*
　　847 F.3d 1151 (9th Cir. 2017) .................................................................10

*Texas v. United States,*
　　809 F.3d 134 (5th Cir. 2015) ...................................................................15

## DOCKETED CASES

*California v. DHS,*
　　No. 20-cv-04592 (N.D. Cal.) ...................................................................15

*Johns Hopkins Univ. v. DHS,*
　　No. 20-cv-1873 (D.D.C) ...........................................................................15

*Massachusetts v. DHS,*
　　No. 20-cv-11311 (D. Mass.) .....................................................................15

*New York v. DHS,*
　　No. 20-cv-5349 (S.D.N.Y.) ......................................................................15

*Regents of the University of California v. DHS*,
No. 20-cv-04621 (N.D. Cal.) ...............................................................................15

*University of Oregon v. DHS*,
No. 20-cv-01127 (D. Or.) .....................................................................................15

*Washington v. DHS*,
No. 20-cv-01070 (W.D. Wash.).............................................................................15

*Z.W. v. DHS*,
No. 20-cv-01220 (C.D. Cal.) .................................................................................15

## STATUTES AND REGULATIONS

5 U.S.C.
§ 553........................................................................................................................7
§ 701........................................................................................................................4
§ 705......................................................................................................................15
§ 706......................................................................................................................15

8 U.S.C.
§ 1101....................................................................................................................12
§ 1182......................................................................................................................7

8 C.F.R. § 214.2 ................................................................................................................5

## OTHER AUTHORITIES

John Bowden, *Cuccinelli Says Rule Forcing International Students To Return
Home Will 'Encourage Schools To Reopen,'* The Hill, July 7, 2020,
https://thehill.com/homenews/administration/506248-cuccinelli-says-rule-
forcing-international-students-to-return-home .........................................................6

9 Foreign Affairs Manual § 402.5-5 ............................................................................8

Rachel Roubein & Adam Cancryn, *Pence, Azar Reassure Governors Trump
Won't End Virus Emergency Declaration*, Politico, July 7, 2020,
https://www.politico.com/news/2020/07/07/pence-azar-governors-
coronavirus-emergency-declaration-350991 .........................................................13

U.S. Immigration & Customs Enforcement, *FAQs For SEVP Stakeholders About
Guidance For The Fall 2020 Semester* (last updated July 7, 2020),
https://www.ice.gov/doclib/sevis/pdf/sevisFall2020_FAQ.pdf ......................... 5, 6

## INTRODUCTION

The government's opposition does not engage with Plaintiffs' primary arguments or authorities and, indeed, relies on propositions that the Supreme Court has repeatedly rejected, including as recently as last month's decision in *Dep't of Homeland Sec. v. Regents of the Univ. of California*, 140 S. Ct. 1891, 1913 (2020)—a decision the government, remarkably, does not even cite.  The government protests that Harvard, MIT, and their students have always known that ICE *could* change course and announce a new policy, and that they should not be surprised that it did.  And it asserts that ICE considered *some* factors before issuing its new policy, even if it did not articulate its reliance on the factors that it was required to consider by the Supreme Court's precedents and the Administrative Procedure Act.

The government's arguments cannot justify the July 6 Directive.  In making a decision—especially one of this magnitude—an agency must consider not only the benefits of its chosen policy, but also its costs.  And when an agency changes its mind, it must explain why it is doing so—and why reliance interests created by its prior policy do not warrant staying the course.  ICE did not do so here, and the government makes no real argument that it did.  That failure is fatal.

Harvard, MIT, and their students face irreparable injury if the Directive is not enjoined.  Indeed, they face such injury *right now*:  The government is enforcing the Directive at airports and consulates across the world, turning students away because they attend universities that have made the considered decision to offer instruction online this fall.  Because Harvard and MIT are likely to succeed on the merits, because they and their students will be irreparably injured absent injunctive relief, and because the remaining factors likewise favor such relief, a preliminary injunction should issue.

**ARGUMENT**

I.    **HARVARD AND MIT ARE LIKELY TO SUCCEED ON THE MERITS**

    A.    **The Directive Is Arbitrary And Capricious**

As Harvard and MIT explained in their initial brief (at 9-15), the July 6 Directive is arbitrary and capricious in multiple respects.  First, the agency failed to consider "the advantages *and* the disadvantages of [its] decisions."  *Michigan v. EPA*, 135 S. Ct. 2699, 2707 (2015). Second, the Directive fails to justify the agency's own change of position, especially in light of the "serious reliance interests" created by ICE's own prior statements.  *Regents*, 140 S. Ct. at 1913.  Finally, contrary to the APA's most basic requirements, the Directive fails to identify *any* reasoned basis for the agency's decision, and in fact appears driven by a different agenda altogether, *see Dep't of Commerce v. New Yor*k, 139 S. Ct. 2551, 2569 (2019): the government's stated desire to encourage universities to reopen.

The government disputes almost none of this—and as a result, abandons the field.  The government all but admits that it did not consider the costs of its actions; that it did not provide any reasoned explanation for its change in position; and that it did not take into account Plaintiffs' and their students' reliance on the agency's prior position.  These flaws are dispositive.  Just last month, the Supreme Court vacated DHS's indistinguishable effort to rescind the DACA program precisely because the agency failed to consider the reliance interests of the program's beneficiaries and failed to adequately explain its decision, rendering it arbitrary and capricious.  *See Regents*, 140 S. Ct. at 1915.  The Court should reach the same result here.

1.    First, the government argues that the Directive tacitly reflects the agency's consideration of "at least two" factors—"the fluid nature of the COVID-19 pandemic and the urgent need for stakeholders … to have access to guidance regarding [its] impact."  Opp. 12.  But that is a non sequitur.  Nothing about the "fluid nature" of the pandemic or stakeholders' need for

guidance demanded—or even naturally led to—the choice the agency actually made.  The fact that the situation was fluid, and that stakeholders needed guidance, does not explain why the agency reacted to the fluidity of the situation as it did.  If anything, the fluidity of the situation should have led ICE to permit universities the flexibility to plan for the fall semester as their best judgment permitted—including choosing to offer courses exclusively online—rather than change positions abruptly and without warning, mere weeks before the fall semester and with critical registration and housing deadlines looming.  At the very least, ICE was required to explain *why* the circumstances it saw justified its last-minute about-face—to "articulate … a 'rational connection between the facts found'" and its choice.  *Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983).  It failed to do so here.

Indeed, the government *still* has not done so.  Although the government cites the "volatile" situation and the need for "flexibility," Opp. 13, it makes no serious effort to comply with the basic requirements of administrative law: that an agency explain its choice and justify it in light of the harms and risks it imposes.  Those harms are substantial.  Many international students are unable to participate meaningfully, if at all, in online courses from their home countries.  *See* Student #2 Decl. ¶ 5; Student #3 Decl. ¶ 11.  Many students will be without adequate Internet (Student #2 Decl. ¶ 5; Student #4 Decl. ¶ 5), others will not have access to research materials (Student #5 Decl. ¶ 4), and still others fear for their safety or health (Student #7 Decl. ¶ 5; Student #8 Decl. ¶ 5).  And leaving the country this month, amid a pandemic, imposes tremendous risks and costs on students and their families.  Student #6 Decl. ¶ 6; Student #7 Decl. ¶ 5.  Students who live off campus could be liable for thousands of dollars in rent on broken leases (Student #5 Decl. ¶ 6; Student #7 Decl. ¶ 5), and many will be forced to risk their own health or their families' health by traveling on international flights (Student #3 Decl. ¶ 9).

The harms to schools are also significant:  Harvard and MIT—like hundreds of other schools—spent months planning and preparing for the upcoming academic year under unprecedented circumstances, and they did so relying on ICE's assurance that international students could retain their visas and remain in the United States while taking online courses for the duration of the emergency.  *See* Garber Supp. Decl. ¶ 13; Waitz Decl. ¶ 21.  They made their decisions knowing that it would be far more disruptive to rapidly empty their campuses during a second wave of COVID-19 infections than to repopulate campus gradually as health conditions improve.  Garber Supp. Decl. ¶¶ 3-4; Waitz Decl. ¶ 10.  ICE not only failed to consider these factors in issuing the Directive; the government *still* does not explain why ICE believes its policy is the best choice, or even a reasonable one, accounting for Plaintiffs' argument to the contrary.

Nor can the government argue that ICE "did not need to" consider these factors, *Regents*, 140 S. Ct. at 1913—in particular, Plaintiffs' and their students' reliance interests—because the agency stated that its approach was "subject to change," Opp. 12.  The government made the same argument in *Regents*, arguing that a boilerplate disclaimer there—stating that the DACA program "conferred no substantive rights"—"automatically preclude[d] reliance interests."  140 S. Ct. at 1913.  The Supreme Court disagreed, explaining that it was "not aware of any" case so holding.  *Id.*  The same is true here:  The agency cannot evade the reliance interests it created by saying that the situation was "fluid" and "subject to change."[1]

2.     Unable to muster any evidence that ICE actually *did* consider either the harms its

---

[1] The government repeatedly incants "discretion," *see* Opp. 1, 4, 10, 13, 17, 20, but it does not argue that its decision is unreviewable because it was "committed to agency discretion by law," 5 U.S.C. § 701(a)(2), or on any other ground.  Any such argument would fail, as the policy announced in the Directive is categorical in nature, is not discretionary, and directly controls the grant or denial of immigration benefits.  *See Regents*, 140 S. Ct. at 1906; *OSG Bulk Ships, Inc. v. United States*, 132 F.3d 808, 812 (D.C. Cir. 1998).

new policy imposes or the reliance interests the prior policy engendered, the government posits interests ICE *might have* considered.  Opp. 12-15.  It suggests that ICE might have "considered the schools impacted by its decision [and] the vast differences among them regarding plans for reopening in the fall," and that, if ICE "had not" done so, "perhaps" it would have "return[ed] to business as usual as before the COVID-19 emergency."  *Id.* at 13.  The government's musings about what ICE might have considered are irrelevant.  A reviewing court "may not supply a reasoned basis for the agency's action that the agency itself has not given."  *State Farm*, 463 U.S. at 50; *see Regents*, 140 S. Ct. at 1907; *SEC v. Chenery Corp.*, 332 U.S. 194, 196 (1947).  The Court may not entertain bases for the Directive advanced for the first time in briefing.[2]

3.     Finally, the government tries to defend the Directive with the agency's statement that, "as many institutions across the country reopen, there is a concordant need to resume" the regime set out in the regulations, Opp. 15 (quoting July 6 Directive at 1).  But the government offers no explanation about *why* such a "need" has arisen or how the Directive is reasonably related to any such "need."  The same is true of the government's online "Frequently Asked Questions" document, which states that the agency's approach was intended to "carefully balance public health concerns against the varied approaches that schools and universities are taking to combat the spread of COVID-19."  U.S. Immigration & Customs Enf., *FAQs For SEVP Stakeholders About Guidance For The Fall 2020 Semester* 2.[3]  This statement explains neither

---

[2] The same is true of the government's suggestion that the Directive could be justified on the ground that permitting international students to attend classes online from the United States could "raise[] significant national security concerns" or allow them to "conduct activities other than full-time studying."  Opp. 14-15.  These arguments are spurious.  ICE's SEVIS system—a database in which universities are required to maintain information, including an up-to-date address, for all international students—accounts for any purported "national security concerns" that might arise from permitting students to remain in the United States.  *See* 8 C.F.R. § 214.2(f)(17).  And, of course, neither ground is identified in the Directive or the regulation.

[3] https://www.ice.gov/doclib/sevis/pdf/sevisFall2020_FAQ.pdf (updated July 7, 2020).

how "public health concerns" are being "balance[d]" against "varied approaches" that schools are taking, nor how the Directive accommodates "varied approaches," given that its effect is to prejudice severely, if not eliminate, one approach that many schools are planning to implement in a matter of weeks.  The statement in the FAQs that the Directive is intended to "minimiz[e] the risk of transmission of COVID-19 by not admitting students into the country," *id.*, provides no greater assistance:  Any asserted interest in minimizing the risk of COVID-19 is frustrated, not furthered, by the Directive, which will (a) force students not in the United States to travel to the country and congregate on campus for in-person instruction and (b) require students who are in the United States to return to their home countries, risking transmission to thousands of people on international flights and in airports.  This explanation thus entirely fails to account for "the evidence before" the agency, *State Farm*, 463 U.S. at 43.  "[C]onclusory statements" of this kind, *Amerijet Int'l, Inc. v. Pistole*, 753 F.3d 1343, 1350 (D.C. Cir. 2014), cannot justify the Directive's complete about-face from the March 13 Guidance.

Indeed, these statements are so thinly reasoned that, taken with the government's public statements regarding ICE's change in policy, they strongly suggest that the real basis for the Directive was something else entirely—namely, to "encourage schools to reopen," no matter the risk.  *See* Bowden, *Cuccinelli Says Rule Forcing International Students To Return Home Will 'Encourage Schools To Reopen,'* The Hill, July 7, 2020.[4]  The government's suggestion that Harvard and MIT have imagined this motivation (*see* Opp. 18) is baffling, given that the Acting Deputy Secretary of DHS not only admitted it, but touted it.  The government does not attempt to explain this as anything other than an accurate statement of the agency's motivations, for which

_____

[4] https://thehill.com/homenews/administration/506248-cuccinelli-says-rule-forcing-international-students-to-return-home.

the agency's proffered reasons are mere pretext.  *See Dep't of Commerce*, 139 S. Ct. at 2575.

### B.      The Directive Violates The APA's Notice-And-Comment Requirement

The Directive is a legislative rule that should have been promulgated subject to notice-and-comment procedures.  *See* 5 U.S.C. § 553(a).  A rule is legislative when it "binds private parties or the agency itself with the 'force of law.'"  *General Elec. Co. v. EPA*, 290 F.3d 377, 382 (D.C. Cir. 2002); *see New Hampshire Hosp. Ass'n v. Azar*, 887 F.3d 62, 70 (1st Cir. 2018).  "[A]n agency pronouncement will be considered binding as a practical matter"—and thus a legislative rule—"if it either appears on its face to be binding or is applied by the agency in a way that indicates it is binding."  *General Elec.*, 290 F.3d at 383 (citations omitted).  Both tests are satisfied here.

First, the Directive is riddled with mandatory, "unequivocal," and "certain" language announcing new obligations of visa holders and schools.  *Appalachian Power Co. v. EPA*, 208 F.3d 1015, 1022 (D.C. Cir. 2000).  Students, for example, "may ***not*** take a full online course load and remain in the United States"; instead, they "must depart the country or … transfer[]."  July 6 Directive at 1.  Schools, too, face immediate consequences; those "that offer ***entirely online classes or programs*** … ***must*** complete an operational change plan" by July 15, while hybrid-model schools "must update and reissue all Forms I-20" by August 4.  *Id.* at 3.  The Directive thus reads like a rule:  "It commands, it requires, it orders, it dictates."  *Appalachian Power*, 208 F.3d at 1023.  Such language "will have practical binding effect … if the affected private parties are reasonably led to believe that failure to conform will bring adverse consequences."  *General Elec.*, 290 F.3d at 383.  The Directive leaves no guesswork here:  It warns students that they will "face immigration consequences including … the initiation of removal proceedings" (and an accompanying 10-year bar on reentry to the United States, 8 U.S.C. § 1182(a)(9)(A)(ii)) if they do not comply.  July 6 Directive at 1.

Second, the government's "conduct applying [the Directive] confirms its binding character." *McLouth Steel Prods. Corp. v. Thomas*, 838 F.2d 1317, 1321 (D.C. Cir. 1988). Officials have already applied the Directive to bar the entry of students holding otherwise valid visas, *see* Student #1 Decl. ¶ 8; 59 Institutions Amicus Br. 2 (ECF No. 42), contradicting the government's suggestion that DHS would "most likely" not enforce the Directive until a rule is issued, Opp. 17. Where, as here, the government "acts as if a document issued at headquarters is controlling in the field" or "bases enforcement actions on the policies … formulated in the document," the document is a binding rule. *Appalachian Power*, 208 F.3d at 1021.

The government's principal argument is that the Directive itself does not have legal effect but rather was "intended solely to provide advance notice that" the government shortly *would* implement a new policy. Opp. 16-17. That argument fails on multiple levels. For one, the Directive's language is not nearly so tentative. It states that the State Department "***will not*** issue visas to students" enrolled in all-online programs, "***nor will*** U.S. Customs and Border Protection ***permit*** these students to enter the United States." July 6 Directive at 1 (emphases added). And the government's actions speak louder than its words. The government is enforcing the Directive at foreign airports *today*, *see* Student #1 Decl. ¶ 8, and has also updated the State Department's Foreign Affairs Manual—which governs the issuance of visas at U.S. consular offices overseas—to bar the issuance of F-1 visas to students who will not attend any in-person classes in the United States, directly reflecting the Directive.[5] The government's suggestion that the Directive is no more than an "announcement" of a future rule is refuted by its actual conduct.

---

[5] *See* 9 Foreign Affairs Manual § 402.5-5(C)(a)(2)(a) ("If an F-1 or M-1 applicant does not plan to take any in-person classes in the United States and could complete the intended course of study online from his or her residence abroad, but prefers for other reasons to be in the United States while pursuing the intended study online, …you should refuse the application."), https://fam.state.gov/FAM/09FAM/09FAM040205.html (last updated July 9, 2020).

### C.       Harvard And MIT Have Standing To Challenge The Directive

The government halfheartedly contests Harvard's and MIT's standing to sue on their

students' behalf (Opp. 21-22), but the government's tacit acknowledgment that Harvard and MIT

have standing in their own right renders this argument irrelevant.  In any event, the argument is

without merit, as Harvard and MIT plainly do have standing to sue on their students' behalf.

1.       First, Harvard and MIT have Article III standing to challenge the Directive in

their own right, and the government does not argue otherwise.  The Directive directly regulates

both schools:  It requires them to submit revised operational plans and new forms for each of

their thousands of international students no later than early August.  *See* July 6 Directive at 2.

More broadly, as Plaintiffs have explained, the Directive (if not enjoined) will cause them

substantial—indeed, irreparable—harm.  The Directive directly impairs the ability of F-1

students to participate fully in coursework and research; if such students cannot meaningfully

participate in the life of the university, they may not return to school.  *See* Elliot Decl. ¶ 11;

Garber Supp. Decl. ¶ 17; Waitz Decl. ¶ 24; *infra* pp. 10-13.  That, in turn, hinders Plaintiffs'

ability to maintain a vibrant and diverse educational environment, impairs their appointment of

teaching assistants, and more.  *See* Elliot Decl. ¶ 11; Barnhart Decl. ¶¶ 17, 25; Waitz Decl. ¶ 22.

To avoid this consequence, Harvard and MIT would have to reverse course and revise

operational plans they spent months devising to maximize the health and safety of their

communities—all in a matter of weeks.  Because Harvard and MIT have Article III standing to

challenge the Directive, the government's suggestion that they lack third-party standing is

irrelevant.  *See Preminger v. Peake*, 552 F.3d 757, 764 (9th Cir. 2008).

2.       In any event, Harvard and MIT ***also*** have third-party standing to assert the rights

of their students.  A litigant may vindicate another's rights when (1) the litigant personally has

suffered an injury in fact; (2) the litigant has a close relationship to the third party; and (3) some

barrier prevents the third party from protecting its own interests.  *Eulitt v. Maine Dep't of Educ.*, 386 F.3d 344, 351 (1st Cir. 2004).  The government does not contest the first factor; it disputes only the second and third.  Neither argument is persuasive.

The government's assertion that Harvard and MIT have not shown "a 'close relationship' between" themselves and their students, Opp. 22, is plainly incorrect.  Courts have long held that schools have third-party standing to assert the rights of their students.  *See Runyon v. McCrary*, 427 U.S. 160, 175 & n.13 (1976); *Heartland Acad. Cmty. Church v. Waddle*, 427 F.3d 525, 533 (8th Cir. 2005); *Parks Sch. of Bus., Inc. v. Symington*, 51 F.3d 1480, 1487-1488 (9th Cir. 1995).  And for good reason:  As the Ninth Circuit has explained, "students' educational success is 'inextricably bound up' in the universities' capacity to teach them."  *Washington v. Trump*, 847 F.3d 1151, 1160 (9th Cir. 2017) (quoting *Singleton v. Wulff*, 428 U.S. 106, 114-115 (1976)).

What is more, many international students are deterred from asserting their own rights.  International students reasonably fear retaliation by the government for speaking out against immigration policies, including in future immigration proceedings, when they submit new visa applications, or when they seek admission at the border.  *See e.g.*, Student #3 Decl. ¶ 1; Student #4 Decl. ¶ 1; Student #7 Decl. ¶ 1; *cf. Does I thru XXIII v. Advanced Textile Corp.*, 214 F.3d 1058, 1069 (9th Cir. 2000) (noncitizens' "highly vulnerable [immigration] status" may deter them from publicly asserting their rights).  Moreover, international students, many of whom are dispersed around the world, cannot practically bring suit to challenge the Directive, especially in the extremely limited time necessary to do so.  For all these reasons, Harvard and MIT may represent their students' interests in this case.

## II.    THE EQUITABLE FACTORS FAVOR ENTRY OF AN INJUNCTION

The remaining factors clearly favor the entry of a preliminary injunction.

1.    The government averts its gaze from the manifest irreparable harm its Directive

will cause F-1 students ordered to leave the country or barred from reentry and U.S. students who will lose the benefit of their peers' contributions. *See* Opp. 19.  But the government's insistence that its go-home order will not affect students' lives is belied by the record.

Harvard's and MIT's students cannot simply fly home, log onto Zoom, and proceed with their coursework.  Many face enormous and often insurmountable challenges to participating in online learning from their home countries.  Since the Directive was announced, schools have fielded hundreds of calls and e-mails from concerned students. *See* Waitz Decl. ¶ 26.  Many have limited or no access to the Internet in their home countries (Student #2 Decl. ¶ 5; Student #3 Decl. ¶¶ 4, 7, 10; Student #4 Decl. ¶ 5; Student #5 Decl. ¶ 4); fear returning to civil unrest (Student #2 Decl. ¶ 5; Student #3 Decl. ¶ 7; Student #4 Decl. ¶ 5); and will struggle to participate fully in classes that may be held throughout the night because of time differences (Student #1 Decl. ¶ 10; Student #3 Decl. ¶ 8; Student #4 Decl. ¶ 5; Student #7 Decl. ¶ 6; Student #8 Decl. ¶ 4).  To take one example, Student #2 will be unable to continue her research—conducted in collaboration with NASA—from her home country, which will harm not only her own graduate studies but also her university colleagues and the NASA team that counts on her.  Student #2 Decl. ¶ 5.  The numbers of students affected puts the harm in stark relief:  At Harvard, more than 4,000 students are studying on an F-1 visa; more than 1,000 of those students are from countries subject to State Department "Do Not Travel" advisories; and more than 3,000 of them are from countries with a time difference of six or more hours from Cambridge. *See* Garber Supp. Decl. ¶ 17.  Many MIT students would also face serious difficulties in attempting to continue their studies outside the United States. *See* Waitz Decl. ¶ 24.

Harvard and MIT will also be irreparably injured if the Directive takes effect.  The Directive puts universities to an impossible choice: give up carefully crafted plans developed

over months with the input of public health experts, *see, e.g.*, Barnhart Decl. ¶¶ 4, 13, or lose the

contributions of many F-1 visa students.  The Directive would require Plaintiffs to redo extensive

planning if they want to give some of these students a meaningful chance to continue their

education next semester.  And many F-1 visa students, facing insuperable obstacles to

participating in coursework from abroad, are likely to defer, drop out, or take a leave of absence.

Waitz Decl. ¶ 26; Garber Supp. Decl. ¶ 16; Student #2 Decl. ¶ 5; Student #3 ¶ 11; Student #4

Decl. ¶ 5.  Moreover, contrary to the government's assertion, Harvard and MIT have

demonstrated that universities and their students derive enormous value from the diverse

perspectives of F-1 visa students.  *See* Elliott Decl. ¶ 11; Barnhart Decl. ¶ 17; Waitz Decl. ¶ 22;

*see also* Student Gov'ts Amicus Br. 5 (detailing experience of graduate student who has "seen

first-hand the tremendous value that international voices bring to the U.S. medical community")

(ECF No. 100).  For example, the curriculum at Harvard's Kennedy School—where nearly half

of the students are international—depends on the unique viewpoints that international students,

and in particular mid-career public officials from around the globe, bring to issues of governance

and policy.  Elliott Decl. ¶ 11.  Losing those students would be a grievous blow to the intellectual

communities at both schools.

2.      The balance of the equities and the public interest likewise favor entry of a

preliminary injunction.  While the government has an interest in enforcing statutes, the July 6

Directive is contrary to the purpose of the F-1 visa program, which is to permit international

students to "pursue a full course of study" in the United States.  8 U.S.C. § 1101(a)(15)(F).  As

ICE explained in March, the best way to "ensur[e] that nonimmigrant students are able to

continue to make normal progress" in light of the COVID-19 pandemic is to allow them to

follow their universities' operational plans and, in many cases, attend classes online.  March 9

Guidance at 1.  The July 6 Directive does not serve that goal; it defeats it.

By contrast, the government will not be harmed by maintaining the procedures ICE announced in March.  ICE made clear that the March 13 Guidance would extend through the "duration of the emergency."  March 13 Guidance at 1.  Vice President Pence and HHS Secretary Azar stated only last week that the national state of emergency was likely to be extended, and the government acknowledges in its opposition that the situation is "ongoing and volatile."  Opp. 13.[6]  Requiring the government to follow the March 13 Guidance for its intended period does the government no cognizable harm, and certainly not one outweighing the harm the July 6 Directive inflicts on Harvard, MIT, and their students.

The public interest also favors a preliminary injunction, as the outpouring of amicus support from the public and private sectors has shown.  Implementation of the Directive will diminish the incomparable contributions made by international students to American social sector organizations, businesses, and the economy.  *See, e.g.*, AFT et al. Amicus Br. 5-8 (ECF No. 108); Chamber of Commerce et al. Amicus Br. 6-9 (ECF No. 73).  The Directive also poses a threat to public health:  By operation and design, it aims to force universities to reopen before they have determined it is safe to do so, imperiling not only their students, faculty, and staff but also their surrounding communities.  It is not in Plaintiffs', their students', or the public's interest to force Plaintiffs to choose between a reckless reopening or forsaking their F-1 students.

## III.    A PROGRAM-WIDE INJUNCTION IS NECESSARY TO PROVIDE COMPLETE RELIEF

The appropriate remedy here is a program-wide injunction barring enforcement and implementation of the Directive, as Plaintiffs informed the Court and the government in their

---

[6] *See* Roubein & Cancryn, *Pence, Azar Reassure Governors Trump Won't End Virus Emergency Declaration*, Politico, July 7, 2020, https://www.politico.com/news/2020/07/07/ pence-azar-governors-coronavirus-emergency-declaration-350991.

motion for a preliminary injunction and proposed injunction.  ECF No. 30 at 2.  The government

does not deny that an injunction should be program-wide, nor could it, as only such an injunction

will provide Harvard and MIT "complete relief" from the harms the Directive imposes.  *Madsen*

*v. Women's Health Ctr., Inc.*, 512 U.S. 753, 765 (1994).

The Directive has "systemwide impact" and therefore calls for a "systemwide remedy."

*Lewis v. Casey*, 518 U.S. 343, 359 (1996).  And it is appropriate for that remedy to "extend[] …

protection to persons other than prevailing parties in the lawsuit" where, as here, "such breadth is

necessary to give prevailing parties the relief to which they are entitled."  *Professional Ass'n of*

*College Educators v. El Paso Cty. Cmty. Coll. Dist.*, 730 F.2d 258, 273-274 (5th Cir. 1984).

A narrower injunction would be unworkable.  Immigration policy is implemented by

thousands of government officials and non-government actors working in concert, including U.S.

consular officials, foreign customs officers, airport and airline employees, border patrol agents,

and ICE agents.  A university-specific injunction would require, among other things, the creation

of a mechanism by which these actors could be trained to, and could in fact, reliably investigate

and verify that a visa holder is a student at Harvard or MIT.  There is thus a serious danger that

such a limited injunction would not prevent incoming students at Harvard or MIT from being

improperly turned away or even detained.

The fact that 18 States have adopted Plaintiffs' motion confirms that programmatic relief

is warranted.  *See* Mem. 1-2, *Massachusetts v. DHS*, No. 20-cv-11311 (D. Mass. filed July 13,

2020), ECF No. 4.  The universities whose interests these States seek to vindicate and the

students they enroll are "dispersed throughout the United States."  *IRAP v. Trump*, 857 F.3d 554,

605 (4th Cir.), *rev'd on other grounds*, 138 S. Ct. 353 (2017).  A "geographically-limited

injunction" confined to Massachusetts and the other Plaintiff States would be "ineffective," as

affected students might arrive at any U.S. port of entry inside or outside those States and then "would be free to move among states," where they would risk losing the protection of such an injunction. *Texas v. United States*, 809 F.3d 134, 188 (5th Cir. 2015), *aff'd by an equally divided court*, 136 S. Ct. 2271 (2016). And an injunction specific to the universities located in these States would compound the intractable administrability problems set out above.[7]

Finally, the APA also supports issuance of a program-wide injunction. It instructs courts to "set aside" unlawful "agency action." 5 U.S.C. § 706. "[W]hen a reviewing court determines that agency regulations are unlawful, the ordinary result is that the rules are vacated—not that their application to the individual petitioners is proscribed." *National Mining Ass'n v. U.S. Army Corps of Eng'rs*, 145 F.3d 1399, 1409 (D.C. Cir. 1998). And although permanent vacatur of the Directive will await final judgment, the APA authorizes equivalent preliminary relief "to prevent irreparable injury" during the pendency of the litigation. 5 U.S.C. § 705. "Such relief is commonplace in APA cases," particularly where, as here, it "is necessary to provide the plaintiffs with complete redress." *Regents of the Univ. of California v. DHS*, 908 F.3d 476, 512 (9th Cir. 2018), *rev'd in part, vacated in part*, 140 S. Ct. 1891.

## CONCLUSION

The Court should enter a preliminary injunction in the form proposed by Plaintiffs, enjoining Defendants from implementing the Directive.

---

[7] Incomplete relief here would also lead to an explosion of litigation. To Plaintiffs' knowledge, eight other cases challenging the Directive have been filed in the single week since it was issued. *See Massachusetts*, No. 20-cv-11311 (D. Mass.); *California v. DHS*, No. 20-cv-04592 (N.D. Cal.); *Regents of the University of California v. DHS*, No. 20-cv-04621 (N.D. Cal.); *Z.W. v. DHS*, No. 20-cv-01220 (C.D. Cal.); *Johns Hopkins Univ. v. DHS*, No. 20-cv-1873 (D.D.C); *New York v. DHS*, No. 20-cv-5349 (S.D.N.Y.); *University of Oregon v. DHS*, No. 20-cv-01127 (D. Or.); *Washington v. DHS*, No. 20-cv-01070 (W.D. Wash.).

Dated:  July 14, 2020

Respectfully submitted,

/s/ Felicia H. Ellsworth
William F. Lee (BBO #291960)
Mark C. Fleming (BBO #639358)
Felicia H. Ellsworth (BBO #665358)
Michelle Liszt Sandals (BBO #690642)
WILMER CUTLER PICKERING
    HALE AND DORR LLP
60 State Street
Boston, MA 02109
Telephone: (617) 526-6000
E-mail:  felicia.ellsworth@wilmerhale.com

Seth P. Waxman (*pro hac vice*)
Paul R.Q. Wolfson (*pro hac vice*)
Ari Holtzblatt (*pro hac vice*)
Alex Hemmer (*pro hac vice*)
WILMER CUTLER PICKERING
    HALE AND DORR LLP
1875 Pennsylvania Avenue, N.W.
Washington, D.C. 20006
Telephone: (202) 663-6000